Ryan D. Watstein (*Pro Hac Vice*)
ryan@wtlaw.com
James M. Ruley (*Pro Hac Vice*)
jruley@wtlaw.com
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

Timothy J. Fransen, OSB No. 073938
tfransen@cosgravelaw.com
**COSGRAVE VERGEER KESTER LLP**
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: (503) 323-9000
Facsimile: (503) 323-9019

*Attorneys for Defendant*
*Freeway Insurance Services of America, LLC*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| CHET MICHAEL WILSON, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>FREEWAY INSURANCE SERVICES OF AMERICA, LLC,<br><br>        Defendant. | Case No. 6:25–cv–1869–MC<br><br><br>**DEFENDANT FREEWAY INSURANCE SERVICES OF AMERICA, LLC'S FED. R. CIV. P. 23 MOTION TO DENY CLASS CERTIFICATION**<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................. 1

II.   BACKGROUND AND PROCEDURAL HISTORY ......................................... 5

      A.    Freeway Contacts Only Consumers Who
            Request Information and Consent to Be Called ...................................... 5

      B.    Freeway Contacted Plaintiff's Number Because
            It Received a Consent-Backed Lead Form ............................................. 5

      C.    Plaintiff Has Filed Nearly 100 Putative Class Actions,
            Settled Them Individually, and Never Sought Certification ................... 6

      D.    Plaintiff's Public Statements Further Confirm His Inadequacy ............. 8

      E.    The Heidarpour Law Firm Originates and Profits
            from Plaintiff's Claims but Is Not Disclosed as Required .................... 10

      F.    The Heidarpour Law Firm and Family
            Have a History of Fraudulent Schemes. ............................................... 11

      G.    Substantial Evidence—Including Plaintiff's Attempt
            to Dismiss this Case on the Eve of this Filing—Suggests
            Wilson and/or the Heidarpour Law Firm are
            Manufacturing Fraudulent Litigation .................................................. 13

      H.    Determining How Plaintiff's Number Entered Freeway's
            System Will Take Enormous Time and Resources ................................ 17

III.  LEGAL STANDARD .................................................................................... 18

      A.    Rule 23 Imposes a Demanding Burden That Plaintiff Cannot Meet .... 18

      B.    The Court Should Deny Certification Now Because
            No Amount of Discovery Will Cure These Defects ............................. 19

IV.   ARGUMENT ................................................................................................. 21

      A.    Plaintiff's "Sue and Settle" Litigation Model Creates an Irreconcilable
            Conflict with Absent Class Members, As Does His Hateful Rhetoric ..... 21

      B.    Individualized Issues of Consent, Standing, Arbitration,
            and Residential Status Overwhelm Any Common Questions .............. 24

            1.    Consent Cannot Be Resolved Through Common Proof
                  Because Each Lead Requires Individualized Investigation ...... 24

Page ii – **DEFENDANT'S MOTION TO
DENY CLASS
CERTIFICATION**

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite. 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

2.  Standing Requires Individualized Proof That
Cannot Be Resolved Class-Wide ................................................................. 26

3.  Arbitrability Inquiries Are Individualized Because
Consent Terms Vary Across Dozens of Marketing Partners .................... 27

4.  Residential Status Requires a Multi-Factor, Consumer-by-Consumer
Analysis Under Binding Ninth Circuit Authority .................................... 28

V.  CONCLUSION .................................................................................................. 29

Page iii – **DEFENDANT'S MOTION
TO
DENY CLASS**

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite. 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

# TABLE OF AUTHORITIES

**CASES**

*Abante Rooter & Plumbing, Inc. v. Signify Health*,
2024 WL 1421279 (N.D. Cal. Apr. 2, 2024) ............................................................. 11

*Abboud v. Circle K Stores Inc.*,
2025 WL 2800052 (D. Ariz. Sept. 30, 2025).............................................................. 23

*Ambrosio v. Progressive Preferred Ins. Co.*,
154 F.4th 1107 (9th Cir. 2025) ................................................................................. 24

*Backhaut v. Apple Inc.*,
2015 WL 4776427 (N.D. Cal. 2015) ......................................................................... 16

*Backhaut v. Apple Inc.*,
723 F. App'x 405 (9th Cir. 2018) .............................................................................. 16

*Backus v. ConAgra Foods, Inc.*,
2016 WL 7406505 (N.D. Cal. Dec. 22, 2016)............................................................ 20

*Black Lives Matter Los Angeles v. City of Los Angeles*,
113 F.4th 1249 (9th Cir. 2024) ................................................................................. 21

*Burk v. Direct Energy, LP*,
2021 WL 4267146 (S.D. Tex. Sept. 20, 2021) .......................................................... 22

*Chennette v. Porch.com*,
50 F.4th 1217 (9th Cir. 2022) ............................................................................... 4, 25

*Connelly v. Hilton Grand Vacations Co., LLC*,
294 F.R.D. 574 (S.D. Cal. 2013) .............................................................................. 22

*Cordoba v. DIRECTV, LLC*,
942 F.3d 1259 (11th Cir. 2019) ........................................................................... 23, 24

*Davis v. Capital One, N.A.*,
2023 WL 6964051 (E.D. Va. Oct. 20, 2023)............................................................. 22

*Davis v. Capital One, N.A.*,
2025 WL 2445880 (4th Cir. Aug. 26, 2025)............................................................. 22

*Gen. Tel. Co. of the Sw. v. Falcon*,
457 U.S. 147 (1982).................................................................................................. 17

*Gene & Gene LLC v. BioPay LLC*,
541 F.3d 318 (5th Cir. 2008) .................................................................................... 22

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Ste. 2600
Atlanta, GA 30309
Telephone: (404) 783-0695

*Ginwright v. Exeter Fin. Corp.*,
    280 F. Supp. 3d 674 (D. Md. 2017) ................................................................... 22

*Gorss Motels, Inc. v. Safemark Sys., LP*,
    2018 WL 1635645 (M.D. Fla. Apr. 5, 2018) ..................................................... 22

*Hicks v. Client Servs. Inc.*,
    2008 WL 5479111 (S.D. Fla. Dec. 11, 2008) .................................................... 22

*Hirsch v. USHealth Advisors, LLC*,
    337 F.R.D. 118 (N.D. Tex. 2020) ............................................................... 23, 26

*Human v. Fisher Investments*,
    --- F.R.D. ----, 2026 WL 925576 (E.D. Mo. Mar. 31, 2026) ........................... 3, 23

*Jarrett v. Panasonic Corp. of N. Am.*,
    8 F. Supp. 3d 1074 (E.D. Ark. 2013) ................................................................ 18

*KHS Corp. v. Singer Fin. Corp.*,
    2018 WL 4030699 (E.D. Pa. Aug. 23, 2018) .................................................... 22

*Kim v. Allison*, 87 F.4th 994 (9th Cir. 2023) ............................................................ 18, 20

*Lara v. First Nat'l Ins. Co. of Am.*,
    25 F.4th 1134 (9th Cir. 2022) ........................................................................... 24

*Lawson v. Grubhub, Inc.*,
    13 F.4th 908 (9th Cir. 2021) ............................................................................. 24

*Licari Fam. Chiropractic Inc. v. eClinical Works, LLC*,
    2018 WL 1449581 (M.D. Fla. Feb. 16, 2018) .................................................. 22

*Lozano v. AT & T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) ...................................................................... 24, 25

*Lytle v. Nutramax Lab'ys, Inc.*,
    114 F.4th 1011 (9th Cir. 2024) ......................................................................... 16

*Maldini v. Marriott Int'l, Inc.*,
    140 F.4th 123 (4th Cir. 2025) ........................................................................... 24

*Mantolete v. Bolger*,
    767 F.2d 1416, 1424 (9th Cir. 1985) ................................................................ 18

*Mattson v. New Penn Fin., LLC*,
    2020 WL 6270907 (D. Or. 2020) .................................................................. 25, 26

*Mattson v. New Penn Fin'l*,

Page v – **DEFENDANT'S MOTION TO
    DENY CLASS
    CERTIFICATION**

2023 WL 8452659 (D. Or. Oct. 23, 2023)……………………………………….…28

*Mattson v. Rocket Mortg., LLC*,
2024 WL 4794639 (D. Or. Nov. 14, 2024)................................................................ 18

*Mattson v. Rocket Mortg., LLC*,
2024 WL 4794710 (D. Or. Sept. 16, 2024) ............................................................. 17

*Mattson v. United Mortg. Corp.*,
2024 WL 4794641 (D. Or. Nov. 14, 2024)................................................................ 18

*Mattson v. United Mortg. Corp.*,
2024 WL 4794711 (D. Or. Sept. 16, 2024) .............................................................. 18

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods* LLC,
31 F.4th 651 (9th Cir. 2022) ................................................................................... 23

*Payne v. Sieva Networks, Inc.*,
347 F.R.D. 224 (N.D. Cal. 2024)................................................................ 17, 25, 26

*Reid v. I.C. Sys. Inc.*,
304 F.R.D. 253 (D. Ariz. 2014) ............................................................................... 20

*Ryan v. Jersey Mike's Franchise Sys.*,
2014 WL 1292930 (S.D. Cal. 2014) ........................................................................ 17

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*,
863 F.3d 460 (6th Cir. 2017) ................................................................................... 22

*Sarmiento v. Sealy, Inc.*,
2020 WL 4458915 (N.D. Cal. May 27, 2020)........................................................... 21

*Schmitendorf v. Juicy's Vapor Lounge, Inc.*,
2025 WL 2966205 (D. Kan. Oct. 21, 2025) ............................................................. 26

*Shelton v. Target Advance LLC*,
2019 WL 1641353 (E.D. Pa. 2019) ......................................................................... 25

*Stromberg v. Qualcomm Inc.*,
14 F.4th 1059 (9th Cir. 2021) ............................................................................ 16, 21

*Tan v. Grubhub, Inc.*,
2016 WL 4721439 (N.D. Cal. July 19, 2016)........................................................... 24

*United States ex rel. Lammers v. Heidarpour*,
Case No. CV 08-3411 WHA (N.D. Cal.) .................................................................. 11

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Ste. 2600
Atlanta, GA 30309
Telephone: (404) 783-0695

*United States v. Heidarpour*,
  Case No. CR-11-109-M (W.D. Okla.) ................................................................. 11

*Van Patten v. Vertical Fitness Grp., LLC*,
  847 F.3d 1037 (9th Cir. 2017) ............................................................................. 22

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009) ............................................................................... 17

*Wilson v. Badcock Home Furniture*,
  329 F.R.D. 454 (M.D. Fla. 2018) ........................................................................ 22

*Wilson v. Skopos Fin., LLC*,
  No. 6:25-cv-376 (D. Or. Dec. 12, 2025) ............................................................ 6, 7

*Worsham v. Disc. Power, Inc.*,
  2021 WL 50922 (D. Md. 2021) ........................................................................... 25

*Wuest v. My Pillow, Inc.*,
  2019 WL 3577176 (N.D. Cal. Aug. 6, 2019) .......................................... 2, 19, 20, 21

*Yaffe v. Detroit Steel Corp.*,
  50 F.R.D. 481 (N.D. Ill. 1970) ............................................................................ 20

## STATUTES

47 U.S.C. § 227 .................................................................................................... 7, 20

## RULES

Fed. R. Civ. P. 23 ............................................................................................... passim

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Ste. 2600
Atlanta, GA 30309
Telephone: (404) 783-0695

## CERTIFICATION UNDER RULE 7-1(a)

In compliance with Local Rule 7-1(a)(1), Defense counsel certifies that they conferred with Plaintiff's counsel, Andrew Perrong, on April 8 regarding the bases for this Motion. Mr. Perrong indicated he opposed the relief requested. Defense counsel had several further calls with Plaintiff's counsel on May 16, describing the evidence the motion, then final, would present—including evidence of a fraudulent scheme being perpetrated through the Heidarpour Law Firm. Within hours, Plaintiff attempted to dismiss his own case with prejudice. Counsel claimed this was precipitated by Plaintiff's violent racist rhetoric, described below, but that was inconsistent with their refusal to dismiss any *other* Wilson case—just this one, where evidence of potential litigation fraud was about to be made public. Plaintiff also still refused to agree to the relief sought herein.

## I.     INTRODUCTION

Plaintiff has filed nearly 100 TCPA class actions in less than two years. He has described this operation as "a line of steady income," has admitted he doesn't even know what certification is, and has, with potentially one exception, never recovered anything for a class. Instead, his lawyers label his small-dollar individual cases as "class actions" and recycle class discovery to ratchet settlement pressure. In this manner, they repeatedly use the *in terrorem* effect of Rule 23 to extract "better than the statute" individual settlements from TCPA-compliant[1] businesses—pocketing millions while class members get nothing. The Court should not permit Rule 23 to be weaponized in this way. It should grant this motion and end the class portion of this case.

---

[1] Even on Wilson's own story, he's not bringing cold-call telemarketing cases. He claims that, given his number ends in 999-9999, he gets calls because someone else entered his number into a lead form without his permission, either accidentally or to avoid a call. The fact that he files "class actions" notwithstanding that his *own theory* is that an individualized mistake occurred just underscores the extortionate nature of his use of the class mechanism.

Page 1 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

That's because it is abundantly clear now, without further discovery, that this case cannot proceed as a class action. Plaintiff is wildly inadequate to represent a putative class—both because of his systematic abuse of the class mechanism and because his violent hate speech renders him unfit to represent the people he purports to protect. And even if he were adequate, individualized issues of consent, arbitration, and residential telephone status each defeat predominance. Each of these five points is independently dispositive under Rule 23.

As to the first, Plaintiff's own litigation history renders him inadequate to represent anyone. In *Wuest v. My Pillow, Inc.*, the Court determined that a plaintiff who had filed ten prior class actions, never pursued certification, and settled each individually was an inadequate class representative. 2019 WL 3577176, at *3–4 (N.D. Cal. Aug. 6, 2019). Plaintiff here has filed nearly ten times as many cases with effectively the same result. He weaponizes Rule 23 to inflate the value of his individual claims and leaves absent class members with nothing.

That's without getting into the impact of Wilson's frequent, violent hate speech. "I got holes f***ing dug already, motherf***ers." That's Plaintiff, publicly describing what he intends to do to "f***ing jews" — the "Bolshevik f***ing jews" who are "f***ing parasites that have taken over this world." In between filing class actions, he bragged of being kicked off "f*ggbook" for hate speech, multiple times, and criticized his followers for "going to your 9-to-5 jobs every day to pay these pieces of sh*t voluntarily." "Taxation of the working class isn't constitutional," he said. Presumably, there will be members of the Jewish and LGBTQ+ community in any class Wilson would seek to certify. Could someone who has "got f***ing holes dug" for such people "fairly and adequately protect the[ir] interests"? That's a rhetorical question, of course.

The adequacy question alone is dispositive. But a hopeless number of individual questions preclude certification too. Here's why: Like most of Wilson's other victims, Freeway does not

Page 2 – **DEFENDANT'S MOTION TO**
**DENY CLASS CERTIFICATION**

cold call consumers, and it did not cold call Plaintiff. Instead, someone entered Plaintiff's number on a website while requesting insurance quotes and asked to be contacted. Relying on that, Freeway contacted Plaintiff. Plaintiff then filed a class action, claiming it "wasn't him" who filled out the request—a pattern he's repeated hundreds of times.

Freeway doesn't believe that story. Significant evidence suggests this and/or Wilson's other cases are litigation fraud perpetrated by either Wilson or the Heidarpour Law Firm, the contingency referral source for each of Wilson's cases and thousands of others of questionable origin. The existing record already suggests such a scheme is occurring. That includes evidence of fraud in several cases referred by the Heidarpour Law Firm; a serial failure to disclose the Heidarpour Law Firm as having a financial interest in the litigation it originates; decisions by multiple firms to abandon (and stop filing) claims referred by the Heidarpour Law Firm after counsel shared evidence of fraud; a history of federal fraud convictions; and much, much more.

Perhaps most tellingly, when Freeway informed Plaintiff's counsel on the eve of this filing that the motion would detail this evidence about the Heidarpour Law Firm, Plaintiff immediately tried to dismiss his own case with prejudice. But he would not concede that he is an inadequate class representative or agree to dismiss his other cases. In other words, Plaintiff wanted the one defendant prepared to expose the scheme out of his hair so the operation could continue undisturbed against everyone else.

In any event, to attempt to get to the bottom of the core issue in this case—*i.e.*, identify who requested the calls at issue in this case—Freeway has retained a private investigator; served dozens of discovery requests; served a request for multiple device inspections; served a deposition notice on Plaintiff; and served a series of third-party subpoenas. Litigating that issue as to Plaintiff alone will consume substantial resources, as in *Human v. Fisher Investments*, --- F.R.D. ----, 2026

Page 3 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

WATSTEIN TEREPKA LLP
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

WL 925576 (E.D. Mo. Mar. 31, 2026). There, after a year of discovery and hundreds of thousands in expense, the court held that the serial TCPA plaintiff likely manufactured claims in the same way: by submitting lead forms using his phone number under other people's names. *Id.* at *9–10. The court struck his pleadings and entered judgment on Fisher's claim for fraud. *Id.* at *11.

For purposes of this motion, however, it does not matter who submitted the contact request form—Wilson, Heidarpour, or someone else. Every call Freeway makes is in response to a consumer's request, after a person submits a contact request form, provides a number, and consents to be called. So how would a class trial work? Would the parties ask millions of consumers whether they submitted the form or whether someone else did? If so, they'd then have to do the significant discovery they are doing now for Plaintiff, but as to each person. In *Human*, that investigation took over a year and hundreds of thousands in expenses for just one person. That isn't the "common proof" Rule 23's predominance prong requires. It's the opposite.

And that's just the individualized inquiry necessary to determine consent and whether an arbitration provision applies, both dispositive of predominance. But there's more: Plaintiff's DNC claims require proof that each class member's number is "residential." Plaintiff's own situation again proves that cannot be done with classwide proof. His number doubles as his business line—he uses it for his TCPA litigation business, his "holistic healer" business, and his military equipment sales. Whether it is "residential" under Ninth Circuit law requires a multi-factor, fact-intensive analysis—a test required for every single class member. *Chennette v. Porch.com*, 50 F.4th 1217, 1225 (9th Cir. 2022). That inquiry alone also defeats predominance.

No amount of discovery will solve these problems, so the Court should deny class certification now. Until then, Freeway faces the same pressure that has allowed this operation to succeed nearly 100 times: the cost and *in terrorem* effect of the class mechanism forces payment

Page 4 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

before fraud can be explored. Removing it would allow the parties to focus on the question that matters: who submitted Plaintiff's number and whether a fraud is being perpetrated on the Court through the systematic manufacture of TCPA claims.

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Freeway Contacts Only Consumers Who Request Information and Consent to Be Called

Freeway is an insurance company that offers a range of insurance services to consumers. Barboza Decl. ¶ 5. It only contacts by phone consumers who request information about these services in a variety of ways: through Freeway's website, through over a dozen third-party websites like insurance comparison sites, through social media, by calling or emailing Freeway, by working with a third-party broker, and so on. *Id.* ¶¶ 6–10. Freeway then communicates with those consumers through the methods they request, including email, text, and phone call. *Id.* ¶ 9.

Freeway maintains robust procedures to ensure compliance, including an internal Do Not Call list of everyone who said they no longer wanted to be contacted. *Id*. ¶ 12. Freeway also requires its marketing partners to certify the authenticity of each lead and the consent obtained, and, where available, provide the IP address and browser used. *Id*. ¶ 13.

Each of Freeway's third-party affiliates manages its own websites, with different web flows, different notices, and different terms that operators routinely update. *Id*. ¶ 16. As such, the wording of the consent disclosures, accompanying terms, and arbitration provisions varies across sources. *Id*. ¶¶ 16, 29. But regardless of vendor-specific wording, Freeway requires TCPA-compliant disclosures and affirmative assent and receives lead certifications documenting that. *Id*.

### B.    Freeway Contacted Plaintiff's Number Because It Received a Consent-Backed Lead Form

This case demonstrates this compliant process in motion: someone visited an EverQuote website and provided information to obtain an insurance quote, including Plaintiff's phone

Page 5 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

<span style="font-variant:small-caps">Watstein Terepka LLP</span>
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

number, the name Dorianne Plageman, and the email drp.work21@gmail.com. *Id.* ¶ 30. When they reached the final page, they were presented with a large button that states "Show My Quotes," along with a disclosure that submitting the number gives written consent for marketing partners—including Freeway—to contact them. *Id.* ¶ 31. The person agreed and submitted the request:



After confirming that the lead complied with the TCPA, Freeway sent three text messages to the phone number provided in the inquiry. *Id.* ¶ 35; Compl. ¶¶ 21–24. Plaintiff didn't reply "stop" to opt out of messages. Instead, he waited until he received "more than one" such message, required for a private claim under § 227(c)(5), and filed a class action, asserting Freeway violated the TCPA by texting him. Compl. ¶¶ 61–68.

**C.      Plaintiff Has Filed Nearly 100 Putative Class Actions, Settled Them Individually, and Never Sought Certification**

Plaintiff is no stranger to this setup: he's a professional litigant who purchased his 999-9999 number for $1,000. Watstein Decl., Ex. B, Dep. Tr. of Chet Michael Wilson, *Wilson v. Skopos Fin., LLC*, No. 6:25-cv-376 (D. Or. Dec. 12, 2025) ("Wilson Dep."). Plaintiff was drawn to the number's unusual format—an Oregon area code followed by 999-9999—the sort of number

Page 6 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

someone might provide if they choose not to provide their own number. *See id.* at 23:24–24:2. Predictably, "[a]lmost instantly," Plaintiff allegedly began receiving anywhere from ten to sixty unsolicited calls or text messages per day. *Id.* at 26:6–15.

While one might expect someone receiving this volume of messages to get a new number, or to respond "STOP" to unwanted messages, Plaintiff has done the exact opposite. He's turned it into his primary source of income. To this end, Plaintiff does not have a job in the conventional sense, as he's bragged about in his litany of racist social media posts, discussed below. Instead, his income derives entirely from three sources: his dozens of TCPA settlements discussed below, an online health store he promotes as a "holistic healer," and selling "decommissioned military equipment." *Id.* at 9:9–10, 9:25–10:2, 32:23–25, 82:19–23. The 999-9999 number is the only phone number he has had since at least January 1, 2024. *Id.* at 13:18–22. As such, he uses it and it alone for his businesses. He also posts the number online, including on social media, and invites people to contact him on it. Watstein Decl. ¶¶ 30–31 & Ex. K.

In late 2024, Plaintiff began filing TCPA "class actions" for these calls and texts. Watstein Decl. ¶¶ 4–5. In less than two years, Plaintiff has filed nearly 100 class action complaints in federal court. Watstein Decl., Ex. A, Table of Cases Filed by Chet Wilson. At least 43 of those cases have already been settled or otherwise resolved before any class was certified. *Id.* ¶ 6.

Plaintiff testified that, apart from "a few" dismissals without payment, his cases have resolved through individual settlement. Wilson Dep. at 7:1–11. As of December 12, 2025 (the date of his deposition in *Skopos Financial*), he recovered tens of thousands of dollars from what he has described as his "job" prosecuting these TCPA actions. Wilson Dep. at 7:19–8:5; 81:17–18. When he received his first settlement offer in December 2024, he posted on Facebook boasting that he had "36 class action lawsuits (so far)," that he "sign[s] several new claims each week," and that

"[his] phone number is gonna [sic] be another line of steady income for [him]." *Id.* at 72:20–73:1, 73:20–24; *see also* Watstein Decl., Ex. D, Wilson Dep., Ex. 10. In response to a comment from a Facebook user expressing frustration at receiving robocalls, Plaintiff stated: "I can help you and maybe my atty would be into talking [sic] more cases then what I did is I just gave her tech guy my iCloud and they stay on top of it." *Id.* at 68:8–21; *see also* Watstein Decl., Ex. C, Wilson Dep., Ex. 9. In other words, the Heidarpour Law Firm has direct access to Wilson's iCloud.

Out of nearly 100 class action complaints Plaintiff has filed, he has not sought certification in any, and only one has (allegedly, according to Plaintiff's counsel) been settled as a class. In fact, Plaintiff doesn't even know what it means to have a class certified. Wilson Dep. 59:16–20; *see also id.* at 61:10–11 ("I don't know what that means."). Nor does he understand the distinction between settling his own claims and obtaining relief for absent class members. When asked whether, in the roughly 70 putative class actions he had filed at that time, he had ever obtained relief for any class, Plaintiff said ***he did not know***. *Id.* at 60:6–61:1. For a 70-time "class representative," that is remarkable.

### D.      Plaintiff's Public Statements Further Confirm His Inadequacy

Plaintiff's public statements raise separate concerns about his ability to serve as a fiduciary for absent class members. In a public Facebook post published on May 6, 2026, captioned, "Got some holes need filled boys & I need to know who's with me on this one," Plaintiff recorded himself making violent anti-Semitic statements, including referring to Jewish people as "parasites," calling them "Bolshevik f***ing jews," and stating that he has "holes f***ing dug already" for them. Watstein Decl. ¶ 15 & Ex. E.

Page 8 – **DEFENDANT'S MOTION TO
            DENY CLASS CERTIFICATION**

Nor is this even close to a one-off event. Just by way of example, in connection with a post detailing his (white) genetic results, he bragged about not having "a fkn trace of knuckle dragger[2] in my bloodline." *Id.*, Ex. G. And he's had posts removed over a dozen times from Facebook, which he derisively calls "f*ggbook"—for "incitement to violence," "hate speech," "bullying," and "harassment." *Id.*, Ex. F. That's not the worst of it. Talking about reparations to families of former slaves, Wilson posted this on October 30, 2025, right before his counsel in this case filed another dozen+ TCPA "class actions" on his behalf:

> So all you motherf***ers can suck a d*ck. F*** you mother***ers. Whining about how we owe you some f***ing sh*t ... F*** you dude. You lazy piece of sh*t. Get the f*** up and go get a job … You were a slave before you got sold off. Your own f***ing people sold you off. How the f*** do I owe you sh*t? You mother f***ers didn't pick a Goddamn nothing off my f***ing trees. F*** you. I don't owe you sh*t. I don't owe you motherf***in sh*t. If anything, we gave you something better dude. You'd f***ing be named WongTong f***ing something in the f***ing, in a mud hut chucking spears in the brush motherf***er … There ain't no white privilege. If anything, it's black privilege … I ain't slaving my life away to feed you f***ing knuckle-dragging piece of sh*t. F*** you.

*Id.*, Ex. H. His vitriol and violent rhetoric also extends to the LGBTQ+ community. Speaking to parents of transgender people on October 23, he stated "I would love to punch some mother***ers in the head. I would love it. But I'm smart. I ain't gonna f**king do stupid shit with witnesses. But, the time will come." *Id.* Ex. I. On top of that, he publicly brags about how he runs a group to "circumvent[] taxation" to help people avoid the federal government, which "enslave[s] its own people and steal[s] their money every chance they can." *Id.* Ex. J. The irony cannot be overstated: At the same time, he was using the resources of the federal court system to extract better-than-the-statute payments out of small businesses.

---

[2] According to Google's AI overview, this is "a racist term when used to evoke simian (ape-like) imagery, particularly against Black individuals, relying on a history of racist tropes."

Page 9 – **DEFENDANT'S MOTION TO
DENY CLASS CERTIFICATION**

And while Plaintiff's rants don't negate his right to file his own lawsuit, this is a putative class action. Any class will presumably include members of the Black, Jewish, and LGBTQ+ communities, making those statements directly relevant to whether Plaintiff can fairly and adequately represent all absent class members (or anyone for that matter).

### E.   The Heidarpour Law Firm Originates and Profits from Plaintiff's Claims but Is Not Disclosed as Required

Even the nearly 100 class actions Plaintiff has filed don't tell the whole story. A large percentage of the undersigned's clients have received letters from the Heidarpour Law Firm threatening Wilson claims, totaling around a dozen that haven't yet been filed. Watstein Decl. ¶ 34. Assuming the clients of other class action practices throughout the AmLaw200 and elsewhere have received similar letters, that means that Heidarpour is sending out *hundreds if not thousands* of similar letters on Wilson's behalf that haven't yet matured into putative class actions.

To this point, Plaintiff has been represented by several attorneys in his TCPA cases (mostly Andrew Perrong). But the firm he primarily deals with is the Heidarpour Law Firm, the lead generator that has sent each Wilson demand to the undersigned. *See* Wilson Dep. at 12:17–13:14; Table of Cases Filed by Chet Wilson; Wilson Dep. 12:17 ("the law firm that I deal with, mostly [is] Heidarpour"). His relationship with the Heidarpour Law Firm is so paramount that he could not even correctly identify the name of his counsel of record when deposed, instead referring to him as "Mr. Berrong [sic]" and describing him as part of a "group of attorneys that are all under the kind of same umbrella" and "all work together." Wilson Dep. at 12:17–13:14.

That testimony, together with the undersigned's personal experience in dozens of cases filed or threatened by Wilson, shows that the Heidarpour Law Firm plays a recurring behind-the-scenes role in originating and profiting from Plaintiff's TCPA lawsuits, while other lawyers appear as counsel of record. Watstein Decl. ¶ 33. But the Heidarpour Law Firm has almost never been

Page 10 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

listed as an interested entity in his certificates of interested persons, or certificates filed in the other cases in which the Heidarpour Law Firm has an interest. *Id.* ¶ 35.

These serial omissions are particularly problematic given the extent of the financial interests at play. Although Plaintiff had allegedly recovered about $50,000 himself from the scheme as of December 2025, Wilson Dep. at 7:19–8:5, his lawyers have recovered potentially several million from cases styled as class actions but that were only used to achieve exorbitant individual settlements that far exceed what the statute permits. That is standard industry practice in TCPA cases: plaintiff's counsel often takes over 90% of the recovery, and sometimes more than 99%.[3] Watstein Decl. ¶¶ 12–13. Assuming that industry standard practice was applied here, and assuming 40 individual settlements at $50,000 each, a standard amount, that would be nearly $2,000,000 in fees, with a portion going to the undisclosed Heidarpour Law Firm every time— and, with one exception, nothing going to any class. *Id.* ¶ 13.

### F.    The Heidarpour Law Firm and Family Have a History of Fraudulent Schemes

Compounding the suspiciousness of the serial failure to disclose the Heidarpour Law Firm is the history of the firm and the Heidarpour family that runs it. Farideh Heidarpour, one of the firm's only employees, did federal prison time for healthcare fraud. Watstein Decl. ¶ 36. She

---

[3] This type of arrangement is almost certainly unethical. Oregon Rule of Professional Conduct 1.5(a) requires that "[a] lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee" as measured by, among other things, "the time and labor required," "the results obtained," and "the fee customarily charged in the locality for similar legal services." Oregon R. Prof. Conduct 1.5(a)(1), (4), (3). The time and labor here are minimal—these cases involve form complaints, form discovery, no certification motions, and no trial. The results obtained are negligible—the clients get less than the statutory damages they could recover in small claims court. And a customary contingency fee is 25–40%, not 95–99%. No factor identified in Rule 1.5(a) supports fees of this magnitude. Of course, this Court need not resolve this issue. Freeway's point in raising it here is twofold: First, it incentivizes the serial sue-and-settle operation that furthers inadequacy, since Plaintiff needs volume to make any real money. And second, it's a practice that needs to be brought to light because it has been ongoing for a decade, with no one raising it or doing anything about it. It's past time that changes.

Page 11 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

admitted to executing a scheme that defrauded federal agencies by billing for medical services that were never performed. *Id.* ¶ 37. She and her co-conspirator, also part of the Heidarpour family, agreed to pay nearly $1.7 million in an accompanying False Claims Act settlement. *See United States v. Heidarpour*, Case No. CR-11-109-M (W.D. Okla.); *United States ex rel. Lammers v. Heidarpour*, Case No. CV 08-3411 WHA (N.D. Cal.). As part of her sentence, Farideh Heidarpour was prohibited from billing for medical services—her prior profession. Watstein Decl. ¶ 38. After her release, the family pivoted to TCPA litigation.

The pivot began with Abante Rooter & Plumbing, Inc., a family-owned company (with Fred Heidarpour as the principal) primarily in the business—not of plumbing—but bringing TCPA claims.[4] *Id.* ¶ 41. Operating under the same sue-and-settle model now being deployed through Wilson, Abante Rooter acquired over 20 telephone lines and filed more than 70 putative TCPA class actions in the Northern District of California alone. *Abante Rooter & Plumbing, Inc. v. Signify Health*, 2024 WL 1421279, at *1 (N.D. Cal. Apr. 2, 2024). As one court observed, "virtually all of them . . . resulted in requests for dismissal pursuant to individual settlements, before any class certification motion has been brought." *Id.*

The parallels to Wilson's litigation are unmistakable: high-volume filings, serial individual settlements, and certification almost never pursued. Eventually, the Abante Rooter litigation scheme dried up after it drew federal court criticism, and after defendants began accusing Abante

---

[4] As one news article remarked skeptically: "while a licensed plumbing contractor, its stated place of business in Emeryville is an apartment in an apartment complex. The door to the lobby was locked during the middle of the day and no signage for the Abante business was visible. Nothing in the setting suggested that a retail customer could gain access to the office of a licensed plumbing contractor." *See* "Serial Filer of Class Action Suits Against Telemarketer Draws Attention of District Judge," *available at* https://localnewsmatters.org/2024/04/08/serial-filer-of-class-action-suits-against-tele-marketers-draws-attention-of-us-magistrate/ (last accessed May 15, 2026).

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

Rooter—with evidence—of filing bogus or manufactured cases. *See id.* at ECF Nos. 22 & 28 (dismissing with prejudice following motion for judgment on the pleadings explaining defendant didn't place calls at issue or even do business in the state).

> **G.    Substantial Evidence—Including Plaintiff's Attempt to Dismiss this Case on the Eve of this Filing—Suggests Wilson and/or the Heidarpour Law Firm are Manufacturing Fraudulent Litigation**

But it appears that the scheme didn't end after the healthcare fraud and Abante Rooter saga. It evolved. After Abante Rooter drew scrutiny, the Heidarpour Law Firm appears to have shifted to a model designed to insulate itself from accountability: recruit outside plaintiffs, originate the claims behind the scenes by filling out webforms or teaching clients how to do so, refer the cases to litigation counsel who may not know the claims' true provenance, and request not to be disclosed in violation of court disclosure requirements so the scheme flies under the radar. The evidence that this scheme is being used to generate fraudulent claims—including at least some of Wilson's—is substantial and growing. For example:

- The undersigned has defended dozens of claims that were originated by the Heidarpour Law Firm. On numerous occasions, we have determined that the lead form was filled out by the plaintiff or someone with a financial interest—sometimes via direct IP evidence that traced back to the plaintiff's location in, for example, a remote town with only a few thousand people. Faced with that evidence, outside litigation counsel dismissed those cases with prejudice. Watstein Decl. ¶ 47; *Compare, e.g.*, *Johnson v. Medigap Life*, No. 22-cv-81427, ECF No. 34 (Dec. 29, 2022) (establishing Plaintiff's claim was manufactured), *with* ECF No. 44 (Jan. 30, 2023) (moving to dismiss own case with prejudice).

- The Heidarpour Law Firm has sent the undersigned's clients dozens of pre-suit letters threatening TCPA class actions, but fishing to see if filing the claim would raise red flags. When we responded, suggesting that we suspected fraud, the Heidarpour Law Firm abandoned the claim without any response and disappeared entirely. Not a single demand letter that we responded to—and thus that the Heidarpour Law Firm knew we were on the other side of—has resulted in a filed lawsuit since we began raising these concerns. That was a marked change from before, when claims we responded to were routinely referred to litigation counsel and filed.  Watstein Decl. ¶ 48.

- More recently, the undersigned represented several defendants in cases brought by another serial plaintiff, Sara Taylor. The parallels to this case are shocking. After obtaining a new

Page 13 – **DEFENDANT'S MOTION TO
          DENY CLASS CERTIFICATION**

telephone number in 2024 and connecting with the Heidarpour Law Firm, Taylor became the named plaintiff in at least ten TCPA class action lawsuits in rapid succession—after her number was submitted to dozens of companies through hundreds of lead forms designed to appear as though they came from Missie Gosset, a felon with multiple federal fraud convictions living roughly 100 miles away with a similar phone number. VPNs and remote-access tools were used to make the leads appear to originate from Gosset's hometown and IP address, though Gosset denied submitting the leads. When we shared those findings and the other information about the Heidarpour Law Firm described above, outside counsel dismissed both cases. Watstein Decl. ¶ 49; *compare Taylor v. LaserAway*, 25-cv-02157, ECF No. 16 (Aug. 22, 2025) (explaining indicia of fraud in case), *with* ECF No. 20 (C.D. Cal. Sept. 16, 2025) (dismissing case); *see Taylor v. Milan Laser Corp.*, 25-cv-00018, *with* ECF No. 31 (M.D. Ga. June 30, 2025) (dismissing case). Despite filing 25 back-to-back class actions before we revealed the suspected fraud, she never filed another case.

- The Wilson cases are following this same pattern. Recently, the Heidarpour Law Firm sent one of the undersigned's clients a demand letter claiming Wilson received text messages in violation of the TCPA. But this instance proved that people were not uniformly inputting Wilson's 999-9999 number into forms to avoid calls. That's because the *sole reason* someone would have entered their name into this lead form was to receive timely stock alerts. Why would someone go to the trouble of putting a fake number into a lead form where the only point *was to get texts*? Proving the answer to our question, when confronted with this information, the outside counsel to which Heidarpour had farmed the claim dropped the claim. Watstein Decl. ¶ 50.

- Incredibly, Taylor and Wilson have even served as co-named plaintiffs in the same TCPA class action represented by the same counsel as in this case. *Sara Taylor & Chet Wilson v. Savvy Ins. Solutions, LLC*, No. 1:25-cv-12393. What are the chances a company would contact both these prolific TCPA litigants at the same time because someone accidentally entered both of their numbers in a lead form, as the story goes? This is exactly the type of coincidence one would expect from an operation that manufactures claims in bulk and assigns them to whichever plaintiff in their quiver is available.

- We are not the only firm that has picked up on this. In *Woodard v. Health Insurance Alliance LLC*, No. 1:23-cv-02630 (N.D. Ill.), Heidarpour originated another TCPA class action—also filed by Perrong—on behalf of serial TCPA plaintiff Antionette Woodard, who also used the "class action" label as a leverage mechanism for individual settlements. HIA, represented by different defense counsel whom the undersigned does not know, asserted fraud counterclaims, alleging that Woodard or someone acting for her submitted the opt-in form to solicit the calls she sued over. *See Woodard*, ECF No. 36 (N.D. Ill. Nov. 8, 2024). The court sustained those counterclaims, holding that Woodard was alleged to have "actively solicited calls such as the ones she complains of in this case for the purpose of manufacturing TCPA claims." *Woodard*, ECF No. 46, at 8 (N.D. Ill. Feb. 26, 2025). HIA then sought discovery from Heidarpour, describing the firm as "notorious for manufacturing TCPA claims" through a "bait-and-switch" model. *See In re Subpoena to Heidarpour Law Firm, PLLC*, No. 1:25-mc-21698-MD, ECF No. 12, at 2 (S.D. Fla. May

19, 2025). The familiar pattern followed: facing counterclaims and a Heidarpour subpoena, and despite two years of litigation, the case was dismissed with prejudice. *Woodard*, ECF Nos. 59–60 (N.D. Ill. May 15–16, 2025).

But perhaps the most damning evidence is the reaction of Plaintiff's counsel here to this very motion. More than a month ago, the undersigned conferred with Plaintiff's counsel about the relief sought in this motion—the denial of class certification on adequacy and predominance grounds. Watstein Decl. ¶ 55. Counsel rejected that, dismissively, falsely claiming this Court had already found Wilson an adequate class representative. *Id.* And as recently as yesterday morning, Plaintiff's counsel intended to add claims and another defendant to this action. *Id.*

But when the undersigned approached Plaintiff's counsel after the conferral about those new claims about the depth of detail this motion would present—including specifically the Heidarpour Law Firm's role and the undersigned's intent to subpoena Andrew Heidarpour—and less than 24 hours after the undersigned served discovery aimed at rooting out the fraud, Plaintiff's counsel immediately reversed course and attempted to dismiss Plaintiff's case with prejudice. *Id.* ¶¶ 56–57. They tried to play their sudden about-face off as related to Plaintiff's hate speech—which has been ongoing for years. *Id.* ¶ 58. Given that purported reason, we responded with something along the lines of "Great, since that's your concern, you will dismiss all of Mr. Wilson's cases then, right?" *Id.*

Of course, they would not—only this case. *Id.* ¶ 58. The message could not be clearer: Plaintiff wanted the one firm that has investigated the scheme and was prepared to expose it out of the way, so that the operation could continue undisturbed against everyone else. *Id.* ¶ 58. That is not how a legitimate actor behaves. A plaintiff with meritorious claims does not offer to walk away—*with prejudice*—the moment a defendant threatens to look behind the curtain. And a

Page 15 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

plaintiff acting in the interest of absent class members does not try to silence the only defendant willing to bring a potential fraud to the court's attention.

To be clear, Freeway does not ask the Court to adjudicate whether the Heidarpour Law Firm or Wilson are manufacturing claims at this stage. That is the subject of ongoing discovery and may ultimately lead to separate proceedings. Freeway presents this evidence now because it is directly relevant to predominance, discussed below: it shows how incredibly complex it is to determine the truth of a single "I didn't provide my number" story. Of course, Plaintiff's own reaction to this evidence—attempting to dismiss this case with prejudice within hours of learning the potential fraud would be disclosed, while refusing to dismiss any other case—speaks for itself.

But even setting aside the evidence of outright fraud, the Heidarpour Law Firm's conduct reflects, at a minimum, a pattern of referring claims so lacking in merit that litigation counsel is forced to repeatedly abandon them. That is, at an absolute minimum, a violation of numerous ethical obligations and federal rules that govern every attorney who originates a legal claim and continues to "represent" the client behind the scenes in litigation.[5]

And the cost of this abuse is *staggering*. Our clients alone have spent around (and likely significantly more than) a million dollars defending clients against Heidarpour claims that were ultimately abandoned with prejudice. If the experience of one small firm accounts for seven figures

---

[5] *See* Fed. R. Civ. P. 11(b)(2)–(3) (requiring that claims be "warranted by existing law" and that "factual contentions have evidentiary support," and authorizing sanctions on the court's initiative under Rule 11(c)(3)); 28 U.S.C. § 1927 (imposing personal liability on any attorney who "multiplies the proceedings in any case unreasonably and vexatiously"); Oregon R. Prof. Conduct 3.1 (prohibiting a lawyer from "bring[ing] or defend[ing] a proceeding" unless "there is a basis in law and fact for doing so that is not frivolous"); Oregon R. Prof. Conduct 8.4(d) (defining as professional misconduct any "conduct that is prejudicial to the administration of justice"); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–46 (1991) (holding that federal courts possess "inherent power" to sanction "bad-faith conduct" that abuses the judicial process, including conduct by non-parties whose actions affect the integrity of the proceedings).

Page 16 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

in wasted defense costs, simple math shows the aggregate burden across the AmLaw200—every one of which defends these types of cases—could be in the hundreds of millions. And that figure does not account for the cost to taxpayers of the judicial resources consumed by hundreds of bogus cases that are ultimately dismissed, each one in the meantime occupying space on federal dockets that are already strained beyond capacity.

H.    **Determining How Plaintiff's Number Entered Freeway's System Will Take Enormous Time and Resources**

With this background, the central conundrum of this case is that despite Freeway's records showing consent, Plaintiff claims he didn't agree to receive text messages from Freeway. Complaint ¶¶ 28–29. But if Plaintiff didn't submit the form, the question is who did, and why. Freeway suspects it was either Wilson or someone at the Heidarpour Law Firm. Or maybe Wilson's claim is legitimate, and only later Wilson claims were manufactured. What matters for purposes of this motion is that answering the question for just Plaintiff is going to require extraordinary effort—an effort that would need to be repeated for any person who claimed they didn't fill out the webform that led to them being contacted.

To this end, to determine who submitted the 999-9999 number, Freeway has served (or as to some items, will shortly serve) targeted written discovery seeking information about Plaintiff's devices, phone records, IP addresses, iCloud access, communications regarding the Freeway texts, communications with the Heidarpour Law Firm, Plaintiff's contact-request submission history, and information about his related TCPA litigation history. Watstein Decl. ¶ 52. Freeway also has requested, or will soon request, forensic inspection of every electronic device Plaintiff used during the relevant period, noticed Plaintiff's deposition, and served third-party discovery on Apple, Inc. and Plaintiff's phone carrier. *Id.*

WATSTEIN TEREPKA LLP
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

Freeway has also attempted to serve discovery on Dorianne Plageman, the individual whose name appeared on the contact request, but she could not be located through conventional means. *Id.* ¶ 53. So, Freeway retained a former FBI agent to find her. Even drawing on two decades of FBI experience, the investigator couldn't locate her remotely. *Id.* He thus travelled to both Orland and Oroville, California, spoke with multiple people associated with nearby addresses, including the manager of a mobile-home park where Ms. Plageman reportedly lived. *Id.* He still could not locate anyone who had heard of her. *Id.* Additional third-party subpoenas to the Heidarpour Law Firm (for records relating to how it originated and referred this claim and others) are forthcoming. Watstein Decl. ¶ 54.

That is the scope of discovery required to even begin investigating one disputed lead form from one third party on one date. And that discovery will require follow-up, just like it did in the *Human* case. For every other putative class member who claims that contact requests bearing their numbers were allegedly submitted by someone else, the same type of burdensome, individualized investigation would be required.

But no further discovery is needed to confirm that this case cannot be certified as a class action. Plaintiff is inadequate, and individualized questions overwhelm any common issues. The Court should deny certification now because no amount of discovery can change the structural defects in Plaintiff's case.

## III.     LEGAL STANDARD

### A.     Rule 23 Imposes a Demanding Burden That Plaintiff Cannot Meet

Rule 23 imposes a demanding, two-part burden that Plaintiff cannot carry. First, Plaintiff must satisfy the requirements of Rule 23(a) and prove: "(1) the class is so numerous that joinder of all class members is impracticable; (2) there are questions of law or fact common to the class;

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

(3) [his] claims or defenses . . . are typical of the claims or defenses of the class; and (4) [he and his counsel] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Second, Plaintiff must prove under Rule 23(b)(3) that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). To satisfy this predominance requirement, Plaintiff must show that the defendant's liability can be established with "common evidence" that will apply to each putative class member. *See Backhaut v. Apple Inc.*, 2015 WL 4776427, at *11 (N.D. Cal. Aug. 13, 2015), *aff'd*, 723 F. App'x 405 (9th Cir. 2018) ("individualized inquiries make class treatment inappropriate").

A plaintiff "must actually *prove*—not simply plead—that [his] proposed class satisfies each requirement of Rule 23," *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (quotation omitted), and he must do so "by a preponderance of actual evidence." *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024); *see also Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1067 (9th Cir. 2021) (reversing class certification because individualized questions "swamp predominance"). Plaintiff could never satisfy that burden in this case, so certification should be denied.

## B.    The Court Should Deny Certification Now Because No Amount of Discovery Will Cure These Defects

Rule 23(c)(1)(A) mandates that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). Rule 23 doesn't require completing discovery first—and expressly contemplates the opposite. The Supreme Court has stated "[s]ometimes the issues are plain enough *from the pleadings* to determine whether the interests of the absent parties are fairly

Page 19 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

encompassed within the named plaintiff's claim." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (emphasis added).

Rule 23 manifests this principle too, specifying—without time restriction—that a court may "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." Fed. R. Civ. P. 23(d)(1)(D). That's why the Ninth Circuit has confirmed that defendants in class actions may affirmatively move to deny class certification. *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939 (9th Cir. 2009) (explaining that defendants may file "a 'preemptive' motion to deny certification"); *Ryan v. Jersey Mike's Franchise Sys.*, 2014 WL 1292930 (S.D. Cal. Mar. 28, 2014) (an affirmative motion to deny class certification "may be appropriately granted before discovery has been completed.").

District courts in this Circuit have followed suit and denied certification *before class discovery even opened* in TCPA cases because no amount of discovery would have made the putative class certifiable. *See Payne v. Sieva Networks, Inc.*, 347 F.R.D. 224, 228 (N.D. Cal. 2024) (denying certification before discovery where the issue of whether a number is residential or business could not be resolved by common proof, and plaintiff failed to show "that discovery is likely to produce substantiation of the class allegations as to this question."); *see also Mattson v. Rocket Mortg., LLC*, 2024 WL 4794710, at *2 (D. Or. Sept. 16, 2024), *R&R adopted*, 2024 WL 4794639 (D. Or. Nov. 14, 2024) (same); *Mattson v. United Mortg. Corp.*, 2024 WL 4794711, at *1 (D. Or. Sept. 16, 2024), *R&R adopted*, 2024 WL 4794641 (D. Or. Nov. 14, 2024) (same).

Nor may a plaintiff rely on generic arguments that more discovery is needed in response to a motion to deny certification. He instead "bears the burden of advancing a prima facie showing that the class action requirements of Fed. R. Civ. P. 23 are satisfied or that discovery is likely to produce substantiation of the class allegations." *Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th

Cir. 1985); *see also Jarrett v. Panasonic Corp. of N. Am.*, 8 F. Supp. 3d 1074, 1090 (E.D. Ark. 2013) (citing *Mantolete*, 767 F.2d at 1424, among others) (noting that a plaintiff must "identify what discovery [he] could obtain that would eliminate the individual issues of fact and law raised by [his] claims"). Where a plaintiff fails to make such a showing, a court's "refusal to allow class discovery is not an abuse of discretion." *Mantolete*, 767 F.2d at 1424.

## IV.    ARGUMENT

### A.    Plaintiff's "Sue and Settle" Litigation Model Creates an Irreconcilable Conflict with Absent Class Members, As Does His Hateful Rhetoric

Plaintiff cannot adequately represent a putative class because his litigation model creates an irreconcilable conflict between his financial interests and those of absent class members. Rather than using Rule 23 to obtain relief for the class, Plaintiff uses the class mechanism to extract individual settlements that far exceed the maximum statutory amount.

A class representative stands in the shoes of absent class members and acts on their behalf. Thus, the minimum requirement is confidence that the representative and his counsel will protect the class's interests rather than put their own first. *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (adequacy inquiry asks whether "the named plaintiffs and their counsel have any conflicts of interest with other class members" and whether they will "prosecute the action vigorously on behalf of the class"). A plaintiff is inadequate where his litigation history shows that he and his counsel use the threat of class litigation to obtain an undeserved premium on the named plaintiff's claim rather than any benefit for the class. That is exactly what the court held in *Wuest*.

The plaintiff there had previously filed ten putative class actions—*eight times less than* Wilson—and settled each one before reaching the class certification stage. He then filed a class action for alleged violations of the California Invasion of Privacy Act (CIPA), accusing the defendant of recording calls without consent. *Id.* at *1. The defendant argued that the plaintiff was

Page 21 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

neither typical nor an adequate representative based on his prior litigation history and his multiple calls to the defendant. *Id.* at *3.

The court found the plaintiff inadequate because his litigation history "show[ed] a pattern of using the threat of class actions to extract an undeserved premium on an individual claim." *Id.* The court also took issue with the large amount of attorneys' fees the plaintiff's attorneys received through the settlement agreements, despite the statute in question "mak[ing] no provision for any attorney's fees," and despite the fact that "no significant benefit was ever conferred on the general public [or] a large class of persons." *Id.* at *4. That's troubling because "[t]he premium was something rightfully due to the "class," but no absent putative class member ever got anything. Wuest and his counsel got it all." *Id.*

If ten prior class action complaints in *Wuest* evidenced abuse of the class action mechanism, Plaintiff's nearly 100 filings in less than two years—nearly ten times as many— present a far more compelling case of inadequacy. Every Wilson case that has been resolved to date except one did so on a non-class basis. Plaintiff has publicly described this operation as "a line of steady income"—not for absent class members, but for himself. And he doesn't even know "what class certification means." Wilson Dep. at 61:10–11. This is not a plaintiff who lacks sophistication. It is someone who weaponizes Rule 23 to inflate the value of his individual claims, pockets his share, and leaves absent class members with nothing. *See Backus v. ConAgra Foods, Inc.*, 2016 WL 7406505, at *5–6 (N.D. Cal. Dec. 22, 2016) (plaintiff and counsel inadequate because "a jury might infer that Backus is not truly an aggrieved customer but a hired plaintiff executing his attorney's raids on the deep pockets of food manufacturers"); *Yaffe v. Detroit Steel Corp.*, 50 F.R.D. 481, 483 (N.D. Ill. 1970) (plaintiff shouldn't "be permitted to enhance his own bargaining power by merely alleging that he is acting for a class of litigants").

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

The economics confirm the conflict. The TCPA, like CIPA, does not provide for attorneys' fees. *See* 47 U.S.C. § 227; *Reid v. I.C. Sys. Inc.*, 304 F.R.D. 253, 256 (D. Ariz. 2014). So Wilson and his lawyers devised the same workaround pursued in *Wuest*: style small individual claims as class actions, serve burdensome form discovery recycled in each case, threaten outsized exposure, and "extract a premium deal far in excess of the value of [an] individual case." *Wuest*, 2019 WL 3577176, at *4. That is what has happened here—nearly 100 times—with nothing for others but enormous multiples of the available statutory damages for the lawyers and tens of thousands also going to Wilson.

But Plaintiff's inadequacy is not limited to his sue-and-settle business model. His own public rhetoric separately disqualifies him from serving as a fiduciary for absent class members. Plaintiff has publicly referred to Jewish people as "parasites," called them "Bolshevik fu\*\*ing jews," and stated that he has "holes fu\*\*ing dug already" for them. Post by Chet Tank Wilson, https://www.facebook.com/story.php?story_fbid=27325585293726458&id=100001050671199 (last visited May 12, 2026). He's expressed the same hatred for Black people and members of the LGBTQ+ community, as explained above. Rule 23(a)(4) requires confidence that a class representative will fairly protect all absent class members, *see Kim*, 87 F.4th at 1000—not just those he happens not to despise. Any class Plaintiff seeks to represent will likely include class members of all the minority community members that he rants against. A person who publicly expresses violent hatred toward members of the class cannot be trusted to stand in their shoes, protect them, or make litigation decisions on their behalf. That alone defeats adequacy.

The bottom line is this: "Someone who has abused the Rule 23 process in this way for his own benefit should not be put in charge of protecting a class. [Plaintiff] is liable to abuse the class action device again and to place his own interest above those of the class." *Wuest*, 2019 WL

3577176, at *4. This Court should do what the court did in *Wuest* on a far less egregious record and deny certification on adequacy grounds. Any other outcome would reward an egregious, ongoing abuse of Rule 23 and the federal court system.

### B. Individualized Issues of Consent, Standing, Arbitration, and Residential Status Overwhelm Any Common Questions

The Court should also deny class certification now because Plaintiff cannot meet his burden to prove that common questions predominate over individualized ones on the claims *and* defenses "by a preponderance of actual evidence." *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024); *see also Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1067 (9th Cir. 2021) (reversing certification because individualized questions "swamp predominance").

In evaluating whether a plaintiff has met his burden on these issues, the court must identify "the substantive issues related to the plaintiff's claims (both the causes of action and affirmative defenses), and then consider[] the proof necessary to establish each element of the claim or defense, and how these issues would be tried." *Sarmiento v. Sealy, Inc.*, 2020 WL 4458915, at *5 (N.D. Cal. May 27, 2020) (denying class certification) (cits. omitted). The predominance requirement is "difficult, and it regularly presents the greatest obstacle to class certification." *Black Lives Matter Los Angeles*, 113 F.4th at 1258. Predominance cannot be met where, as here, the class members' claims "hinge on a wide array of facts and circumstances." *Id.* at 1260.

Plaintiff cannot satisfy that burden. Individualized issues of consent, standing, arbitration, and residential status would each independently predominate over common issues at trial.

#### 1. Consent Cannot Be Resolved Through Common Proof Because Each Lead Requires Individualized Investigation

Consent is a complete defense to Plaintiff's TCPA claim and it is the primary reason certification fails in TCPA cases. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044

Page 24 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

(9th Cir. 2017).[6] This is not a TCPA case where a defendant "sprayed robocalls across a nonconsenting public," *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 459–60 (M.D. Fla. 2018), or where liability turns on one uniform form or defect. Freeway's records reflect consent for each lead, obtained in a variety of ways across many vendors, webpages, and years. Barboza Decl. ¶¶ 7–13, 16. Plaintiff's theory requires proving, lead by lead, that those records are wrong.

That means determining for each putative class member how their number entered Freeway's system, who submitted it, what disclosures appeared, whether the submitter assented, and whether consent was later revoked. The central liability question—whether Freeway had consent to contact each consumer—cannot be resolved through common proof. It requires individualized adjudication of each lead and each consumer's circumstances. *See Abboud v. Circle K Stores Inc.*, 2025 WL 2800052, at *9 (D. Ariz. Sept. 30, 2025); *Hirsch v. USHealth Advisors,*

---

[6] Courts routinely deny certification where consent cannot be resolved with common proof. See, e.g., *Davis v. Capital One, N.A.*, 2023 WL 6964051, at *14–15 (E.D. Va. Oct. 20, 2023), aff'd, 2025 WL 2445880 (4th Cir. Aug. 26, 2025) (denying certification where consent was likely to be involved for a significant number of putative class members and plaintiff failed to show a method for efficiently resolving consent); *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008) (reversing certification where consent would require individualized inquiries and "myriad mini-trials"); *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468–70 (6th Cir. 2017) (affirming denial of TCPA certification based in part on individualized consent issues); *Ginwright v. Exeter Fin. Corp.*, 280 F. Supp. 3d 674, 687–89 (D. Md. 2017) (individualized issues of consent and revocation predominated); *Connelly v. Hilton Grand Vacations Co., LLC*, 294 F.R.D. 574, 577–78 (S.D. Cal. 2013) (denying certification where contact information was provided in a variety of ways and consent had to be evaluated individually); *Burk v. Direct Energy, LP*, 2021 WL 4267146, at *4 (S.D. Tex. Sept. 20, 2021) (denying certification where contact information and opt-ins came from multiple companies and landing pages); *Gorss Motels, Inc. v. Safemark Sys., LP*, 2018 WL 1635645, at *6 (M.D. Fla. Apr. 5, 2018) (individualized consent issues defeated certification); *Hicks v. Client Servs. Inc.*, 2008 WL 5479111, at *7–8 (S.D. Fla. Dec. 11, 2008) (plaintiff failed to show how lack of consent could be tried without mini-trials); *Licari Fam. Chiropractic Inc. v. eClinical Works, LLC*, 2018 WL 1449581, at *4 (M.D. Fla. Feb. 16, 2018) (denying certification where plaintiffs failed to present evidence demonstrating putative class members' collective lack of consent); *KHS Corp. v. Singer Fin. Corp.*, 2018 WL 4030699, at *4 (E.D. Pa. Aug. 23, 2018) ("Individualized issues of consent often preclude class certification of TCPA fax cases.").

Page 25 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

WATSTEIN TEREPKA LLP
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

*LLC*, 337 F.R.D. 118, 130–31 (N.D. Tex. 2020) (no predominance where defendant "used various methods to obtain consent" through "multiple lead-generation vendors").

Plaintiff's own claim proves the point. Investigating one disputed consent record has already required written discovery, a device-inspection request, third-party subpoenas, and a private investigator. Section II.H. In *Human*, the same inquiry consumed over a year, required forensic phone analysis, multiple depositions, motions to compel, and an evidentiary hearing, and ended with the plaintiff's pleadings struck as a sanction. 2026 WL 925576, at *2–8. Replicating that process for each putative class member is incompatible with class treatment and requires denial of certification now.

### 2.  Standing Requires Individualized Proof That Cannot Be Resolved Class-Wide

Separate from consent, Plaintiff must show that absent class members suffered a concrete injury traceable to Freeway's alleged TCPA violation, and that this issue can be resolved with common proof. Under Rule 23(b)(3), Plaintiff must show that class members' standing can be resolved classwide. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods* LLC, 31 F.4th 651, 668 n.12 (9th Cir. 2022); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274–75 (11th Cir. 2019) (reversing certification where court failed to address "significant individualized standing question").

People who requested contact and then received it have not suffered any harm. *Cordoba*, 942 F.3d at 1271–72. And while Plaintiff may try to identify outliers who claim they never consented, Freeway has the due process right to investigate each putative class member's contact request. "Allowing [Freeway] to mount this defense" as to each putative class member "would render class certification inappropriate," but "denying [Freeway] this defense altogether would . . . violate due process." *Ambrosio v. Progressive Preferred Ins. Co.*, 154 F.4th 1107, 1112 (9th Cir.

Page 26 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

WATSTEIN TEREPKA LLP
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

2025) (affirming certification denial); *see also Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022) (affirming denial because "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person"). The necessity of individualized mini-trials on standing independently precludes certification.

> **3.  Arbitrability Inquiries Are Individualized Because Consent Terms Vary Across Dozens of Marketing Partners**

Whether each putative class member must arbitrate their claims will also require an individualized analysis. *See Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007) (affirming denial of certification where defendant's intent to seek arbitration would require individualized review); *see also Maldini v. Marriott Int'l, Inc.*, 140 F.4th 123, 126–27, 131–32 (4th Cir. 2025) (vacating certification order entered without addressing the effect of class-action waivers binding putative class members); *Tan v. Grubhub, Inc.*, 2016 WL 4721439, at *8–10 (N.D. Cal. July 19, 2016), *aff'd sub nom. Lawson v. Grubhub, Inc.*, 13 F.4th 908 (9th Cir. 2021).

Consumers who submitted contact requests through Freeway or its marketing partners agreed to the terms then in force on that particular site. Barboza Decl. ¶ 27. Most, if not all, contain arbitration provisions. *Id.* ¶ 28. Because Freeway does not control the precise language across its various partners, *id.* ¶ 29, determining arbitrability requires an individualized inquiry into whether a given consumer agreed to arbitrate claims against Freeway, and whether it delegated threshold arbitrability questions—all turning on source-specific terms and assent, not common proof. This alone defeats predominance. *See Lozano*, 504 F.3d at 728.

That Plaintiff says he did not submit the form and therefore did not assent to any terms only underscores the problem. He cannot represent a class of consumers whose claims may be subject to arbitration provisions and class waivers he did not encounter, did not assent to, and cannot test. *See Tan*, 2016 WL 4721439, at *8–10.

Page 27 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

### 4. Residential Status Requires a Multi-Factor, Consumer-by-Consumer Analysis Under Binding Ninth Circuit Authority

Plaintiff also cannot show that residential use of a number can be determined on a class-wide basis. The DNC provisions only regulate calls to residential numbers and are inapplicable to "business phone numbers." *Mattson v. New Penn Fin., LLC*, 2020 WL 6270907, at *1 (D. Or. 2020). Several courts hold that "a phone used for both personal and business purposes is not a residential phone for purposes of § 227(c)," meaning no DNC liability attaches to any number used for business purposes. *See Worsham v. Disc. Power, Inc.*, 2021 WL 50922, at *4 (D. Md. 2021); *Shelton v. Target Advance LLC*, 2019 WL 1641353, at *6 (E.D. Pa. 2019) ("The Phone Number is also for business use, and business numbers are not permitted to be registered on the National Do Not Call Registry" even though they often are).

The Ninth Circuit instead applies a multi-factor test requiring evaluation of numerous non-exhaustive factors, such as how plaintiffs actually used their phone and how they held their number out. *Chennette*, 50 F.4th at 1225. The burden is on Plaintiff to establish residential status classwide—"in one stroke." *Payne*, 347 F.R.D. at 228.

Plaintiff uses his number as a "holistic healer," for an "online health food [] store," for trading military equipment, and for filing TCPA lawsuits as "a job" consuming 5 to 20 hours per week. Wilson Dep. at 28:21–24, 29:8–12, 30:12–15, 32:10–25, 73:21–24, 81:3–18. Plaintiff's number itself is almost certainly not residential—but that's also beside the point, because Plaintiff must show that residential status for each class member can be resolved classwide. "Analyzing whether plaintiff's mixed-use phone was a residential or business line is an individualized determination based on the totality of the circumstances," *Mattson v. New Penn Fin'l*, 2023 WL 8452659, at *3 (D. Or. Oct. 23, 2023)—an analysis that must be repeated for each class member. Predominance cannot be satisfied. *Payne*, 347 F.R.D. at 228; *Schmitendorf v. Juicy's Vapor*

*Lounge, Inc.*, 2025 WL 2966205, at *8 (D. Kan. Oct. 21, 2025) (no predominance where "the circumstances surrounding [plaintiff's] cell phone use demonstrate the fact-specific nature of the inquiry"); *Hirsch*, 337 F.R.D. at 131 (no commonality where each number's residential status would have to "be tested individually").

## V.    CONCLUSION

Plaintiff cannot satisfy Rule 23. He is an inadequate class representative—in any case. And multiple independently dispositive individualized issues—consent, standing, arbitration, and residential status—all overwhelm any common questions and preclude a finding of predominance. The evidence already in the record demonstrates that these defects are structural and cannot be cured through additional discovery. The Court should reject Plaintiff's attempted weaponization of Rule 23, deny class certification now, and allow the parties to focus on the individualized question that actually matters: who submitted Plaintiff's number and why.

Dated: May 16, 2026

*/s/ Ryan D. Watstein*
Ryan D. Watstein (*Pro Hac Vice*)
ryan@wtlaw.com
James M. Ruley (*Pro Hac Vice*)
jruley@wtlaw.com
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

Timothy J. Fransen, OSB No. 073938
tfransen@cosgravelaw.com
**COSGRAVE VERGEER KESTER LLP**
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: (503) 323-9000
Facsimile: (503) 323-9019

*Attorneys for Defendant Freeway Insurance Services of America, LLC*

Page 29 – **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a true and correct copy of the foregoing **DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION** on the date indicated below by email on all counsel of record.

DATED: May 16, 2026

<div align="center" style="margin-left:45%">

*/s/ Ryan D. Watstein*
Ryan D. Watstein

</div>

Page 1 – **CERTIFICATE OF SERVICE**

<div align="right">

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 783-0695

</div>