## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| CHET MICHAEL WILSON, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>FREEWAY INSURANCE SERVICES OF AMERICA, LLC,<br><br>        Defendant. | Case No. 6:25–cv–1869–MC<br><br>**DECLARATION OF RYAN D. WATSTEIN IN SUPPORT OF DEFENDANT FREEWAY INSURANCE SERVICES OF AMERICA, LLC'S MOTION TO DENY CLASS CERTIFICATION** |

### DECLARATION OF RYAN D. WATSTEIN IN SUPPORT OF DEFENDANT FREEWAY INSURANCE SERVICES OF AMERICA, LLC'S MOTION TO DENY CLASS CERTIFICATION

1.      My name is Ryan D. Watstein. I am an attorney and co-founder of Watstein Terepka, LLP, an approximately 25-lawyer firm based at 75 14th Street NE, Suite 2600, Atlanta, Georgia 30309. I am over the age of 18, of sound mind, and competent to make this Declaration. I make this Declaration based on my personal knowledge.

2.      I am counsel of record for Defendant Freeway Insurance Services of America, LLC ("Freeway") in this action. Based on my active participation and supervision of all material aspects of the defense of this action and others, I have personal knowledge of the matters set forth herein.

3.      As noted below, I have defended around 700 class actions in 30+ jurisdictions across the country as lead counsel. My firm and I also prosecute select class actions for plaintiffs.

#### Plaintiff's Litigation History and Deposition Testimony

4.      Attached hereto as Exhibit A is a true and correct copy of the Table of Cases Filed by Chet Wilson, which our team prepared based on our review of publicly available federal court dockets.

5.    As reflected in that table, Plaintiff has filed nearly 100 putative TCPA class action complaints in federal courts across the country in less than two years.

6.    At least 43 of those cases have already been settled or otherwise resolved before any class was certified.

7.    I am not aware of a single Wilson case in which he has sought or obtained contested class certification. And my understanding, based on a conversation with Plaintiff's counsel, is that he has only obtained one class settlement.

8.    Attached hereto as Exhibit B is a true and correct copy of the deposition transcript of Chet Michael Wilson, taken on December 12, 2025, in *Wilson v. Skopos Financial, LLC*, No. 6:25-cv-376 (D. Or.).

9.    Attached hereto as Exhibit C is a true and correct copy of Wilson Dep. Exhibit 9.

10.    Attached hereto as Exhibit D is a true and correct copy of Wilson Dep. Exhibit 10.

### Plaintiff's Settlements

11.    Over the course of my practice, I have defended somewhere around 700 class actions nationwide, probably around 600 of which were TCPA class actions. I have also handled well over a thousand non-class TCPA claims.

12.    Based on that extensive experience, I know that, in the case of an individual settlement, plaintiff's counsel takes the vast majority of the recovery—often more than 90% and in some cases more than 99%. By definition, nothing goes to any class member in any such settlement.

13.    Individual settlements in cases styled as TCPA "class actions" average $50,000 or more each, depending on who the plaintiff's counsel is and a variety of other factors. It is not uncommon to see individual TCPA settlements over $100,000 and some cases settle individually

for many multiples of that. In almost all instances, individual settlements are vastly in excess of the maximum statutory damages. This is what is known as the "extortion premium."

**Plaintiff's Public Statements**

14.     On or about May 6, 2026, Plaintiff published a public video on Facebook captioned "Got some holes need filled boys & I need to know who's with me on this one."

15.     In that video, Plaintiff made violent antisemitic statements, including referring to Jewish people as "parasites," calling them "Bolshevik fu\*\*ing jews," and stating that he has "holes fu\*\*ing dug already" for them.

16.     The video was previously available at the following address: https://www.facebook.com/story.php?story_fbid=27325585293726458&id=100001050671199. After I told Plaintiff's counsel that we would be including it in this motion, it was removed from the internet, as noted below.

17.     Attached hereto as Exhibit E is a true and correct copy of a screenshot of that post.

18.     Plaintiff has had posts removed from Facebook on more than a dozen occasions for "incitement to violence," "hate speech," "bullying," and "harassment." That is according to his own Instagram post, which actually shows the removed posts and that he has been suspended from Facebook for that reason.

19.     He refers to Facebook derisively as "f\*ggbook"—a homophobic slur—and has bragged publicly about being removed from the platform.

20.     Attached hereto as Exhibit F is a true and correct copy of relevant Instagram posts reflecting these statements.

21.     In a separate public Instagram post discussing his genetic ancestry results, Plaintiff bragged about not having "a fkn trace of knuckle dragger" in his genetic results.

22.     Attached hereto as Exhibit G is a true and correct copy of that post.

23.     According to a Google search I conducted, that term is a racist epithet used to evoke simian imagery against Black individuals.

24.     That's not the worst of it. Talking about reparations to families of former slaves, Wilson said this on October 30, 2025:

> So all you motherf***ers can suck a d*ck. F*** you mother***ers. Whining about how we owe you some f***ing sh*t ... F*** you dude. You lazy piece of sh*t. Get the f*** up and go get a job … You were a slave before you got sold off. Your own f***ing people sold you off. How the f*** do I owe you sh*t? You mother f***ers didn't pick a Goddamn nothing off my f***ing trees. F*** you. I don't owe you sh*t. I don't owe you motherf***in sh*t. If anything, we gave you something better dude. You'd f***ing be named W*ngT*ng f***ing something in the f***ing, in a mud hut chucking spears in the brush motherf***er … There ain't no white privilege. If anything, it's black privilege … I ain't slaving my life away to feed you f***ing knuckle-dragging piece of sh*t. F*** you.

25.     Attached hereto as Exhibit H is a true and correct copy of that post. The video is available at https://www.instagram.com/p/DQcJsJBCY3k/?hl=en (last accessed on May 15, 2026).

26.     His vitriol and violent rhetoric also extends to the LGBTQ+ community. Speaking to parents of transgender people on October 23, he stated "I would love to punch some motherfuckers in the head. I would love it. But I'm smart. I ain't gonna fucking do stupid shit with witnesses. But, the time will come."

27.     Attached hereto as Exhibit I is a true and correct copy of that post. The video is available at https://www.instagram.com/p/DQKQERdDyvI/?hl=en (last accessed on May 15, 2026).

28.     Plaintiff also publicly operates and promotes a group devoted to helping people "circumvent[] taxation" and avoid what he characterizes as enslavement by the federal government.

29.     Attached hereto as Exhibit J is a true and correct copy of a post reflecting those statements.

30.     Wilson posts his 999-9999 number online, including on social media, and invites people to contact him on it.

31.     Attached hereto as Exhibit K is a true and correct copy of an Instagram post reflecting an example of such a statement.

### The Heidarpour Law Firm's Role in Plaintiff's Litigation

32.     The Heidarpour Law Firm, PLLC ("Heidarpour") is a law firm based in the District of Columbia whose principal is Andrew Heidarpour.

33.     Based on my firm's personal experience in dozens of Wilson cases and demand letters, Heidarpour plays a recurring behind-the-scenes role in originating and profiting from Plaintiff's TCPA lawsuits, even when other attorneys appear as counsel of record.

34.     My firm has personally received demand letters from Heidarpour threatening Wilson TCPA claims against approximately one dozen of my clients that have not yet resulted in filed lawsuits.

35.     Despite the Heidarpour Law Firm's financial interest in the outcome of Wilson's cases, it has almost never been disclosed as an interested entity in the Certificates of Interested Persons filed in those cases, or in similar certificates in cases in other districts. *See, e.g.*, *Kotlarsz v. Platinum Choice Healthcare LLC*, 9:24-cv-80835, ECF No. 4 (S.D. Fla. July 9, 2024) (failing to disclose Heidarpour as an interested party, despite the fact that he originated the case); *Lyman v. Quinstreet*, 23-5056, ECF No. 3 (N.D. Cal. Oct. 3, 2023) (same); *see also* Ex. A.

### Background on the Heidarpour Law Firm and Family's Litigation Practice

36.     Public records show that Farideh Heidarpour, an employee of the Heidarpour Law Firm and the mother of Andrew Heidarpour, pleaded guilty in the Western District of Oklahoma to healthcare fraud. *See United States v. Heidarpour*, Case No. CR-11-109-M, ECF No. 146 (W.D. Okla. Aug. 14, 2012).

37.     She admitted to executing a scheme that defrauded multiple federal agencies by willfully and intentionally billing for medical services that were never performed. *Id.*

38.     She was sentenced to over a year in federal prison and was prohibited from participating in any provider that bills federal health benefit programs. *Id.,* ECF No. 194.

39.     Farideh Heidarpour and a co-conspirator, also a member of the Heidarpour family, paid nearly $1.7 million to resolve an accompanying False Claims Act civil case. *See United States ex rel. Lammers v. Heidarpour*, Case No. CV 08-3411 WHA (N.D. Cal.).

40.     After Farideh Heidarpour's release from prison, the family entered the TCPA litigation business.

41.     Fred Heidarpour—Andrew's father—converted Abante Rooter & Plumbing, Inc., a family-owned plumbing company, into what functioned as a TCPA claim mill. According to public federal court filings, Abante Rooter acquired over 20 telephone lines and filed more than 70 putative TCPA class actions in the Northern District of California alone, represented by the same plaintiff's counsel in each case. *See Abante Rooter v. Signify Health,* 2024 WL 1421279 (N.D. Cal. Apr. 2, 2024).

42.     As mentioned above, Farideh Heidarpour now works at the Heidarpour Law Firm and, according to public reviews, appears to carry out much of the work of generating TCPA lawsuits associated with Heidarpour Law PLLC.

43.    As demonstrated by the screenshots of Google reviews below, Ms. Heidarpour assists potential clients with their cases:



44.    Neither Mr. Heidarpour's website, nor any other site located to date, identifies any other assistant, secretary, or intake coordinator, besides Ms. Heidarpour, nor any other female employee. No other female employee is mentioned by name in any of the more than 100 reviews we were able to find online.

45.    Google reviews discuss additional conversations with a female employee that, given the lack of other female employees, appears to be Ms. Heidarpour:





## Evidence of Manufactured Claims Referred by the Heidarpour Law Firm

46.      Everything in this section of this declaration is based on public information or facts that have already been shared with opposing counsel. None of this waives any privilege or work product protection over our investigative files. With that said, based on my personal experience defending dozens of TCPA claims originated by the Heidarpour Law Firm on behalf of Wilson and other plaintiffs, I have observed a consistent pattern: false or meritless claims are packaged and referred to outside litigation counsel who may not know the claims' true provenance, and the claims are abandoned only when the underlying fraud is directly exposed.

47.      Over the course of my practice, my firm has defended dozens of claims originated by the Heidarpour Law Firm. On numerous occasions, we discovered evidence that the lead forms underlying those claims appeared to have been filled out by the plaintiff himself or by someone with a financial interest in the litigation—in some instances through IP address evidence tracing the form submissions to the plaintiff's geographic location, including in at least one case a remote town with only a few thousand residents. When confronted with this evidence, outside litigation counsel—to whom the Heidarpour Law Firm had referred the cases—dismissed with prejudice in an attempt to avoid sanctions.

48.     In addition to filed cases, my firm has received dozens of pre-suit demand letters from the Heidarpour Law Firm threatening TCPA class actions against my clients on behalf of Wilson and other plaintiffs. On multiple occasions, after we responded in writing, suggesting that we had evidence the claims were manufactured and describing what we believed to be an ongoing fraudulent scheme, the Heidarpour Law Firm abandoned the claim without any response. It disappeared entirely. To my knowledge, none of those abandoned claims were subsequently filed or referred to other counsel. Ever since we let the Heidarpour Law Firm know that we suspected fraud, not a single demand letter that we responded to (and thus that the Heidarpour Law Firm knew we were on the other side of) has resulted in a lawsuit. That was a marked change from before we told them about the suspected fraud, when they used to refer cases we responded to out to litigation counsel all the time.

49.     More recently, the undersigned represented several defendants in cases brought by another serial plaintiff, Sara Taylor. The parallels to this case are shocking. After obtaining a new telephone number in 2024 and connecting with the Heidarpour Law Firm, Taylor became the named plaintiff in at least ten TCPA class action lawsuits in less than a year—after her number was submitted to dozens of companies through hundreds of lead forms designed to appear as though they came from Missie Gosset, a felon with multiple federal fraud convictions living roughly 100 miles away with a similar phone number. VPNs and remote-access tools were used to make the leads appear to originate from Gosset's hometown and IP address, though Gosset denied submitting the leads. When we shared those findings and the other information about the Heidarpour Law Firm described above, outside counsel dismissed both cases with no payment. Despite filing 25 back-to-back class actions before we revealed the suspected fraud, she never filed another case—her last filing was in August, 2025.

50.    The Wilson cases are following this same pattern. Recently, the Heidarpour Law Firm sent one of the undersigned's clients a demand letter claiming Wilson received text messages in violation of the TCPA. But this instance proved that someone was not accidentally inputting Wilson's 999-9999 number into lead forms to avoid calls. That's because the *sole reason* someone would have entered their name into this lead form was to receive free timely stock alerts. Why would someone go to the trouble of putting a fake number into a lead form where the only point was to get texts? Proving the answer to our question, when confronted with this information, the outside counsel to which Heidarpour had farmed the claim dropped the claim completely.

51.    The instances described above are representative of a broader pattern I have observed across dozens of matters. In case after case, claims originated by the Heidarpour Law Firm are abandoned with prejudice when the underlying facts are investigated and defense counsel shares its suspicion of fraud with opposing counsel.

### Discovery Efforts to Investigate the Disputed Lead in this Case

52.    To determine who submitted the contact request form, Freeway has served or will shortly serve targeted written discovery seeking information about Plaintiff's devices, phone records, IP addresses, iCloud access, communications with Heidarpour, Plaintiff's history of submitting contact request forms, and his broader TCPA litigation history. Freeway has also requested or will soon request a forensic inspection of every electronic device Plaintiff used during the relevant period, noticed Plaintiff's deposition, and served third-party discovery on Apple, Inc. and Plaintiff's phone carrier.

53.    Freeway also attempted to locate Dorianne Plageman, whose name appeared on the contact request form. After conventional investigative means failed, Freeway retained a former FBI agent with approximately two decades of investigative experience. Drawing on that

experience, the investigator could not locate her remotely. He then traveled to both Orland and Oroville, California, spoke with multiple people associated with nearby addresses—including the manager of a mobile home park where Ms. Plageman reportedly lived—and still could not locate anyone who had heard of her.

54.     Additional third-party subpoenas to the Heidarpour Law Firm (for records relating to how it originated and referred this claim and others) are forthcoming.

### Plaintiff's Counsel's Response to this Motion

55.     On April 8, 2026, I conferred with Plaintiff's counsel Andrew Perrong via Zoom regarding the relief sought in this motion—specifically, the denial of class certification on adequacy and predominance grounds. Mr. Perrong rejected the proposal. He claimed, inaccurately, that this Court had already found Wilson to be an adequate class representative. And as recently as this morning, Plaintiff's counsel intended to add claims and another defendant to this action.

56.     On May 15, 2026, I again spoke with Mr. Perrong to confer about Plaintiff's request to add a new claim and a new defendant to this case. Mr. Perrong was again dismissive and was not interested in engaging in a discussion about his proposed amendment. Before we got off the call, I repeatedly asked him if he knew his client had posted hate speech online. He repeatedly refused to answer the question. He instead became furious and ended the call.

57.     I then called Mr. Perrong's co-counsel, Anthony Paronich, who I know well. I told Mr. Paronich about the significant hate speech we had discovered online. I also told him that we were about to file our motion to deny class certification and that we would be addressing the Heidarpour Law Firm's and Wilson's involvement in what we believe is litigation fraud, and that we would be seeking discovery directly from the Heidarpour Law Firm to prove it. This

conversation occurred less than 24 hours after Freeway served dozens of discovery requests specifically aimed at investigating the suspected fraud.

58.    In response, Mr. Perrong immediately emailed, offering to dismiss this case with prejudice, apparently trying to play their sudden about-face off as related to Plaintiff's hate speech, which had been occurring for years. Given that purported reason, we responded with something along the lines of "Great, since that's your concern, you will dismiss all of Mr. Wilson's cases then, right?" We also asked whether Plaintiff would agree to pay the expenses Freeway incurred preparing the motion to deny class certification that Mr. Perrong refused to agree to more than a month ago. Mr. Perrong immediately declined, presumably without ever speaking with his client about it. The email chain is here:

**Plaintiff's counsel:**

Counsel,

As I understand from Ryan's conversation with Anthony, attached is a proposed stipulation of dismissal with prejudice for this litigation that we are willing to file today. Otherwise, we intend to file a motion to dismiss the case with prejudice.

**Defense counsel:**

Will you be dismissing all Wilson cases and conceding he is inadequate to serve as a class representative?

**Plaintiff's counsel:**

We will not. If you will not sign the stipulation, we will file a motion.

**Defense counsel:**

We have to talk with our client. One more question though: will Plaintiff agree to pay our fees and expenses—including most importantly those we spent preparing our motion to deny class certification after you flippantly rejected our arguments when we conferred over a month ago?

**Plaintiff's counsel:**

> You mean the meet and confer in which you used multiple *ad hominem* insults against me, and without your local counsel present? We will not agree to pay any fees or expenses.

**Plaintiff's counsel:**

> Following up here. We intend to file the motion by close of business Eastern today.

**Defense counsel:**

> I'll ignore the false statements below that I understand you are making out of desperation. We told you about our motion several months ago. In fact, I think we conferred twice, if I'm not mistaken. Now you have entirely changed your mind—after we incurred the enormous expense of briefing the issue—and want an answer on a few-hour turnaround on a Friday afternoon. That's reasonable. We will get back to you when we are able.

59.    Almost immediately thereafter, Mr. Perrong filed a motion to dismiss Plaintiff's own case with prejudice. When I pointed out that it contained several false representations about the above exchange, he hurriedly withdrew that motion without prejudice, indicating they would re-file it after they heard back definitively from us on whether we would agree to let them dismiss the case with prejudice.

### Plaintiff's Attempt to Delete or Hide Evidence

60.    In the meantime, the undersigned continued to ready this motion for filing. When we went to insert links to Plaintiff's hate speech, we discovered that multiple links had been taken down, including the video where Plaintiff threatened Jewish people with violence. The link now says "This content isn't available right now." *See* https://www.facebook.com/story.php?story_fbid=27325585293726458&id=100001050671199 (last accessed May 15, 2026).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 16, 2026 in Atlanta, Georgia.

/s/ Ryan D. Watstein
Ryan D. Watstein

# EXHIBIT A

| Case Caption | Date Filed | Court | Disposition | Plaintiff's Attorney | Certificate of Interested Parties |
|---|---|---|---|---|---|
| Wilson v. Altria Grp. Distr. Co., No. 1:24-cv-1917 | 2024-10-09 | E.D. Va | Notice of Settlement 05/13/2025 | Anthony Paronich, Dana Oliver, Avi Kaufman | |
| Wilson v. Prof. Credit Serv., No. 6:24-cv-1826 | 2024-10-31 | D. Or. | Stip of Dismissal 05/29/2025 | Anthony Paronich, Andrew Perrong | |
| Wilson v. Elevate Patient Fin. Sols., LLC, No. 4:24-cv-4285 | 2024-11-04 | S.D. Tex. | Notice of Settlement 05/07/2025 | Anthony Paronich | CIP NOT FILED, even though there was court order to file |
| Wilson v. Avid Ratings, Inc., No. 3:24-cv-782 | 2024-11-04 | W.D. Wis. | Stip of Dismissal 06/02/2025 | Anthony Paronich | |
| Wilson v. Nationstar Mortg. LLC, No. 6:24-cv-1855 | 2024-11-07 | D. Or. | In discovery as of 02/23/2026 | Anthony Paronich, Andrew Perrong, Dana Oliver | |
| Wilson v. PacifiCorp, No. 6:24-cv-1956 | 2024-11-21 | D. Or. | Notice of Settlement 02/13/2026 | Anthony Paronich, Dana Oliver, Avi Kaufman, James Stranch, IV, Nathan Ring, Alex Phillips | |
| Wilson v. Credit Suite Inc., No. 8:24-cv-2711 | 2024-11-21 | M.D. Fla. | Stip of Dismissal 07/14/2025 | Avi and Rachel Kaufman | |
| Wilson v. The Savings Bank Mutual Life Ins. Co. of Mass., No. 1:24-cv-12950 | 2024-11-26 | D. Mass. | Notice of Settlement 09/11/2025 | Anthony Paronich | |
| Wilson v. Disability Help Grp., No. 0:24-cv-62319 | 2024-12-07 | S.D. Fla. | Stip of Dismissal 03/03/2026 | Avi and Rachel Kaufman, Dana Oliver | |
| Wilson v. S. Or. Credit Serv., Inc., No. 1:24-cv-2087 | 2024-12-17 | D. Or. | Still pending as of 02/23/2026 | Anthony Paronich, Andrew Perrong | |
| Wilson v. Lower, No. 1:24-cv-3665 | 2024-12-18 | D. Md. | Notice of Settlement 05/02/2025 | Anthony Paronich, John Thomas McGowan, Jr. | CIP NOT FILED |
| Johnson & Wilson v. Am. Home Shield Corp., No. 1:24-cv-2339 | 2024-12-20 | E.D. Va. / W.D. Tenn | Transferred to W.D. Tenn. 03/26/2025 Stipulation of Dismissal 12/23/2025 | Anthony Paronich, William Robinson, III | |
| Wilson v. Fairway Independent Mortg. Corp., No. 3:24-cv-924 | 2024-12-27 | W.D. Wis. | Stip of Dismissal 07/30/2025 | Anthony Paronich | |
| Wilson v. Icon Creative Consulting, Inc., No. 1:24-cv-25119 | 2024-12-30 | S.D. Fla. | Notice of VD 02/19/2025 | Avi and Rachel Kaufman | |
| Wilson v. Club 1 Hotels, LLC, No. 1:25-cv-3 | 2025-01-02 | N.D. Ill. | Notice of VD 04/23/2025 | Anthony Paronich | |
| Wilson v. AUM Ins. Servs. LLC, No. 3:25-cv-260 | 2025-01-07 | N.D. Cal. | Notice of VD 08//10/2025 | Anthony Paronich, Dana Oliver | CIP NOT FILED |
| Wilson v. Zillow, No. 2:25-cv-48 | 2025-01-08 | W.D. Wash. | Notice of Resolution 05/19/2025 | Avi Kaufman, Eric Draluck | |
| Wilson v. Cent. Med. Grp. E., LLC, No. 6:25-cv--43 | 2025-01-09 | D. Or. | Still pending as of 02/23/2026 | Anthony Paronich, Andrew Perrong, Dana Oliver | |
| Wilson v. KUIU, LLC, No. 2:25-cv-212 | 2025-01-15 | E.D. Cal. | Notice of VD 08/22/2025 Transferred to N.D. Ohio 03/17/2025 | Anthony Paronich, Dana Oliver | |
| Wilson v. LeafFilter N., LLC, No. 2:25-cv-39 | 2025-01-16 | S.D. Ohio | Stip of Dismissal 05/07/2025 (settled) | Anthony Paronich, Brian Giles | |
| Wilson v. Easy Spirit, LLC, No. 3:25-cv-112 | 2025-01-22 | D. Conn. | Seeking appeal | Anthony Paronich | |
| Wilson v. Blendjet Inc., No. 2:25-cv-278 | 2025-01-23 | E.D. Cal. | Notice of VD 03/07/2025 (w/o prejudice) | Anthony Paronich, Dana Oliver | |
| Wilson v. Kaiser Found. Health Plan, Inc., No. 3:25-cv-802 | 2025-01-23 | N.D. Cal. | Stip of Dismissal 01/26/2026 | Rachel Kaufman, Dana Oliver | CIP FILED, Heidarpour not listed |
| Wilson v. Trajector Inc., No. 1:25-cv-23 | 2025-01-23 | N.D. Fla. | Notice of Settlement 06/26/2025 | Avi Kaufman | |
| Wilson v. Hard Eight Nutrition LLC, No. 6:25-cv-144 | 2025-01-28 | D. Or. | Stip of Dismissal 02/10/2026 | Anthony Paronich, Andrew Perrong | |
| Wilson v. CMRE Fin. Servs., Inc., No. 6:25-cv-152 | 2025-01-28 | D. Or. | Still pending as of 02/23/2026 | Anthony Paronich, Andrew Perrong | |
| Wilson v. Fleet Fin., Inc., No. 1:25-cv-340 | 2025-01-31 | D. Colo. | Stip of Dismissal 02/10/2026 | Anthony Paronich | |
| Wilson v. Finmax Smart Cap. LLC, No. 6:25-cv-173 | 2025-01-31 | D. Or. | Notice of Settlement 01/26/2026 | Anthony Paronich, Andrew Perrong | |
| Wilson v. Pharmacenter LLC, No. 0:25-cv-60212 | 2025-02-06 | S.D. Fla. | Notice of Settlement 01/22/2026 | Avi and Rachel Kaufman | |
| Wilson v. Blue Moon Fabrics, No. 6:25-cv-333 | 2025-02-27 | D. Or. | Notice of Settlement 04/25/2025 | Anthony Paronich, Andrew Perrong | |
| Wilson v. Consumer Cellular Inc., No. 2:25-cv-745 | 2025-03-04 | D. Ariz. | Settled 04/02/2026 | Avi Kaufman | |
| Wilson v. Skopos Fin, LLC, No. 6:25-cv-376 | 2025-03-04 | D. Or. | MSJ denied | Neal Weingart, Patrick Peluso | |
| Wilson v. Norco, Inc., No. 6:25-cv-410 | 2025-03-09 | D. Or. | Notice of VD 028/06/2025 | Anthony Paronich, Andrew Perrong | |
| Wilson v. Roman Health Ventures Inc., No. 1:25-cv-3479 | 2025-04-27 | S.D.N.Y. | Notice of Settlement 09/19/2025 | Anthony Paronich | |
| Wilson v. Mountainside Fitness Acquisition LLC, No. 2:25-cv-1481 | 2025-05-01 | D. Ariz. | Discovery | Anthony Paronich, Gupta Wessler | |
| Wilson v. Craftie Fox, Inc., No. 1:25-cv-22069 | 2025-05-08 | S.D. Fla. | Notice of VD 07/24/2025 | Avi and Rachel Kaufman | |
| Wilson v. Medvidi Inc., No. 5:25-cv-3996 | 2025-05-19 | N.D. Cal. | Settled 03/06/2026 | Anthony Paronich, Dana Oliver | CIP FILED, Heidarpour not listed |
| Wilson v. MAH Grp., Inc., No. 6:25-cv-855 | 2025-07-02 | D. Or. | Discovery | Anthony Paronich, Andrew Perrong | |
| Wilson v. Inogen, Inc. | 2025-07-06 | D. Or. | Stip of Dismissal 11/20/2025 | Anthony Paronich, Andrew Perrong | |
| Wilson v. Better Mortg. Corp., No. 1:25-cv-5503 | 2025-07-06 | S.D.N.Y. | Notice of VD 02/24/2025 | Anthony Paronich | |
| Wilson v. Atlanta Med. Day Spa & Surgery Ctr., LLC, No. 25-4023 | 2025-07-21 | N.D. Ga. | Discovery | | CIP FILED, Heidarpour listed |
| Wilson v. AMP FIT, Inc., No. 3:25-cv-1741 | 2025-07-21 | D. Or. | Discovery | Anthony Paronich, Valerie Chinn | |
| Wilson v. Home Warranty of Am., Inc., No. 6:25-cv-1331 | 2025-07-29 | D. Or. | Notice of Settlement 12/19/2025 | Anthony Paronich, Andrew Perrong | |
| Wilson v. Roof Max Techs., No. 2:25-cv-872 | 2025-08-06 | S.D. Ohio | Notice of Settlement 10/15/2025 | Anthony Paronich, Brian Giles | |
| Wilson v. Nat'l Gen. Ins. Co., No. 1:25-cv-719 | 2025-08-07 | M.D.N.C. | Discovery | Anthony Paronich, Ryan Duffey | |
| Wilson v. Tabak Law LLC, No. 2:25-cv-1197 | 2025-08-11 | E.D. Wis. | Notice of VD 10/29/2025 | Anthony Paronich | |
| Wilson v. Liberty Home Guard LLC, No. 1:25-cv-1075 | 2025-08-11 | N.D.N.Y. | Stip of Dismissal 01/09/2026 | Anthony Paronich | |
| Wilson v. Monarch Recovery Mgmt., Inc., No. 2:25-cv-4845 | 2025-08-24 | E.D. Pa. | Discovery | Andrew Perrong | |
| Taylor & Wilson v. Savvy Ins. Sols., LLC, No. 1:25-cv-12393 | 2025-08-29 | D. Mass. | Notice of Settlement 01/20/2026 | Anthony Paronich | |
| Wilson v. Lifestation, Inc., No. 1:25-cv-7246 | 2025-08-30 | S.D.N.Y. | Discovery | Anthony Paronich | |
| Wilson v. Inbox Health Corp., No. 3:25-cv-1417 | 2025-09-02 | D. Conn. | Notice of Resolution 11/24/2026 | Anthony Paronich | |
| Wilson v. Disability Servs. of Am., LLC, No. 1:25-cv-10578 | 2025-09-03 | N.D. Ill. | Notice of VD 12/1/2025 | Anthony Paronich | |
| Wilson v. McNeil & Meyes Rec. Mgmt. Grp., LLC, No. 2:25-cv-1810 | 2025-09-04 | E.D. La. | Notice of VD 01/23/2026 | Anthony Paronich, Joseph David Andress | No CIP filed |
| Wilson v. Vozzcom, Inc., No. 0:25-cv-61793 | 2025-09-05 | S.D. Fla. | Class Cert Motion to be filed 04/16/2026 | Avi and Rachel Kaufman | |
| Wilson v. MIA Aesthetic Holdings, LLC, No. 1:25-cv-24103 | 2025-09-09 | S.D. Fla. | Still pending as of 02/23/2026; motion to stay class discovery filed 02/13/2026 based on P's many filings | Avi and Rachel Kaufman | |
| Wilson v. TRA Med. Imaging Found., No. 3:25-cv-5808 | 2025-09-10 | W.D. Wash. | Discovery | Avi Kaufman, Eric Draluck | |
| Wilson v. Nissan N. Am., Inc., No. 3:25-cv-1042 | 2025-09-16 | M.D. Tenn. | Discovery | Avi Kaufman, Susan S. Lafferty | |
| Wilson v. Get Away Today, Inc., No. 6:25-cv-1716 | 2025-09-23 | D. Or. | Notice of VD 10/21/2025 | Andrew Perrong | |
| Wilson v. TPH Paralegal Prof. Corp., No. 6:25-cv-1703 | 2025-09-23 | D. Or. | Discovery | Andrew Perrong | |
| Wilson v. Lumen Techs. Inc., No. 3:25-cv-1471 | 2025-10-02 | W.D. La. | Notice of Settlement 01/23/2026 | Anthony Paronich, Joseph David Andress | No CIP filed |
| Wilson v. Freeway Ins. Servs. Am., LLC, No. 6:25-cv-1869 | 2025-10-12 | D. Or. | Discovery | Andrew Perrong | |
| Wilson v. GameChanger247, LLC, No. 6:25-cv-1870 | 2025-10-12 | D. Or. | Discovery | Anthony Paronich, Andrew Perrong | |
| Wilson v. Salespromis, LLC, No. 9:25-cv-81268 | 2025-10-14 | S.D. Fla. | Discovery | Avi and Rachel Kaufman | |
| Wilson v. Cirkul Inc., No. 6:25-cv-2036 | 2025-11-02 | D. Or. | Objections to MTD | Anthony Paronich, Andrew Perrong | |
| Wilson v. Cont'l Tire the Ams., LLC, No. 6:25-cv-2052 | 2025-11-04 | D. Or. | Stip of Dismissal 02/18/2026 (w/o prejudice) | Anthony Paronich | |
| Wilson v. Coverright Ins. Servs. Inc., No. 1:25-cv-6357 | 2025-11-17 | E.D.N.Y. | Stip of Dismissal 02/18/2026 (w/o prejudice) | Anthony Paronich | |
| Wilson v. Mortg. One, Inc., No. 3:25-cv-3648 | 2025-12-17 | S.D. Cal. | MTD pending | Anthony Paronich, Dana Oliver | |
| Wilson v. Dealmed Med. Supplies, LLC, No. 1:26-cv-9 | 2026-01-02 | E.D.N.Y. | Discovery | Anthony Paronich | |
| Wilson v. Autoweb, Inc., No. 4:26-cv-39 | 2026-01-04 | N.D. Cal. | Settled 03/25/2026 | Anthony Paronich, Dana Oliver | CIP FILED, Heidarpour not listed |
| Wilson v. The HELOC Co, No. 8:26-cv-25 | 2026-01-05 | D. Md. | Discovery | Andrew Perrong, John Thomas McGowan, Jr. | No CIP filed |
| Wilson v. AnyTime Fitness Franchisor, LLC, No. 6:26-cv-19 | 2026-01-06 | D. Or. | Voluntary dismissal | Andrew Perrong | |
| Wilson v. Yakima Valley Farm Workers Clinic, No. 1:26-cv-3003 | 2026-01-07 | E.D. Wash. | Discovery | Anthony Paronich, Samuel Strauss | |
| Wilson v. Gen. Audit Corp., No. 3:26-cv-207 | 2026-01-27 | N.D. Ohio | Discovery | Anthony Paronich, Brian Giles | |
| Wilson v. Pyxis Sols., No. 6:26-cv-344 | 2026-02-22 | D. Or. | Discovery | Andrew Perrong | |
| Wilson v. HomeLand Ins. LLC, No. 6:26-cv-345 | 2026-02-22 | D. Or. | Discovery | Andrew Perrong | |
| Wilson v. Wayfair Inc. | 2026-03-24 | D. Mass. | Discovery | Anthony Paronich | |
| Wilson v. AMS Moving Inc. | 2026-03-25 | S.D. Fla. | Dismissed with prejudice | Avi Kaufman | |
| Wilson v. Staples, Inc. | 2026-03-29 | D. Mass. | Pre-Answer | Anthony Paronich | |
| Wilson v. Umpqua Health Alliance, LLC | 2026-04-03 | D. Or. | Pre-Answer | Andrew Perrong | |
| Wilson v. Cascades Ins., LLC | 2026-04-03 | D. Or. | Pre-Answer | Andrew Perrong | |
| Wilson v. Med. Air Servs. Assoc., No. 6:26-cv-666 | 2026-04-03 | D. Or. | Pre-Answer | Andrew Perrong | |

# EXHIBIT B

UNITED STATES DISTRICT COURT DISTRICT OF OREGON

EUGENE DIVISION

CHET WILSON, individually and on
behalf of all others similarly
situated,

       Plaintiff,

      v.                              Case No.: 6:25-cv-00376

SKOPOS FINANCIAL, LLC d/b/a
REPRISE FINANCIAL,

       Defendant.
_____

AND ALL RELATED CROSS-ACTIONS.

_____


VIDEOCONFERENCE DEPOSITION OF CHET MICHAEL WILSON

FRIDAY, DECEMBER 12, 2025

9:02 AM

APPEARING REMOTELY FROM

EUGENE, OREGON




REPORTED BY:

Cheryl L. Haase
NCRA RPR No. 12443/WA CCR No. 3503
(541)409-2190 - cheryl.haase@gmail.com

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:

PELUSO LAW, LLC
865 Albion Street, Suite 250
Denver, Colorado 80220
(720) 805-2008

By:  Patrick Peluso
     ppeluso@pelusolawfirm.com
     (Pro Hac Vice)

For Defendant Skopos Financial, LLC dba Reprise Financial:

BILES WILSON, PLLC
457 Laurence Drive, Suite 195
Heath, Texas 75032
(972) 345-2626

By:  Dunham Biles
     dunham@bileswilson.com
     (Pro Hac Vice)

Also Present
Julia Coons, Paralegal

Chet Michael Wilson
December 12, 2025

Page 3

INDEX OF EXAMINATIONS

Exam          by Mr. Biles                              4

INDEX OF EXHIBITS

Exhibit 1    Defendant's First Request for          17
             Production to Plaintiff

Exhibit 2    Plaintiff's Responses and              18
             Objections to Defendant's First Set
             of Requests to Produce

Exhibit 3    Class Action Complaint                 39

Exhibit 4    Screenshots                            44

Exhibit 5    Facebook Marketplace ad                46

Exhibit 6    Conviction Table                       53

Exhibit 7    Chet Tank Wilson Facebook post         66

Exhibit 8    Chet Tank Wilson Facebook Post         66
             dated December 12, 2022

Exhibit 9    Facebook post                          68

Exhibit 10   Chet Tank Wilson December 10, 2024     72
             Facebook posts

Exhibit 11   Chet Tank Wilson Facebook page         77
             dated 11/11/2024

Chet Michael Wilson
December 12, 2025

APP. 004

Page 4

REPORTED REMOTELY FROM LINN COUNTY, OREGON

FRIDAY, DECEMBER 12, 2025

9:02 AM


CHET MICHAEL WILSON,

called as a witness,

having been first duly affirmed,

was examined and testified as follows:


EXAMINATION

BY MR. BILES:

Q.   Good morning, Mr. Wilson.

A.   Good morning.

Q.   Could you please state your full name for the record?

A.   Chet Michael Wilson.

Q.   And Mr. Wilson, have you ever had your deposition taken before?

A.   Yes, sir.

Q.   Okay.  How many times?

A.   For these matters, this will be the third time, I believe.

Q.   And when you say "these matters," what do you mean?

A.   The TCPA.

Chet Michael Wilson
December 12, 2025

Page 5

Q.   When was the last time you had your deposition taken in a TCPA case?

A.   Roughly a week ago.

Q.   Okay.  And what case was that?

A.   It was -- I forget the exact name of the company, it was a mortgage company, I believe.

Q.   Were you working with any other plaintiffs in that case?

A.   I believe there was one other plaintiff on that case with me.

Q.   Okay.  Is that Sara Taylor?

A.   Yes, sir.

Q.   Who is Sara Taylor?

A.   What's that?

Q.   Who is Sara Taylor?

A.   She was a co-plaintiff, if that's the correct wording for it.

Q.   She's a co-plaintiff on several cases with you, right?

A.   I am not certain.  I deal --

Q.   Sorry.  Go ahead.

A.   I deal with numerous of these cases, so it's hard to, you know, get the names exactly with them, so --

Q.   Who is Antwane Johnson?

A.   I know the name's really familiar, but I -- I'm

Case 6:25-cv-01036-NMC    Document 123-1    Filed 05/16/26    Page 22 of 149

Page 6

not certain.

Q.   He's a co-plaintiff with you on cases, isn't that correct?

A.   I just -- I recognize the name.  I can't specify exactly.

Q.   You have so many cases you don't recognize all the ones you have with Antwane, is that right?

A.   Yeah, I have a lot going on, so --

Q.   How many TCPA cases do you have going on?

A.   I'm not sure which are pending or still active, but there's upwards of somewhere around 70, 69, 70, something like that.

Q.   So that 70 would be ones, that's you think the grand total of number of cases you've ever filed under the TCPA including ones that are active and ones that are no longer active?

A.   I believe that's fairly accurate, yes.

Q.   Approximately how many of those are currently active?

A.   I am not certain.

Q.   When did you first file your TCPA case?

A.   It was around a year ago, I think.

Q.   So in a year you've filed approximately 70 TCPA cases as a plaintiff, is that correct?

A.   I -- I think that's -- that's fairly accurate.

Page 7

Q.   Okay.  How many of those have been concluded in one way or another?

A.   I think somewhere around 20 or so.  I don't have the exact number.

Q.   And were those all concluded by settlement?

A.   I -- I think there was a few that were dismissed, but yeah, that's -- that's correct.

Q.   Approximately how many do you believe were settled?

A.   Some in the 20 area, somewhere -- something like that.

Q.   How much did you get paid?

MR. PELUSO:  Objection.  I'm going to object to the relevance of that, you know, a lot of these settlements obviously are going to be confidential.

BY MR. BILES:

Q.   Sir, would you answer the question, please?

A.   Will you repeat it so I get it accurately again?

Q.   Yeah.  How much have you received in settlement cases on TCPA cases?

MR. PELUSO:  Same objection.

A.   I am not certain to an accurate number, so --

BY MR. BILES:

Q.   Is it more than a hundred thousand?

A.   I don't believe so, no.

Chet Michael  Wilson
December 12, 2025

Page 8

Q.   Is it more than 10,000?

A.   Yes.

Q.   Okay.  More than 50,000?

A.   I think we're getting close to somewhere in there.  I'm not certain.

Q.   Okay.  And what are the terms of the agreement with your counsel in this case should you -- should this case be concluded?

A.   I -- I believe we're going off of the claim standards as far as TCPA actions, so I'm not certain the entirety of it, but --

Q.   What does that mean to you?

A.   From my understanding it's -- it's 500 per infringement, and then if it's -- if it's intentional, it's $1,500 per incident, so --

Q.   What I -- well, let me ask you:  Are you paying your attorney on an hourly basis?

A.   No, sir.

Q.   So it's a contingency fee, correct?

A.   Yes.  Yes.  I -- yes.

Q.   What percentage does your lawyer get?

MR. PELUSO:  Objection to the relevancy.  I -- I think we've turned over the retainer agreement, so you already have the terms.

Chet Michael Wilson
December 12, 2025

Page 9

MR. BILES:  I don't think I have it, but --

MR. PELUSO:  If not, I'm happy to turn it over.

MR. BILES:  Okay.  That will be sufficient.

BY MR. BILES:

Q.   And, sir, just to back up and talk about depositions for a minute, you understand you're under oath today, correct?

A.   Yes, sir.

Q.   And what I'm going to ask of you for the benefit of our court reporter, actually, is that I will ask questions and if you would let me finish the question before you respond, and then you'll respond and I will do my best not to interrupt you.

Your -- your lawyer may object at some point, and the reason why we need to do this is our court reporter is trying to get literally every single word we say down.

And so if we speak over each other, we make our court reporter's job impossible and annoying.  So can we agree to do our best not to speak over each other?

A.   Yes, sir.

Q.   And then I'd ask you that if I ask you a question and you don't understand it, will you let me know?

A.   Yes, sir.

Q.   If you don't say you don't understand it, can we

Page 10

agree that that means you did understand the question?

A.   Yes, sir.

Q.   Okay.  And then the way this works, of course, today is -- at any point if you'd like a break, just let me know.  We all have to use the restroom, we all may need food, whatever.

Let me know and I'll do my best to grant it right then.  The exceptions to that are like if I literally have a question pending to you, I'm going to need you to answer it before we take a break, and it may be a situation where I have a few more questions I want to finish in a line before I agree to take a break.

Does that work for you?

A.   Yes, sir.

Q.   Now, what if anything did you do to prepare for this deposition today?

A.   I just -- I reviewed the documents with the texts again that were from the defendant and just previously went over things.

Q.   What documents did you review?

A.   The complaints, the dismissal, that paperwork that was overturned, and I believe that there's a few documents in there, I don't remember the exact titles of them, so --

Q.   And when you say you briefly went over things, what did you mean?

Chet Michael Wilson
December 12, 2025

Page 11

A.   Well, I briefly went over them with Mr. Peluso.

Q.   Okay.  Now, let's be -- let's be clear about this today.  I may ask you if you met with your counselor, so forth, but there's almost no chance I want to know anything about what your counsel told you or what you told your counsel.  So let's -- you understand?

A.   Yes.  Yes.

Q.   When did you meet with Mr. Peluso --

A.   I spoke --

Q.   -- about the deposition?

A.   I spoke with him briefly this morning.

Q.   Did you otherwise speak with Mr. Peluso about your deposition before some time this morning?

A.   We also had a brief conversation yesterday.  Just basically going over the same stuff, just making sure I was --

Q.   I don't -- I don't -- honestly, I promise you I don't need to know about your communications with your -- I'm just asking you when you met with him, and I'll ask you how long you met with him.  I'm not going to ask you what you discussed with him.  Okay?

A.   Okay.

Q.   That's -- I don't want to know.

A.   Okay.

Q.   Okay.  So how long did you speak to Mr. Peluso

Page 12

yesterday?

A.   I'd say 15, 20 minutes, maybe.

Q.   Okay.  Did you speak with your attorney or anyone else in preparation for your deposition other than the conversation you had yesterday and the one you had this morning?

A.   I don't believe so.

Q.   Did you speak with any of your other lawyers who are not part of this case about this deposition?

A.   I don't believe so.

Q.   Of those 70 cases, does Mr. Peluso represent you in any of those other than this one?

A.   I believe this is the first time I've worked with Mr. Peluso.

Q.   How did you come to contact Mr. Peluso?

A.   Excuse me?

Q.   How did you come to contact Mr. Peluso about this case?

A.   I was -- he was referred to do the litigation from my -- the law firm that I deal with, mostly, so Heidarpour.

Q.   How do you get in contact with Heidarpour?  I forget how to pronounce them, but that law firm initially?

A.   I did a web search for TCPA and that's who it pulled up, so --

Q.   Now, are they the law firm that you've given

Chet Michael Wilson
December 12, 2025

APP. 013

Page 13

access to your cell phone to go back five years and searched for all the text messages?

A.   Sir, to be accurate, I have -- there's several attorneys that I deal with on these cases, so I just don't want to be inaccurate.  I'm not certain who specifically I've dealt with on all these, but it's -- I have -- there's a group of attorneys that are all under the kind of same umbrella.

Q.   Who are those attorneys under that umbrella?

A.   So we have -- we have Anthony Paronich.  We have Andrew Heidarpour.  I know -- and then I'd -- I think there's a guy, Mr.  Berrong that I was dealing with, too.  Yeah, they're all underneath kind of the same group, they all work together, so --

Q.   And do all of them have access to your Cloud account for your phone number (541) 999-9999?

A.   I -- I'm not certain on how that works, so --

Q.   Okay.  Can you tell me every cell phone number you've had since January 1, 2024?

A.   It's been this phone number.

Q.   You don't have any other phone numbers?

A.   No, sir.

Q.   Where is that cell phone right now?

A.   It is in my bathroom.

Q.   When is the last time you called somebody on it?

Chet Michael  Wilson
December 12, 2025

APP. 014

Page 14

A.   I spoke with Mr. Peluso this morning.

Q.   Is there a reason why you haven't given me your cell phone records so I could verify that you actually use that phone?

A.   Is there a reason why I hadn't given it to you?

Q.   Yeah.  I've requested them, right?

Let me ask you this:  Did you see the document request that I sent?

A.   For my cell phone?

Q.   For documents in this case, I sent what we call a Request for Production of Documents.  Did you review that document?

A.   I'm assuming so.  I -- I didn't -- I don't remember that exact detail though so.

MR. BILES:  Okay.  Julia, will you pull that document up, please?  Go ahead and give us Exhibit 1.

MS. COONS:  Yes, sir.  One moment.

BY MR. BILES:

Q.   While she's doing that, sir, is it correct that you received something like 50 to 70 texts a day that you consider violations of the TCPA?

A.   I can't --

MR. PELUSO:  Objection to the extent it calls for a legal conclusion.  Go ahead.

A.   I can't answer to the exact number.  You know,

Chet Michael Wilson
December 12, 2025

Page 15

because it varies.  It's kind of random.  But I'd say I get at least probably 15 to 20 a day and some serious days potentially upward of, you know, 50, 60, 70, you know.  But I'd say that's more of a --

MR. BILES:  Julia, you can hang on now.  You can hang off.  That's fine.  We can have it up there.

BY MR. PELUSO:

Q.  Let's just finish this question, then we'll put it up there.  Okay.  So when you receive one of those texts, as I understand it your lawyers already know about it, because they have access to your account just the same as you do, right?

MR. PELUSO:  Objection to the form.  It's leading, lacks foundation.

BY MR. BILES:

Q.  You can answer, sir.

A.  I -- I don't know the process of how that works exactly.

Q.  Well, do you contact your lawyers and say, Look, I just received another text, sue somebody?

MR. PELUSO:  Objection to the extent attorney-client privilege, you've already told him you don't want to hear what he says to his lawyers.

BY MR. BILES:

Q.  I'll -- do you initiate contact with your

Page 16

attorneys when you receive a text that you consider to violate the law?

A.   Yes, I send screenshots of my -- of my messages.

Q.   And in regards to -- let's make sure.  I believe you -- you have sued over four texts in this case, correct?

A.   Yes, sir.  Well, I -- I believe at least four, yes.

Q.   Out of more than four?

A.   I'm not certain.

Q.   Okay.  There's no voicemails, though, right?

A.   Not to my memory, no.

Q.   There were no phone calls either, correct?

A.   I can't speculate to that.

Q.   Are you suing Reprise based on them having called you?

A.   I don't believe so.

Q.   You're suing them only because of the text messages that you've alleged in the lawsuit, correct?

A.   From my understanding.

Q.   Someone other than you have a better understanding of what you're claiming?

A.   Well, I know at times I received more in the process of litigation, so at this time I'm not certain.

Q.   Julia, why don't you put up the doc request now.

Okay.  Mr. Wilson, this is, as you'll see

towards the top right, it says, "Defendant's First Request for Production to Plaintiff."

A.   Yes.

MR. BILES:  I will mark this as Exhibit 1.

(Deposition Exhibit No. 1 was

marked for identification.)

BY MR. BILES:

Q.   And I'm happy to have Julia walk you, scroll through this document.  But my -- my question really is only have you ever seen this document?

A.   Yes, it looks familiar.

Q.   Okay.  Do you have an issue with producing to me your phone records from September of 2024 to present?

MR. PELUSO:  Objection to the form.

A.   I leave -- I leave all, you know, legal stuff like that, I'd have to correspond with my representation (sic).

BY MR. BILES:

Q.   Okay.  What kind of -- who's your carrier currently?  Your cell phone carrier, just to be clear?

A.   Verizon.

Q.   And who was your carrier at the time that you received the texts that this lawsuit is based on?

A.   I've used Verizon as long as I can remember.

Q.   And what type of account do you have with Verizon, by which I mean what do you, how are you being charged?

Chet Michael Wilson
December 12, 2025

Page 18

A.   I have a prepaid account.

Q.   Okay.  What -- what does a prepaid account mean?

A.   It's just without the contract.  And it ends up, I think it's cheaper with the same benefits, so --

Q.   And I assume like -- like me, you have unlimited text messaging?

A.   Yes, sir.

Q.   And you're not paying per phone call, right?

A.   Nothing specifically, it's all included, all inclusive.

Q.   And so you're not paying for each text message received, correct?

A.   That's accurate.

MR. BILES:  Julia, would you put up the -- what we'll mark as Exhibit 2, Plaintiff's Responses and Objections to Defendant's First Set of Requests to Produce.

(Deposition Exhibit No. 2 was

marked for identification.)

MS. COONS:  Yes, sir, one moment.

BY MR. BILES:

Q.   All right, sir, can you see this document is titled "Plaintiff's Responses and Objections to Defendant's First Set of Requests to Produce"?

A.   Yes.  I'm reading it now.

Q.   Yeah.  Have you seen this document before today?

Chet Michael Wilson
December 12, 2025

Page 19

A.   I believe so, yes.  It looks familiar.

MR. BILES:  Julia, if we go to Page 5 of that document -- can you go to Page 5 of that document, and can you make this big enough that everybody can read it?

And maybe they can, I don't know.  I need to make mine bigger.  Oh, now, I can.  I had my screen too small.

BY MR. BILES:

Q.   All right, sir.  If we look at Request No. 7, it says, "All documents that evidence" -- whoa.

Okay.  "All documents that evidence, refer or relate to any opt-out messages, (e.g., 'STOP'), consumer complaints, carrier complaints, or regulatory submissions made by Plaintiff regarding the alleged messages, and any responses or outcomes."

And then the response says, "Plaintiff possesses no responsive documents."  Is it correct that you have no responsive documents?

A.   To clarify, that would be of any action I had taken to opt out of the messages, is that correct?

Q.   That is one of the things requested, yes.

A.   And we're talking specifically about the Request No. 7, correct?

Q.   We're -- and we're specifically talking about Reprise and Reprise -- we're only talking about this

Chet Michael  Wilson
December 12, 2025

Page 20

lawsuit, not your other --

A.    Yes.

Q.    So is it correct that you did not respond to those messages at all?

A.    Yes, that is true.  And --

Q.    Go ahead?

A.    I -- I've found in the past that when I do respond it's more of click bait, and a lot of these companies, they'll wait until they find an actual person to respond, and then you get inundated with ten times as much stuff.

So, you know, from my past experience, it doesn't -- it's a very rare occasion when actually replying "Stop" works.

Q.    Did you apply to Reprise, "Stop"?

A.    If --

Q.    Did you apply "Stop" to Reprise's text messages?

A.    No, sir, I did not.

Q.    And at that point in time how many TCPA lawsuits had you filed?

A.    Once again, I'm not certain, exact number.

Q.    Approximately how many?

A.    Upwards of 70.

Q.    Okay.  Based on your knowledge, how many text messages would it take from Reprise before you could possibly sue them?

Chet Michael Wilson
December 12, 2025

Page 21

MR. PELUSO:  Objection, calls for a legal conclusion.

MR. BILES:  I'm just asking his -- his knowledge based on 70 cases.

A.    I believe it's more than one.

BY MR. BILES:

Q.    Okay.  And you already told us this, but remind us again how statute damages are calculated in the TCPA case.

A.    From my understanding is if they are intentional, it's $1,500.  If they are found not intentional, it's 500.

Q.    So if you'd applied "Stop" on the first text you received from Reprise, and if Reprise didn't send another text, you wouldn't have a lawsuit, would you?

MR. PELUSO:  Objection, calls for a legal conclusion.  Go ahead.

A.    If -- if you're -- I mean, if it's actually how it works.  You know, a lot of these companies I've seen completely the opposite, so I can't speculate on what would happen.  So --

BY MR. BILES:

Q.    And for each text they send you, you think you get more money, right?

A.    Yes, depending on the terms.

Q.    So to be clear, you didn't respond "Stop" because you wanted a lawsuit and you wanted more money, correct?

Chet Michael  Wilson
December 12, 2025

Page 22

MR. PELUSO:  Objection, mischaracterizes testimony, leading.

BY MR. BILES:

Q.   You may answer, sir.

A.   It's -- I don't believe that's accurate at all, because I've taken every step that I can to try to get rid of these telemarketer phone calls.  And that's what has brought me here, prior to me knowing anything about TCPA action.

Q.   You said you took every step possible to stop text messages from Reprise and other lenders, correct?

A.   From anyone harassing me on my phone that's not -- that I'm not expecting to contact me, yes.  This has been five years plus I've been dealing with this.  And just now I've finally come to a situation where it's -- something's being done about it.

Q.   What steps did you take to stop text messages that you are complaining of from coming in?

A.   When I first received the phone, I started blocking every phone number that called me that wasn't somebody that I recognized, and I just got overwhelmed with that.

At that point, I -- I called, made sure that the phone number was on the Do Not Call registry and which it was and it still is.

Chet Michael Wilson
December 12, 2025

Page 23

And then after a matter of years of dealing with this, you know, feels like parasites harassing me all day long, every day, I can't answer phone calls, I can't text people, I can't listen to music without my phone going off.

So I did a web search, and -- and I think we went over this fact, it -- it led me to this law firm that's now helping me fix the situation, so to speak.

Q.   You said when you received the phone.  That's not really accurate, is it?

A.   When I received the phone number, yes.

Q.   Yeah.  You bought it, right?

A.   I --

MR. PELUSO:  Objection to the form.

BY MR. BILES:

Q.   Did you buy the phone number, sir?

A.   I did not buy the phone number.

Q.   You traded a title to a vehicle for it, correct?

A.   Yes, because for one, it was probably the only way I'd ever get compensation for the vehicle, because there had been no payments made.  And the specific person had a problem paying his bills is why I gave him the title for the number.

And I thought that it was a neat number that, you know, my friends, family and people in my life would be

Chet Michael Wilson
December 12, 2025

Page 24

able to recognize easily.  So I was -- I was attracted to it for that reason.

Q.   When did you acquire the number, sir?

A.   On or about 2019, 2018, 2019, somewhere in there.

Q.   And from whom did you acquire it?

A.   It was an acquaintance of mine, a friend named Warren Brownlee.

Q.   And where does Mr. Brownlee live?

A.   I'm not certain, I haven't heard from him for years.

Q.   Where did he live at the time?

A.   He lived in Florence, Oregon, where I lived.

Q.   Do you know Mr. Brownley's date of birth?

A.   No, sir.

Q.   Can you spell his name for the record, please?

A.   I -- I believe this is correct, it's W-A-R-R-E-N, and last name is Brownlee, B-R-O-W-N-L-E-E.

Q.   So when you say you -- well, let's back up.  How exactly did you exchange title for the phone number?  How did that transaction happen?

A.   Okay.  He called me.  Actually the number showed up on my phone, I didn't have it in my contacts.  And I almost didn't answer it, I thought it was fake.  So I answered the phone and Warren was like, Hey, what's up, man?

And I said, What's going on with this phone

Chet Michael Wilson
December 12, 2025

Page 25

number?  How are you calling me from this?  Is it fake or what?

And he said, No, it's not fake, it just got generated to him.  Because he didn't pay his bill, got a new phone.  And so it got generated to him, so I was thinking about it.

I told him, I said, Hey, you owe me on the -- on the car.  If you give me, if you port the number over to me, I'll just give you the title to that car that you owe me on and we can be done with this.

And he agreed and that was the end of it.

Q.   How much did he owe you on the car?

A.   It was somewhere around a thousand, I believe.  Give or take.

Q.   I'm sorry, what was your friend's last name?

A.   Brownlee.

Q.   Did Mr. Brownlee tell you anything about that phone number?

A.   He didn't tell me anything, no.

Q.   Did he complain about receiving solicitations?

A.   No, sir.

Q.   When did you register the (541) 999-9999 number on the Do Not Call Registry?

A.   I -- I don't have a specific date.  I'm not certain.  I'd have to look back at the records.  I think I

Chet Michael Wilson
December 12, 2025

Page 26

do have that information somewhere.

Q.   What year?

A.   I believe, I mean, it's between 2019 and 2021, so I'm not sure the exact time when, you know, how long I took after blocking all the numbers didn't work, so --

Q.   When -- when did you -- when did you first become concerned that you were receiving text messages that you didn't want to receive?

A.   Almost instantly.

Q.   Since you acquired the phone number, approximately how many text messages do you think you receive on a daily basis, that you object to?

A.   I'd say at the very least ten, so --

Q.   So -- go ahead.

A.   Anywhere from ten to, you know, 50, 60 a day, you know, so it varies.

Q.   So those ten to 50 to 60 a day, you -- you find to be unauthorized solicitations, is that right?

A.   That's accurate.

Q.   So for approximately six years you've been receiving ten to 60 text messages a day that you consider inappropriate solicitations, correct?

A.   That's accurate.

Q.   And yet you didn't change your phone number, correct?

Chet Michael  Wilson
December 12, 2025

Page 27

A.  That's correct, for various reasons.

Q.  Okay.  What various reasons did you choose not to change your cell phone number for?

A.  For one, my life is driven by networking and my -- my collection of people that -- and resources.  So between that, my family, and everybody that's important to me, it's, you know, in a way it's a special phone number because all my family, my children, everybody can remember my phone number, without having to look it up.

And so that's, you know, the main benefit to me is, you know, I have this collection of people I care about that depend on access to me.  Some of which I might not even have their contact, just in passing, and so I think that I'd -- yeah, at this point the number's a part of -- a part of my life, so --

Q.  Any other reasons?

A.  No, sir.

Q.  Let's go back.  You just mentioned networking is a part of your life, is that correct?

A.  That's true.

Q.  And you've been convicted of distribution of cocaine, correct?

MR. PELUSO:  Objection to the relevance.

A.  I believe everything is in documents that you've been provided.

Chet Michael  Wilson
December 12, 2025

Page 28

BY MR. BILES:

Q.   No, that would be incorrect.  I -- I may have the documents, it's not because you gave them to me, you objected to them.  But have you been convicted of a felony?

Well, in the last ten years have you been convicted of a felony?

A.   No, sir.

Q.   Have you been convicted of any crimes in the last ten years?

A.   Just traffic.

MR. PELUSO:  Objection again to the relevance.

BY MR. BILES:

Q.   Go ahead, sir.

A.   I don't know if it's considered a crime, but only traffic stuff.

Q.   So you haven't been convicted of possession of marijuana?

A.   In the last -- no, sir, in the last ten years?  I don't believe so.

Q.   How is networking part of your life today?

A.   For one, I'm a holistic healer.  I get people off pharmaceuticals, help them deal with cancer and all kinds of different things.

I know some world healers that have helped me

Chet Michael Wilson
December 12, 2025

Page 29

along that path of knowledge.  I, yeah, just a lot of all my food is sourced through farms and through people that have ranches and I try to circumvent commercial food and sources. I just, yeah, there's a lot, lot of different reasons why networking is important, so I'm being self reliant, not depending on everybody else or anyone else for what I need, so --

Q.   What if anything is your current job?

A.   I do not have a current job.  I have an online health food, health store.  But that's more education than anything else, so I just -- I like sharing stuff with people, it's not about monetary.

Q.   When is the last time you were employed?

A.   I had -- I owned a moving company that I ended up dissolving around 2020.

Q.   What was the name of the moving company?

A.   It's called Barter Movers.

Q.   And how long were you affiliated with Barter Movers?

A.   I had -- it was about, I'd say about five years.

Q.   Why did you dissolve it?

A.   For one, the COVID thing messed up a lot of my work.  And multiple injuries, it was hard for me to do that hard of manual labor so I got ride of my equipment.

Q.   Where do I find your online health store?  What's

Page 30

the web site?

A.   It is tank, T-A-N-K, dot, cultureforgood.com.

Q.   And are you able to earn any money from that online health store?

A.   I've say -- maybe made, I've made under a hundred dollars probably for the whole time.  I usually just order the stuff and then just resell it to my friends personally, so --

Q.   What does -- what does the term "tank" mean to you in the sense of why do you use "tank?"

A.   A while back I bought a bunch of military stuff. I trade, barter and trade military equipment, like decommissioned military stuff, like auction stuff.  And so everybody -- I'm a bigger guy and everybody just started calling me Tank, so --

Q.   Where do you live currently?

A.   I live in Eugene, Oregon.

Q.   What's the address?

A.   It is 29798 Willow Creek Road.

Q.   Is that a house, apartment, condo?

A.   Townhouse.

Q.   Townhouse.  And do you own the townhouse?

A.   No, sir. I just rent.

Q.   How much is your monthly rent?

A.   Roughly 2600.

Page 31

Q.   And are you married?

A.   No, sir.

Q.   Do you have any kids?

A.   I have six children.

Q.   And do those six kids live with you?

A.   I have three full time.

Q.   And how old are the three?

A.   Thirteen, eight and five.

Q.   And the other three that you do not have full time, where are they?

A.   One is 19 and then the other two are with their mothers.

Q.   Are they with their mothers full time?

A.   Yes, during the school year, yes.  During the summer, I have them full time also.

Q.   I assume you have to pay child support, correct?

A.   Yes, I'm actually working with my ex right now, we're getting it all dissolved, so -- and, yeah.

Q.   So how do you earn sufficient money to pay for your rent, children, your other needs?

A.   I was --

          MR. PELUSO:  Objection to the relevance.

A.   Yeah, I have -- I have, you know, multiple assets that I can liquidate at any time.  Many resources that I've collected over the years and kind of squirreled away for

Chet Michael Wilson
December 12, 2025

Page 32

myself and so, yeah, I'm doing pretty well for myself.

BY MR. BILES:

Q.   Do you have any income besides selling assets?

A.   No, sir.

Q.   When is the last time you had an income, other than from selling off assets?

A.   The moving company.

Q.   Okay.  Before -- before the moving company, what was your last employment before that?

A.   I had -- it's kind of always been the same thing, just networking, barter, trading.  You know, I lived a lot of my life without needing any kind of money or anything because of my collection of people.  I have everything I need at my fingertips, so --

Q.   Between -- after you shut down the moving company, we know you generate money from selling assets, correct?

A.   Yes.

Q.   Settling TCPA cases?

A.   Come again?

Q.   You also generate income from settling TCPA cases, right?

A.   If that's considered an income, I guess, yes.

Q.   Okay.  You -- you have money come in to you by selling assets and settling TCPA cases, correct?

A.   Correct.

Chet Michael  Wilson
December 12, 2025

Page 33

Q.   Anything else?

A.   No, sir.

Q.   Let's go back and just do some basic background. Where did you go to high school?

A.   Siuslaw, Florence, Oregon.

Q.   Did you graduate?

A.   Yes, sir.

Q.   When did you graduate?

A.   2000.

Q.   And what did you do after you graduated?  Did you go to college, did you get a job, join the military, what?

A.   I did -- I worked with concrete a lot, pumping concrete, forms, foundations, construction stuff.

Q.   Okay.  And how long did you do that for?

A.   Maybe a couple years max.

Q.   And then what did you do after that?

A.   Then I started throwing events, charity events, festivals, gatherings.  And I kind of got into the holistic medicine scene.

Q.   How -- where is the money coming from for you to be able to throw events?

A.   I -- I've always just kind of bartered and traded up so, you know, vehicles I trade for better stuff or, you know, so I've really done amazingly well, even in my younger years straight out of high school, just, you know, trading

Chet Michael Wilson
December 12, 2025

APP. 034

Page 34

vehicles and stuff like that, like the Barter Kings.

Q. You've mentioned holistic medicine a few times now. So do you have any degrees, certificates, other things that -- in regard to holistic medicine?

A. No, I think western medicine has missed -- missed the target for a long time now, and I've just done a lot of my own research and I know some world healers that have taught me a lot of stuff about the simplicity of how your body works, and how to escalate your level of existence so, with natural stuff.

Q. So I've asked you about sources of money, income, what have you. You haven't listed holistic medicine. Is that because you're not generating money from holistic medicine?

A. That's accurate.

Q. So in -- in what way are you practicing holistic medicine?

A. Through education. And giving folks the resource after they get the knowledge to make the choice on what kind of fuel they would like to put in their body to -- to, you know, get rid of deficiencies, which I believe are the basis of most disease is based on a deficiency.

Q. Are you charging for that?

A. No. My compensation is watching people be healed and learn about themselves.

Chet Michael  Wilson
December 12, 2025

Page 35

Q.   All right.  So I'm just trying to get your work history.  So from -- you graduated in 2000, for a couple years you did construction?

A.   Yes.

Q.   And then you got into throwing events, is that right?

A.   Yes, sir.

Q.   Did that financially support you in some way?

A.   Yeah, I made -- I made some pretty good money doing that.

Q.   What kind of -- okay.  And how, for what period of time did you financially support yourself through throwing events?

A.   I mean it's hit and miss because that's an industry you can't really depend on always making money on, but, you know, on and off for a decade after high school.

Q.   I'm going to give you a chance to just -- because this is just background stuff, I'll give you a chance just to give me a narrative.  Between 2000 when you graduated and today --

A.   Mm-hmm.

Q.   -- other than what we've covered, what jobs, professions, et cetera, were you involved in to earn a living?

A.   Very few.  I've always been dependent on myself,

Chet Michael  Wilson
December 12, 2025

Page 36

followed a different route rather than the nine to five, and it's -- I don't know, it's set me up in a situation where I'm not dependent on the government.  I'm not dependent on anyone else to provide for my family, because like I said before, it's -- my network provides everything for me.  Just a phone call away.

Q.   I understand being independent.  But, I mean, there are many ways to be independent.  You can own a business, you can -- what have you, but how are you generating the ability to take care of yourself other than there was a period of time where you did construction?

A.   Yes.

Q.   You did some events which is according to you hit and miss and whether that works out well.

A.   Mm-hmm.

Q.   Then you -- you're buying and selling collectibles or other things.

A.   Yeah.

Q.   And you settled some lawsuits.  Is there anything else that you were doing to make money?

A.   That's -- I think that's -- I'm sure there's more, but that's about -- that's all that I can think of.

Q.   Okay.  Are you on any medications today?

A.   No, sir.

Q.   Is there any reason that you would not be able to

APP. 037

Page 37

testify truthfully today?

A.   No, sir.

Q.   Have you been diagnosed with any mental, emotional issues?

A.   No, sir.

Q.   Do you know Brian ███████?

A.   I do not know Brian ███████.

Q.   Have you ever communicated with Brian ███████?

A.   Absolutely not.

Q.   Do you know anybody who does know Brian ███████?

A.   Who does know Brian ███████?  Nope, not to my knowledge.

Q.   Because you paused for a minute when I asked you if you knew Brian ███████?

A.   I don't -- I wasn't trying to, I think I didn't hear you correctly.

Q.   Have you ever indirectly communicated with Mr. ███████?

A.   No, sir.

Q.   Do you know any of his family members?

A.   No, sir.

Q.   Do you have -- strike that.

A.   I believe the first time I heard of Brian ███████, the full name, was in -- yeah, in this situation, in this case, so --

APP. 038

Page 38

Q.   You said full name.  Were you familiar with less than his full name prior to this case?

A.   Whose full name?

Q.   You said the first time you heard of Brian ████ , you became familiar with his full name was in regard to this litigation.  Did you somehow know of his name separate and apart of this litigation?

A.   Well, in the text messages from the defendant, it stated Brian, so --

Q.   So when you received those text messages you knew they weren't intended for you, correct?

A.   Yes, sir.

Q.   And you didn't respond "Stop," correct?

A.   Like I said, I believed it was click bait.

Q.   It was yes or no.  Did you or did you not respond with "Stop"?

A.   I did not respond with "Stop."

Q.   Did you respond saying, Hey, you got the wrong person?

A.   There was no response.

Q.   And in this lawsuit you've alleged that Reprise is an auto lender, correct?

A.   Reprise is an auto lender?

Q.   Yeah.

A.   I don't know if that's all that they lend, I'm not

Chet Michael Wilson
December 12, 2025

Page 39

certain.

Q.   Do you know if they lend on autos at all?

A.   I -- I'm not certain if what they -- what all they lend on.

Q.   Did you review the complaint before it was filed?

A.   Yes.

        MR. BILES:  Julia, let's go ahead and mark Exhibit 3 and let's go through some issues with the complaint.

        (Deposition Exhibit No. 3 was

        marked for identification.)

BY MR. BILES:

Q.   All right.  Mr. Wilson, do you recognize this document?

A.   Yes.

Q.   And you reviewed it before it was filed?

A.   Yes, sir.

Q.   So if we go to Page 3, Paragraph 8, do you see that you allege that "Reprise is an auto-loan lender based in Texas"?

A.   Yeah.  Yes, sir.

Q.   What's your basis for that assertion?

A.   Well, it's -- I believe that -- was had to do with the investigation on my attorney's part.

Q.   So you don't have any knowledge, personal

Chet Michael Wilson
December 12, 2025

Page 40

knowledge of what Reprise is in the business of doing, is

that correct?

A.   No, sir.

Q.   This is the problem with double negatives.  When

you say, "No, sir," let me ask you, do you have personal

knowledge about what Reprise is in the business of doing?

A.   Just lending.  I believe that's all.

Q.   But you don't know what type of lending?

A.   I think it's just one of those databases connected

with like Lending Tree that connects with a bunch of

different people to give a loan.  I'm not certain what all

they do loans for but, you know.

Q.   Let's go down to Paragraph 11.  I'm sorry, I got

the wrong number.  14, please.

Sir, if you can look at Paragraph 14, I'll

read it first, "Unfortunately for consumers, Defendant casts

its marketing net too wide.  That is, in an attempt to

promote its business, Defendant conducted (and continues to

conduct) a wide-scale telemarketing campaign that repeatedly

sends unsolicited telemarketing text messages to consumers'

cellular telephones, including to those whose numbers are on

the National Do Not Call Registry who did not provide prior

express invitation or permission to receive such messages."

A.   Yes, sir.

Q.   Did I read that correctly?

APP. 041

Page 41

A.    Yes, sir.

Q.    What's the basis of your personal knowledge in regard to that paragraph?

A.    That the process of the way the defendant uses had the telemarketing campaign is too broad to where it includes people that are not involved whatsoever with their company, or not requesting any kind of interaction.

Q.    But what factual basis do you have to make that allegation?  How do you know that?

A.    Well, because I never -- I never contacted the business, and I never asked for this contact, and I'm the one that's forced to deal with it, so --

Q.    But as far as you know, have personal knowledge of, you're the only person that happened to, right?

A.    Yes, that's as far as my personal knowledge, but I would assume there's more.

Q.    Okay.  So it's just an assumption, correct?

A.    That's correct.

Q.    You're aware that Brian ██████ consented to receive text messages, correct?

A.    I'm not certain if he consented to text messages. I do understand that he was the one that -- that put my phone number into the database thinking it was fake.

Q.    So why are you suing Reprise for Mr. ██████ having entered your number?

Chet Michael Wilson
December 12, 2025

Page 42

A.   Because I was the one that had my privacy violated because of it and -- yeah.

Q.   Any other reasons for it?

A.   It's -- it's just a hassle.  You know, it's -- you know, hopefully in the end of this we can change the way that the defendant operates, and more people won't be bothered by similar situations.

MR. BILES:  Okay.  Well, Julia, why don't you pull up the four text messages with the Wilson Bates number on them.

We have a better copy, don't we?  Or, yeah, maybe not.  Maybe that's the right one.  All right.  I'm sorry, Court Reporter.  I forget, are we now on Exhibit 4, I think?

MR. PELUSO:  Yeah.

THE REPORTER:  I can look.

MR. BILES:  You're on mute.

THE REPORTER:  Sorry.  My automatic -- my automatic counter is not working, so --

MR. BILES:  That's okay.  I think -- I think Patrick and I agree we're on 4.

MR. PELUSO:  Yeah, I think you're on -- you're on 4.  You did sort of two versions of the request to produce, one that you served, one was the responses, then the complaint, now this, that's 4.

Page 43

MS. COONS:  And I'm on No. 4 as well.

MR. BILES:  Julia, it's most important because you have to keep track of this, because you, after this is all over you have to send the court reporter the --

MS. COONS:  Yes.  Yes, sir, and Madam Court Reporter, if you wouldn't mind putting the email in the chat so I know where to send, at your earliest convenience. Thank you.

BY MR. BILES:

Q.   All right.  So, Mr. Wilson, this is a document that has a Bates label at the end that's Wilson a bunch of zeroes and then a six.  Do you see that?

A.   Yes.

Q.   Do you understand that's a Bates label meaning that it was produced -- well, in this -- it was produced in this case?

A.   For the court, right, or for this litigation here.

THE REPORTER:  I can't hear you all of a sudden.  Can you speak up, Mr. Wilson?

THE WITNESS:  Yes.  Can you hear me?

THE REPORTER:  Yeah.  You need to speak up. For some reason you went really quiet.

THE WITNESS:  Okay.  Yeah, I -- I just assumed that number is, you know, attached for litigation for the document.

Chet Michael Wilson
December 12, 2025

Page 44

BY MR. BILES:

Q.   Yes.  Mr. Wilson, do agree that these are the four text messages that you are suing over?

A.   That looks accurate.

Q.   Okay.  Do you see that the very first one says, "TXT STOP to Stop messages from this number"?

A.   I see that.

Q.   And that's in the second text message as well?

A.   Yes.

Q.   Third text message as well?

A.   Yes.

Q.   And the fourth one?

A.   Yes.

Q.   Now, by the way, I showed you the document requests earlier and your responses.  Can you tell me what if anything you did to locate documents to produce in this case?

                 (Deposition Exhibit No. 4 was

                 marked for identification.)

A.   I believe that's a screenshot from my phone that I sent, and I'm assuming I sent the link attached to it.  I don't know if that answers --

BY MR. BILES:

Q.   Well, you produced some other documents, and so what did you do to go try to find documents that you have

that were to be produced by you through your lawyer?

A.    I usually -- I usually just when I find a text like that, I usually do a search on my phone to see what other interactions there are, and I produce all documents to the law firm.

Q.    Okay.  Did you -- did you -- did you search your emails for any communications with Brian ███████?

A.    I don't know Brian ███████.  No.

Q.    Did you search your Facebook for any of your posts that were relevant to this case?

A.    No, sir.  I don't believe there's any relevant to this case.

Q.    Okay.  You did offer to sell your -- your cell phone number, correct?

MR. PELUSO:  Objection to the form.

A.    Yes, years ago there was a brief period of time I was in correspondence with someone interested in purchasing it.

BY MR. BILES:

Q.    When was that?

A.    I -- I can't remember the exact dates.

Q.    It was on Facebook Marketplace, is that correct?

A.    Yes, I did -- I did put it on Facebook Marketplace for a period of time.

Q.    And you said you were willing to accept nothing

Page 46

less than $20,000, correct?

A.   I don't -- I'm not sure if that's the wording, but that's -- I was offered 20,000 but it never panned out.

MR. BILES:  Julia, can you pull up that document, please.

BY MR. BILES:

Q.   Mr. Wilson?  You're Chet Wilson; right?

A.   That is me.

Q.   And that's your phone number, correct?

A.   Correct.

MR. BILES:  We'll mark this -- we'll mark this as Exhibit 5.

(Deposition Exhibit No. 5 was

marked for identification.)

BY MR. BILES:

Q.   And you posted this; correct?

A.   Yes, sir.

Q.   Okay.  And you said it was "a once in a lifetime opportunity to own the coolest number ever," right?

A.   Yes, sir.

Q.   You said you "gave a car title up for the number," correct?

A.   That's correct.

Q.   We covered that, is that correct?

A.   Yes.

Chet Michael Wilson
December 12, 2025

Page 47

Q. So you were owed about a thousand dollars on the car, so you swapped the debt and title in exchange for a number, for this number, correct?

A. Yes, I believed I would never get payment any other way, so that was -- yeah.

Q. And then you say, "I passed up 20,000 already so unless it sells over that, I'm in no hurry to part with it." Is that correct?

A. That's correct.

Q. And do you know what year this was?

A. It was not -- it wasn't long after I had acquired the number. Within the year probably. Yeah.

Q. Would you sell the number today?

A. Would I sell it?

Q. Yeah.

A. Well, at that point I hadn't connected that phone number with as many people, so it didn't have a personal value to me. But no, I -- I wouldn't sell it at this point. I have too many people connected to it.

Q. And you make too much money off of it, right?

MR. PELUSO: Objection to the form.

A. To tell you the truth, if -- if I could use my phone, I'm fine without this money. If I could use my phone without being harassed every day, I'd be more than happy to have a regular cell phone that's -- so, yeah, I don't think

Chet Michael Wilson
December 12, 2025

Page 48

that has any bearing on my keeping the phone number.

BY MR. BILES:

Q.   Did you review your Facebook post before this deposition?

A.   Yes, I believe those are attached in one of the documents.

Q.   I have no idea what that means, attached to what documents?

A.   I know that there's some Facebook posts.  Well, I have, I believe there was a couple Facebook posts that were attached to this litigation.

Q.   Attached to what in this litigation?

A.   As part of the discovery?  I don't know the legal stuff, but I remember seeing a couple pictures of my Facebook stuff attached, what I believe, I think it was this particular litigation.  As you know, I have many.

Q.   Yes, I do.  Now, you keep -- let me ask you this: You don't actually call anybody based on memorizing their phone number these days, do you?

A.   Very few.

Q.   Because it's easier and faster to go to your phone and select the number, right?

A.   Unless you have a phone number like mine.

Q.   You think people just dial your number, don't go to their phone?

Chet Michael Wilson
December 12, 2025

Page 49

A.    Yeah.

Q.    With their contacts?

A.    Lot of time.

Q.    Mm-hmm.  Wouldn't be very hard for the rest of us to call anyone else just using our phones right, we don't memorize phone numbers anymore?

A.    No, I -- but like --

        MR. PELUSO:  Objection to the form.

A.    You know, my --

BY MR. BILES:

Q.    Go ahead.

A.    I know there's a lot of times people don't have their phones with them, especially my children or family members or whatever, and it's been very helpful.  I've, you know, I've encountered some situations where someone memorizing my number has helped them a great deal, so --

Q.    How many phone numbers do you have memorized?

A.    Maybe ten, 15 numbers.

Q.    That's nine more than me, but, okay.  Or 14 more than me.

A.    That's how we used to have to do it all the time.

Q.    I know, especially people my age.  So for the -- for the fact that a few people have your number memorized, you wouldn't sell it for 20,000?

A.    You know, money isn't as value to me as -- as

Chet Michael  Wilson
December 12, 2025

Page 50

having those connections and, you know, like I said, I --
you know, I've lived my life without having to worry about
exchanging cash, you know.  A lot of my life surrounds just
barter and trade and having people that I've helped out that
are willing to help me out and vice versa.

It's just -- it's really nice not having to
deal with the structured society a lot of the time.

Q.   What social media accounts do you have, sir?

A.   I have two Facebooks, an Instagram, and that's the
majority, that's my social media.

Q.   So what are the two Facebook pages?

A.   It's the Chet Tank Wilson and there's another one
that's Tank tha Dank, T-H-A --

Q.   Wait.  It's just T-I-N-K T-H-E T-A-N-K?

A.   T-H-A is the Tank Tha Dank, with an A., not E.

Q.   And what's your Instagram page?

A.   Bunker Plot.

Q.   Any other social media?

A.   That's all I use.

Q.   Do you communicate with other people about
bringing TCPA suits besides your own lawyers?

A.   No, I've referred some people towards the process.
Other people that were being harassed.  And with no details
of any specific case or anything of that nature.

Q.   And you've referred them to your own lawyers, is

Page 51

that correct?

A.   No, not -- just in general, the process.  You know, so --

Q.   Who if anybody have you spoken to about your lawsuit against Reprise besides your lawyers?

A.   Absolutely no one.

Q.   Not Sara -- it's not Sara Taylor?

A.   I have no direct communication with Sara Taylor whatsoever.

Q.   Ever?

A.   Not that I --

Q.   You have never heard of Sara Taylor in your life?

A.   I don't believe so.

Q.   You never communicated with Sara Taylor in your life?

A.   Uh -- no, I don't think so.

Q.   How about Antwane Johnson?  You ever communicated with Antwane?

MR. PELUSO:  Objection, the relevance of this.  Neither one of those people is a plaintiff in this case.

BY MR. PELUSO:

Q.   I might make them a witness depending on what Mr. Wilson told them.  Those would be admissions.

A.   I've never spoken to any one of those people

Chet Michael Wilson
December 12, 2025

Page 52

whatsoever about this case or any matter to my recollection.

Q.   Never spoken to your own kids about your case?

A.   I mean, there's no reason why I'd ever talk to them about details of this case.  They wouldn't even be interested.

Q.   Okay.  So you've never spoken to anybody other than your lawyers in any way, and I see you -- let's back up.

You've never communicated with anybody, literally anybody besides your lawyers about your case against Reprise?

A.   Not to my knowledge, no.

Q.   How much money are you looking for from Reprise?

A.   Whatever the statutes direct, you know, whatever the Judge thinks fair.

MR. BILES:  Can we take like a ten-minute break?  I've got to use the restroom.

MR. PELUSO:  Sure.

(Recess.)

MR. BILES:  Julia, would you put up D11?

MS. COONS:  Yes.  One moment.  Which will be Exhibit 6.  You said E11?

MR. BILES:  The conviction table.

MS. COONS:  Okay.  Got It.  Thank you.  Yes, sir.

Chet Michael Wilson
December 12, 2025

Page 53

(Deposition Exhibit No. 6 was

marked for identification.)

BY MR. BILES:

Q.   All right.  Mr. Wilson, I've gone through your

criminal history and I've attempted to limit it down to

actual convictions.

A.   Okay.

Q.   Can you review this and tell me, one, if there's

any of these that is wrong, and then two, if there's any I

left out.

MR. PELUSO:  Just going to lodge a standing

objection.  I'm not going to keep jumping in every time with

a relevance objection.  It will be too choppy, but to all

the questions related to criminal history, I object as to

the relevance.

MR. BILES:  Understood.

A.   I mean, it looks all accurate.

BY MR. BILES:

Q.   So --

A.   I don't believe there's anything missing.

Q.   So we go down below -- so we go to 6, we get,

"Possession of Marijuana," correct?

A.   Yes, sir.

Q.   And then 7 is "Manufactured/delivery of a

controlled substance, Schedule 1.  Do you see that?

Chet Michael Wilson
December 12, 2025

Page 54

A.   Yes.

Q.   Can you tell me what that was?

A.   I'm not sure what the exact thing was.  This was all -- actually all that -- there was evidence planted on me for that one.  I don't know if that's relevant.  But, yeah, I don't know -- I don't now what the exact 7 or 8 are.

Q.   Okay.  For the items that are listed at 7 and 8, though, you were convicted, correct?

A.   Correct.

Q.   Do you agree that all 1 through 16 are things that you were convicted for?

A.   Looks accurate.

Q.   Okay.  Now, Mr. Wilson, earlier we showed you the four text messages -- actually, Julia, why don't you just put those back up.

This has got to be Exhibit 3 if my recollection is right.  No, it's -- well, it doesn't matter.

MS. COONS:  I have it as Exhibit 4.

MR. BILES:  As what?

MS. COONS:  Exhibit 4.

MR. BILES:  Yeah, that's what I thought.  I had it wrong.

BY MR. BILES:

Q.   All right.  Mr. Wilson, I'm showing you again which is Exhibit 4, which is the four text messages at issue

Chet Michael  Wilson
December 12, 2025

Page 55

with Bates label Wilson ending in 06.  Do you see that?

A.    Yes, sir.

Q.    When the text at the top came in, did you even
read it?

A.    I don't recall if I read the first one or if I
noticed after there was several or more than one.

Q.    Did you read the second text at the time?

A.    I've read -- I've read all the texts.

Q.    I understand that.  When that text came in, did
you read it?

A.    I don't recall if I did directly at that time or
not.

Q.    Did you read the third text, and we're numbering
them from top to bottom, the third text, did you read that
when it came in?

A.    I don't recall.

Q.    The fourth text, the bottom text, did you read
that when it came in?

A.    I don't recall.  I just constantly have an
inundation of similar messages, so hard to remember if I did
at the exact time.

Q.    And you didn't respond to any of those, right?

A.    No, sir.

Q.    So to the best of your recollection the first time
you dealt with these texts, you took an image of it and sent

Chet Michael Wilson
December 12, 2025

Page 56

it to your lawyers; is that right?

MR. PELUSO:  Objection to the form.

A.  I don't recall.

BY MR. BILES:

Q.  Before sending this to lawyers, how much of your life did this take up?

MR. PELUSO:  Objection to the form again.

BY MR. BILES:

Q.  None, right?  You didn't even -- you don't even remember reading them?

A.  I don't remember the time that I read them, but I do remember reading them, yes.

Q.  Sure.  You know that you read them when you took an image of it and sent it to your lawyers; right?

MR. PELUSO:  Objection to the form.

A.  At the very latest date.  I assume I had read them earlier, too.

BY MR. BILES:

Q.  How, if at all, do you claim receipt of those four texts hindered you?

MR. PELUSO:  Objection.  Calls for a legal conclusion.

A.  I didn't even understand your question.

BY MR. BILES:

Q.  Do you contend that you suffered an injury because

Page 57

you received those four texts?

A.   Absolutely.  This added to my harassment that I deal with every day, so, yeah, it definitely did.

Q.   Well, if you're receiving ten to 60 a day, it's not that much a big of a deal to receive one more, right?

MR. PELUSO:  Object to form.

A.   Every one -- honestly every one is a huge harassment to me.  And, you know, it's all these together that cause a huge problem to me.  And this is definitely, you, it's not helping the issue whatsoever.

BY MR. BILES:

Q.   How did -- just tell me, how did the very first text skip all the others?  How did that first text cause you to be harassed, if at all?

A.   It's -- I mean, it's been a matter of time.  I don't understand, I don't remember the exact frustration that I had in the moment that I had read those, but I don't -- I don't like any of these texts.

Q.   That's not true, sir.  But we'll get to that.  But you love these?

MR. PELUSO:  Objection.

BY MR. BILES:

Q.   You said so on line, right, sir?  You've said you love this.

MR. PELUSO:  Objection, harassment, form,

Chet Michael Wilson
December 12, 2025

Page 58

relevance.

A.   I don't -- I don't believe that's accurate at all.

BY MR. BILES:

Q.   This is how you make money right, sir?

MR. PELUSO:  Objection.  Same objections, plus asked and answered.  We've already extensively gone over them.

BY MR. BILES:

Q.   Sir, you want these text messages -- sir, you want these text messages, don't you?

MR. PELUSO:  Object to form.  Objection. Harassment.

BY MR. BILES:

Q.   You can answer.

A.   We've -- we've been over this.  I absolutely do not want these, as I stated earlier on the record under oath.

Q.   How did receiving the first text -- well, do you, let's make sure I understand everything you're saying. You're claiming that you're injured because this harassed you, is that correct?

A.   It's a huge -- it's a huge burden to me, yes.

Q.   Anything else?

A.   No.

Q.   Okay.  How is it a huge burden when you received

Chet Michael Wilson
December 12, 2025

Page 59

the first text that you didn't read or that you don't recall reading until after you sent it to your lawyers?

A.   Oh, this is an ongoing burden that these text messages has led me to.  You know, I had to go buy a computer so that I could do this, I had to sit here and do all this, I had to go over all these documents.

I'd rather just have not gotten the messages in the first place and never dealt with this, honestly.  I don't need the money from it, but I'm going to hold these people accountable if I'm being harassed, because I guarantee I'm not the only person.

And that's my main goal here is to stop these and create a situation where these people can respect consumers and not harass them as a class, as for everybody.  Not for myself only.

Q.   You've never had a class certified, though, have you, sir?

A.   Excuse me?

Q.   You've never had a class certified, have you?

A.   I'm not sure what that means.

Q.   How many cases have you settled?

A.   Upwards of 20.  I don't know.  I'm not certain exactly.

Q.   Did anybody besides your -- you or your attorneys receive anything from those settlements?

Chet Michael Wilson
December 12, 2025

Page 60

A.   I assume so, yeah.  I think so.

Q.   On what basis do you assume so, sir?

A.   Well, I know there's at least one incidence where I've been a co-plaintiff and I believe the case was settled, so --

Q.   Okay.  Fair enough.  Did anybody besides you, a named co-plaintiff, your attorney and any named co-plaintiffs receive any money?

A.   I can't -- I can't speculate on how funds are disbursed, you know, but, yeah, I don't -- I don't know all the -- that's all -- my attorneys do all of that stuff, so --

Q.   Did you ever get a class any relief whatsoever?

A.   I don't understand the question.

Q.   Sir, you've filed 70 potential class actions, right?

A.   Somewhere around there.

Q.   And you understand as a result there's a difference between you receiving money, and the class receiving money, correct?

A.   I believe the same standards of compensation are for everybody.  I don't -- I don't necessarily understand how that's distributed.  And I -- I don't actually understand the -- how the difference, how the class -- I -- I don't understand all the little -- the verbiage as far as

Chet Michael Wilson
December 12, 2025

Page 61

how it goes.

Q.   Okay.  Okay.  Do you know whether you ever got a class certified?

A.   I don't believe that it's moved to a class certification on this case as of yet.  But I believe.

Q.   How about the other cases?

A.   I don't -- I don't recall exactly, no.

Q.   You do, you recall that you have not had a class certified, don't you?

A.   I don't know what the class certified, I don't know what that means.

Q.   Sir, I think you'd remember if you got a class certified, don't you think so?

A.   I don't -- I don't know -- I don't know what class certified, actually the --

Q.   So you brought 70 class actions, you don't know what a class, getting a class certified is?

A.   I've never been told that term directly like that, class certified, no.

Q.   Okay.  Now, I understand that what you say is receiving all these texts from all these lenders in conglomeration, you say that's a burden, a huge burden.

But that's not my question.  My question is how, if at all, do you claim that receiving the four texts that are currently up on the screen burdened you, or

Page 62

otherwise harmed you in any way?

A.   Every time I get a text it's -- it just irritates me.  It's irritating, it's like a little gnat just bothering me.  So every single time that I get one of these texts that's not meant for me, it upsets me, and I don't enjoy it and that's why we're here.

Q.   Well, we're here because you want money, right, sir?

MR. PELUSO:  Objection to the form.  Objection, harassment.

A.   I'd be -- oh, go ahead.

BY MR. BILES:

Q.   Go ahead.

A.   I'm -- I'm content without any money just as long as this stuff stops.  I mean, I'd -- I don't -- you know, I think I should be compensated for what's been done so far, and I think the biggest thing to me is making sure that if anybody else is in this situation that they're compensated even over myself -- that's the least of my worries is my own personal compensation.

Q.   Yet you care so much that you can't tell me whether you ever got a class certified, right?

MR. PELUSO:  Objection, asked and answered.

A.   I just don't know what that means.  So it's not me avoiding anything, I just don't understand what that all

Chet Michael Wilson
December 12, 2025

Page 63

pertains to.

MR. BILES:  Okay.  Julia, can we go back to the complaint?  Can we go to the prayer, Page 9?

BY MR. BILES:

Q.  All right.  Mr. Wilson, do you see Paragraph B there?

A.  Yes.

Q.  So you're asking for, An award of statutory damages in the amount of $500 for each violation, whichever is -- which is greater -- what -- oh, whichever is greater all to be paid into a common fund for the benefit of the plaintiff and the class members, correct?

A.  Yes, sir.

Q.  All right.  So for you personally, how much money is that?

A.  That would be $2,000 if -- as long as they weren't found to be intentional.

Q.  Well, you haven't pleaded intentional, right?

A.  What's that?

Q.  You haven't requested the $1,500 version, correct?

MR. PELUSO:  Objection to the extent it calls for a legal conclusion.

A.  Yeah, I believe we're waiting on a legal conclusion before.

Chet Michael Wilson
December 12, 2025

Page 64

BY MR. BILES:

Q.   Do you know why you haven't pleaded for $1,500 per violation?

A.   I believe that's, you know, I give that to my attorneys to kind of find out what standards that -- yeah.

Q.   Okay.  So -- and to be frank, you also asked for attorney's fees if we went down -- Julia, scroll down.  He's asking for attorney's fees, too.

And you want attorney's fees, correct?

A.   I believe that's how it's written out in the statute.

Q.   So on your best day you personally would get, according to you, $2000 plus attorney's fees, correct?

A.   Uh --

MR. PELUSO:  Objection.  That mischaracterizes the testimony.  Also calls for a legal conclusion.

A.   Yeah, I don't understand if these have only been found to be nonintentional or if they -- more information is, could possibly change that, so I'm not certain.

BY MR. BILES:

Q.   I'll help you out.  You haven't pleaded intentional because then you could never get a class, and so you're not asking for $1,500 because then you're -- your lawyers have made -- made a decision about this that you've

Chet Michael Wilson
December 12, 2025

Page 65

agreed to.  So how much is it that you want from my client to have this case go away?

A.   I guess according to this, probably 2,000 and attorney fees, I'm assuming, at least.

Q.   Would you settle on that?

A.   I'm not certain I'd have to talk with my counsel.

Q.   Okay.  That's fair enough.

MR. BILES:  Julia, let's start pulling the Facebook ones.  Let's -- I'll tell you which one in a second, Julia.

MS. COONS:  Okay.

BY MR. BILES:

Q.   All right.  Let's go with tab 10.

Mr. Wilson, I think you covered this already, but Chet Tank Wilson is one of your Facebook pages; right?

A.   Mm-hmm.

Q.   Did you make this post?

A.   I did.

Q.   Okay.

A.   Yes.  Shows my frustration in getting all these calls.

Q.   You got no calls from Reprise, though, right?

A.   I'm not certain at this point.  That was quite some time ago.

Q.   All right.  So, and so, but you were saying you're

Chet Michael Wilson
December 12, 2025

Page 66

getting 30 to 70 telemarketer calls a day, is that correct?

A.   I don't recall how accurate that is, but that seems to be the case.

Q.   You wouldn't post something that was inaccurate, would you?

A.   No, but it's five years ago, so hard to remember details.

Q.   How do you know this was five years ago?

A.   Because it says at the bottom.  Five years ago. The screenshot or whatever it is.

Q.   Oh, I see.  Okay.  Thank you.

MR. BILES:  Julia, let's go with tab 9.

MS. COONS:  Are we marking this one?

MR. BILES:  Oh, I'm sorry, yeah.  Let's mark this as Exhibit -- I think we're on 7 now.

MS. COONS:  Yes, sir.  Okay.  And you said 9?

MR. BILES:  9.

(Deposition Exhibit No. 7 was

marked for identification.)

(Deposition Exhibit No. 8 was

marked for identification.)

BY MR. BILES:

Q.   All right.  So now we're at Exhibit 8.

Mr. Wilson, this is posted by you, is that correct?

Page 67

A.   Yes.

Q.   Well, top one is posted by you and then there's other people communicating, and then we go down a little bit later and we get you responding to Liz Anderson, is that correct?

A.   Yes, sir.

Q.   So this post you originally posted on December -- well, 2022, right?

A.   Yes, sir.

Q.   And at that time you were receiving, what, 30 to 70 solicitations a day?

A.   I mean, I'm sure there's a variance, but, you know, it's random, but, yes, somewhere in that vicinity.

Q.   Okay.  And then you tell Liz Anderson, "I literally got to say all the 9's.  Definitely once in a lifetime.  The universe loves me."

That's what you told her, right?

A.   Yes.  That's what I said.

Q.   Okay.

A.   I do think it's important you read the rest of that comment, though, because it's -- I'm an optimist, so I'm going to turn anything negative hopefully into something positive.

Q.   Move to strike, nonresponsive.

MR. BILES:  Let's go to tab 6, Julia, so this

Page 68

will be the next exhibit, 8, I think.

                    (Deposition Exhibit No. 9 was

                      marked for identification.)

BY MR. BILES:

     Q.   All right.  So Mr. Wilson, do you see, first of
all, you see where it says Chet Tank Wilson?

     A.   Yes, sir.

     Q.   And then you're responding to a Celeste Gable, is
that correct?

     A.   Yes, sir.

     Q.   And did you in fact make this post?

     A.   Yes.

     Q.   Did you refer her to one of your attorneys?

     A.    I don't believe she ever followed through with
anything, or we spoke anymore other than this post.

     Q.   And in this message you then -- you go on to say,
"What I did is just gave her tech guy my iCloud and they
stay on top of it.  They are going back five years, the
biggest thing is keeping all the voicemails."  Did I read
that correctly?

     A.   Yes, sir.

     Q.   And do you know when you posted this?

     A.    It says one year, but I'm not certain how long
it's been.  Yeah, probably, that's probably accurate because
that's right about when I started learning about how to do

Chet Michael Wilson
December 12, 2025

Page 69

these cases, so, yeah.

So I didn't have the exact accurate details to give her, it was just kind of -- obviously I was in the introductory stages of learning this process.

Q.   So you gave the tech guys at one of your law firms access to your iCloud so they could stay on top of the text messages you were receiving, is that right?

A.   I don't believe -- it's not necessarily stay on top of it, but to -- I had five years of all this stuff gathered, and it was nearly impossible for me to go through all of it and get all the details and stuff without some kind of technical, somebody to help me go through it all.

Q.   Okay.  So you were -- you wanted to go back and find every lawsuit you could bring under TCPA, right?

A.   Yeah, you know, after years of being harassed, I definitely wanted compensation for all that.  I've spent so much of my personal time trying to resolve this situation, prior to them even acknowledging there was any kind of claim or TCPA action, you know.

And I, as in the last document you showed me, I said I'm going to keep this number and that's prior to me ever knowing there was money involved in it, so it just goes to show, and documents and supports everything I'm saying here, so, yeah.

Q.   So I mean you've got to have help going back

Chet Michael Wilson
December 12, 2025

Page 70

through all your text messages because you didn't really pay that much attention to all of them, so now you got to go back and find the ones that you want to sue over, right?

MR. PELUSO:  Object to the form.

A.   I don't think that's accurate whatsoever.  I believe that when you deal with such a volume of harassment, it's -- it's hard to decipher which is what.

So you have to, you know, you have to organize that to where you can acknowledge who's all at fault for all these period of years that I have been harassed.  Before I knew there was any kind of compensation.

BY MR. BILES:

Q.   And when you have a large volume of text messages coming in, you don't really read every one of them, right?

MR. PELUSO:  Object to the form, leading.

A.   I go through them all.

MR. BILES:  Go ahead, sir.  You may answer.

A.   I usually go through the majority of my texts and calls, yes, I do.

BY MR. BILES:

Q.   Every single text that comes in, as it comes in you read it?

A.   Well, it pops up on my screen usually when I'm trying to do something else, and I get the -- I get the text message and I read it and then, you know, and then sometimes

Chet Michael  Wilson
December 12, 2025

Page 71

I get multiple and then I'm like, Wow, okay.  This person is really harassing me, so let me send this, so --

Q.   So you're claiming that unbelievably, unlike the rest of us, you read the text messages that come in as they come in, every single one of them?

A.   I did not say that.

Q.   Even though you can tell -- even though you can tell the second you see it that it's not something you want to deal with.

MR. PELUSO:  Objection to the form.

A.   Well, when it -- when it pops up in a notification I'm forced to read it right there, usually, and so yes, I do, the majority of them while I'm awake anyways, I -- I -- I read them.

BY MR. BILES:

Q.   Why?

A.   To see what they're about.

Q.   Why?

A.   Because I have to weed through all this stuff to find out what has to do with me and what could be connected to something I'm doing, or if I have a bill or whatever because I do have a lot of different things attached to my private phone number.  So if I'm getting something, I'm going to make sure it's not something important that I have to -- that I'm going to overlook.

Chet Michael Wilson
December 12, 2025

Page 72

Q.   How long would that take you?  Tenth of a second?

A.   I mean it doesn't matter.  When they all add up, it's a waste of my life.

Q.   I didn't ask you that question.  I asked you how long did it take per text?

A.   Every text is different, sometimes there's links, so, you know, that's not -- that's not -- that's not something I can answer accurately.

MR. BILES:  Julia, let's go to tab 5.

MS. COONS:  Okay.  We're marking this one as Exhibit 9, correct?

MR. BILES:  Yes.

MS. COONS:  Okay.

MR. BILES:  Better mark this one that's coming up as the next exhibit.

MS. COONS:  Okay.  Tab five.

(Deposition Exhibit No. 10 was marked for identification.)

BY MR. BILES:

Q.   Sir, this is a post you made on your Chet Tank Wilson Facebook account on -- I need my glasses -- on December 10th, 2024, correct?

A.   Yes, sir.

Q.   And on that day you said you had "36 class action lawsuits so far, and this is my first offer."  Correct?

Page 73

A.   Yes, sir.

Q.   How much was the offer?

A.   I don't remember.

Q.   Did you settle it?

A.   I don't recall.

Q.   What case was it?

A.   I don't recall.

Q.   You don't remember the very first time you got a settlement offer, you can't tell me what case it was in?

A.   I don't know.

Q.   I mean, you're a professional.  You have 70 of these.  You don't remember which one?

A.   That's why I don't.

MR. PELUSO:  Object to the form.

A.   That's why I don't remember, because there's a lot of them.

BY MR. BILES:

Q.   Too many to keep track of, right, sir?

A.   Accurately, yes, without looking at documents.

Q.   Because as you said right there, "I sign several new claims each week so looks like my phone number is gonna be another line of steady income for me," exclamation point. Correct, sir?

A.   That's what I wrote.

Q.   So these lawsuits including the lawsuit against

Page 74

Reprise under the TCPA are a line of steady income for you, correct, sir?

A.   Yes, that's what I wrote.

Q.   And it' true?

A.   Yes, that's true because after all this harassment it's like a light at the end of the tunnel, I was excited. Yeah, I was excited that I'm finally going to be compensated for all this time that I've wasted in my life dealing with people that I don't even know.

Q.   And you kind of enjoy these lawsuits, right?

A.   I don't --

MR. PELUSO:  Objection to the form.

A.   I don't enjoy any part of this, to tell you the truth.

BY MR. BILES:

Q.   You're out there posting telling other people how to do it, right?

A.   To help other people.  Just why I'm -- why I'm trying to bring these class actions.  Exactly.

Q.   Um-hmm.  Do you know how -- I'm going to ask you this again:  Do you know how much you've received in settlement under TCPA?

A.   I thought we went over this.

Q.   Do you know if your lawyers in other cases have settled for six figures?

Chet Michael Wilson
December 12, 2025

Page 75

A.    On larger cases I believe that wouldn't be that far off.

Q.    So how much did you get?

A.    Without looking at documents, I can't --

Q.    What documents would we need to see in order for us to determine how steady of a line of income this is for you, sir?

A.    Will you repeat that one more time?

Q.    What documents would I need to review in order to determine how steady of a line of income TCPA lawsuits are for you?

A.    It would have to be something that you'd received from my attorneys, or, you know, I mean, I sign every document, so I don't know.

Q.    So I asked for every document in every lawsuit, right, you saw that in the doc requests?

A.    Yes, I believe so.

Q.    And you know that you said that that was overly burdensome and too hard for you to do, right?

            MR. PELUSO:  Objection.  Calls for a legal conclusion and these were legal objections.

A.    This is all -- this is all things that I would refer to my attorneys to produce.  I'm not very tech savvy.

BY MR. BILES:

Q.    You don't have to be, but in order to say it's

Chet Michael  Wilson
December 12, 2025

Page 76

harass -- it's too much for you to do you'd have to know that it's too much for you to do.  How hard is it for you to produce the files that your lawyers have, sir?

A.  Accurately without missing anything, I wouldn't feel comfortable that I'm good enough at doing computer work and stuff.

Q.  Wouldn't be hard for them to produce the settlement agreements, though.  You'd agree with that, right?

A.  I'm not certain.  That's a question for them.

Q.  That's a question for you, then, you could produce them, is that right?

A.  So --

MR. PELUSO:  Objection to form.

A.  I try not to add any more burden to this than I have to.  That's why I have attorneys.

BY MR. BILES:

Q.  Yeah, so you get to sue people and add burden to them, but you won't produce basic documents, sir.  Is that your position?

MR. PELUSO:  Objection to form.  Harassing.

A.  It's -- I don't know how that's in my hands. That's why I have attorneys.

MR. BILES:  Oh.  Julia, let's go to tab four which we'll mark as the next exhibit number, which -- what

Chet Michael  Wilson
December 12, 2025

Page 77

are we on, 11 now?  It will be 11?

MS. COONS:  It will be 11.  Tab 4.

(Deposition Exhibit No. 11 was

marked for identification.)

BY MR. BILES:

Q.   Sir, do you recognize -- can you just tell us what this is?

A.   This is my Facebook account.

Q.   And a post that's down there under Chet Tank Wilson, you posted that, right?

A.   Yes, I did.

Q.   So in there you claim you got -- started getting blown up years ago with robot calls and prerecorded nonsense, right?

A.   Will you repeat that?  I was read -- I was trying to read it.

Q.   It says, "I've been getting blown up for years with robot calls and prerecorded nonsense."  Did I read that portion of that sentence correctly?

A.   Yes.

Q.   And when did you make that post?

A.   I'm not certain.  There should be a date on it, but it doesn't, it was just -- I don't know.  Within the last year.

Q.   How do you know it's within the last year?

Chet Michael Wilson
December 12, 2025

Page 78

A.    Because I just started the TCPA actions, I just got knowledge of the TCPA actions a year ago when I contacted the law firm to help me decipher all this.

Q.    So you contacted --

A.    So has to be within the year.

Q.    Okay.  So in a year you filed 70 lawsuits?

A.    Roughly.

Q.    And do you see there you just -- it says, "I just signed two more class actions this morning and I have been signing 1 - 3 per day since I started a month ago."

A.    Yes, sir.  Lots of work to be done.

Q.    And you've mentioned there at that point you had brought 30 suits so far, is that correct?

A.    That looks accurate.  I'm sure I wasn't exaggerating.  I think this outlines my stance from the get-go is that, you know, I was finally excited that this burden is actually bringing me some compensation, because I'd been frustrated for years.

It's absolutely, yeah, it's insane for what I've had to go through to get to this point.

Q.    Just to be clear, for years you were being, receiving 30 to 70 text messages a day you thought were violations of the TCPA, right?

A.    Yes, sir.

Q.    Okay.  And not one time did you respond to any of

Chet Michael Wilson
December 12, 2025

Page 79

those with "Stop," correct?

A.    Yeah, I did with multiple, and I told you earlier in the previous comments that I believe I found it's click bait.  And the majority of the time when you do respond in any form whether its "Stop" or what have you, it just entices them to realize there's somebody real on the other end and it makes it worse.

Q.    When is the last time you responded "Stop"?

A.    I'd have to look back through my texts, but at least, you know, it's -- I just had -- I just had some the other day that I found that I pushed "Stop" and it was, there were multiple messages afterwards.

Then I said "Stop" again and there's more multiple messages, and so, yeah, I do have documents but it would take me some time to track them down.

Q.    So you did -- okay.

A.    I have proof of when I typed "Stop," it's not working.  So at least, you know, at least one occasion that is in my memory.  So --

Q.    You didn't give Reprise that chance, though, right?

A.    After over and over and not working, it -- yeah, there's -- I mean it just seems like it could make that situation worse, so it's just more time I'd have to invest in something that would never come to fruition.

Chet Michael Wilson
December 12, 2025

Page 80

Q.   But just to be clear, you did not send "Stop" in response to Reprise text messages, right?

A.   I did not because I thought it would be detrimental.

Q.   Earlier you said you had to invest in doing these lawsuits and you bought a computer, is that right?

A.   I'd invested, yeah, I had to buy a computer and then -- I mean, my time is far more valuable than that.

Q.   So why did you buy a computer to do these lawsuits?

A.   Because it was my understanding I needed an actual PC rather than my iPad that I already had, and I believe it was at the request of the defendant, so that's -- that's why.  Otherwise I wouldn't spend a penny on this.

Q.   What were you using -- what are you using the computer to do in regard to the lawsuits?

A.   I believe it was the connection with the Zoom and having a steady camera, and that's my understanding.  I don't -- I don't -- I'm absolutely the least technical savvy person you'll ever meet.  So I just, yeah, I was told that that's what's needed, so I went and got a computer.  And here I am.

Q.   What else have you done to invest in these lawsuits?

A.   Mostly my time, you know, it takes a lot of time

Page 81

and, yeah, you know, I've -- I've learned a lot over the last year.

Q.    How much time do you -- how much time do you invest in this on a weekly basis?

A.    I don't know.  Maybe five to ten hours, depending on how -- how much harassment I get a week.  And that's just on -- actually more than that because -- I don't know, I'd say potentially upwards of 20 hours a week.

Q.    And what are you doing for those 20 hours you invest into litigation?

A.    Gathering information, sending documents that I think would pertain to TCPA actions, forwarding voicemails, transcripts of voicemails, you know, going through documents, preparing for depositions.

Just paperwork and paperwork and paperwork, all, you know, looking in my emails all the time. There's -- it's a lot to it.  It's, you know, it's a -- it's a job.  A job I never -- I never asked for, so --

Q.    Well, no one is making you file these lawsuits, right?

A.    Nobody's making me.

Q.    And I assume the law firm didn't ask you to file them, you went to the law firm, right?

A.    Yes, sir.

Q.    Are you sure you found the law firm you're using,

Chet Michael Wilson
December 12, 2025

Page 82

not Mr. Peluso, the law firm that referred you to Mr.

Mr. Peluso by Googling them?

A.   Yes.  I believe in a previous discovery we even

produced that.  My search -- not with this case in

particular, but I believe the search, there is search

history of me looking for representation.

Q.   They're not the easiest firm to find on the

internet, are they?

A.   I believe I clicked one of the first options so I

had never heard of them prior, that's for sure.

MR. BILES:  I'm pretty much done, so we'll

take a five-minute break and then I'll make sure we're done?

MR. PELUSO:  Okay.

(Recess taken.)

BY MR. BILES:

Q.   Mr. Wilson, I just want to understand one issue.

You say in order to make ends meet you're doing that by

selling things.  What are you selling?

A.   I have multiple pieces of equipment.  I collect

decommissioned military equipment, semi-trucks, transport

buses, Unimogs, 6 by 6 cranes, you know, many different

military things.  And, you know, cars, trucks, what have

you.

And I do a lot of bartering and trading and

it works really well.  I'm really good at it.

Page 83

Q.   In order to barter or trade, you have to already own stuff which requires money.  I'm still trying to figure out where the money is coming from for these lawsuits.  So you haven't had an income in forever, right?

A.   About five years.

Q.   Okay.

A.   I made really good money moving people with my moving company that I owned.

Q.   How much did you make?

A.   I'm not certain exactly, but --

Q.   Well, you're the one who said really good money, so what does really good money mean to you?

A.   Well, a lot of the things is barter movers, so to put into clarification, a lot of these elderly people that are moving into retirement facilities, they'd give me basically all their assets that wouldn't fit in their place, in trade for doing the move.

So then I'd, in return I'd put them online or, you know, sell whatever kind of stuff that I get out of it, furniture, what have you.  And, you know, so I had an accumulation of many, many things that I acquired while doing this moving, and, you know.

So I'd say a lot of my assets come from like kind of a residual based on the work I put in years ago.  So, you know.

Chet Michael Wilson
December 12, 2025

Page 84

Q. Okay. Well, how much were those items of the estates -- that's not right, they're still alive, but of the materials, equipment, stuff they gave you, how much was it worth at the time because you'd have to know that in order to fill out your tax returns?

A. I had a CPA so he handled all that stuff. I mean it would be something I'd have to like go back into documents about, so, yeah. I always have different little, facets of, you know, things trickling in because of my network and, you know, I just -- it's kind of neat.

MR. BILES: Okay. I'll pass the witness.

MR. PELUSO: I don't have anything.

THE REPORTER: Are you going to order, Mr. Biles?

MR. BILES: Yes, I am.

THE REPORTER: Did you want to order, Mr. Peluso?

MR. PELUSO: Yes, please.

THE REPORTER: Do you want him to read and sign?

MR. PELUSO: Yeah, we'll read.

THE REPORTER: And you'll handle that?

MR. PELUSO: Yes.

(Whereupon the deposition concluded at 11:27 AM)

Page 85

E-R-R-A-T-A

Deponent:  CHET MICHAEL WILSON
Case:  Wilson v. Skopos Financial
Date Taken:  December 12, 2025

Page / Line          Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I declare under penalty of perjury that the foregoing 84
pages are true and correct except for such corrections as I
may have noted above.

Executed this _____ day of _____, 2025.


_____
CHET MICHAEL WILSON

Chet Michael Wilson
December 12, 2025

Page 86

C-E-R-T-I-F-I-C-A-T-E


        I, CHERYL L. HAASE, a NCRA Registered Professional

Reporter and Certified Court Reporter for the State of

Washington, do hereby certify that the above and named

witness, CHET MICHAEL WILSON, was first duly affirmed to

testify the truth; that said witness did thereupon testify

as is set forth; that the answers of said witness to the

oral interrogatories propounded by counsel were taken by me

in stenotype and thereafter reduced to typewriting under my

personal direction and supervision.

        I further certify that the facts stated in the caption

hereto are true; and that all of the proceedings in the

course of the hearing of said deposition are correctly and

accurately set forth herein.

        I further certify that I am not counsel, attorney or

relative of either party, nor financially or otherwise

interested in the event of this suit.

        IN WITNESS WHEREOF, I have hereunto set my hand as such

Registered Professional Reporter on this the 16th day of

December, 2025, at Lebanon, Oregon.

_____
Cheryl L. Haase, RPR, CCR
NCRA RPR No. 12443/WA CCR No. 3503

Chet Michael Wilson
December 12, 2025

---

### Exhibits

**EX 0001 Chet Michael Wilson 121225**
  3:5 14:16 17:4,5

**EX 0002 Chet Michael Wilson 121225**
  3:6 18:15,17

**EX 0003 Chet Michael Wilson 121225**
  3:8 39:8,10 54:16

**EX 0004 Chet Michael Wilson 121225**
  3:9 42:13 44:18 54:18, 20,25

**EX 0005 Chet Michael Wilson 121225**
  3:10 46:12, 13

**EX 0006 Chet Michael Wilson 121225**
  3:11 52:22 53:1

**EX 0007 Chet Michael Wilson 121225**
  3:12 66:18

**EX 0008 Chet Michael Wilson 121225**
  3:13 66:20, 23

**EX 0009 Chet Michael Wilson 121225**
  3:15 68:2 72:11

**EX 0010 Chet Michael Wilson 121225**
  3:16 72:17

**EX 0011 Chet Michael Wilson 121225**
  3:17 77:3

---

### $

**$1,500**
  8:15 21:10 63:20 64:2, 24
**$2,000**
  63:16
**$20,000**
  46:1
**$2000**
  64:13
**$500**
  63:9

---

### 0

**06**
  55:1

---

### 1

**1**
  13:19 14:16 17:4,5 53:25 54:10 78:10
**10**
  65:13 72:17
**10,000**
  8:1
**10th**
  72:22
**11**
  40:13 77:1, 2,3
**11:27**
  84:25

**12**
  4:2
**14**
  40:14,15 49:19
**15**
  12:2 15:2 49:18
**16**
  54:10
**19**
  31:11

---

### 2

**2**
  18:15,17
**2,000**
  65:3
**20**
  7:3,10 12:2 15:2 59:22 81:8,9
**20,000**
  46:3 47:6 49:24
**2000**
  33:9 35:2,19
**2018**
  24:4
**2019**
  24:4 26:3
**2020**
  29:15
**2021**
  26:3
**2022**
  67:8
**2024**
  13:19 17:13 72:22
**2025**
  4:2
**2600**
  30:25
**29798**

**30:19**

---

### 3

**3**
  39:8,10,18 54:16 78:10
**30**
  66:1 67:10 78:13,22
**36**
  72:24

---

### 4

**4**
  42:13,21,23, 25 43:1 44:18 54:18, 20,25 77:2

---

### 5

**5**
  19:2,3 46:12,13 72:9
**50**
  14:20 15:3 26:15,17
**50,000**
  8:3
**500**
  8:13 21:10
**541 999-9999**
  13:16 25:22

---

### 6

**6**
  52:22 53:1, 21 67:25 82:21
**60**
  15:3 26:15, 17,21 57:4

Chet Michael Wilson
December 12, 2025

**69**
  6:11

**7**

**7**
  19:9,23
  53:24 54:6,7
  66:15,18
**70**
  6:11,13,23
  12:11 14:20
  15:3 20:22
  21:4 60:15
  61:16 66:1
  67:11 73:11
  78:6,22

**8**

**8**
  39:18 54:6,7
  66:20,23
  68:1

**9**

**9**
  63:3 66:12,
  16,17 68:2
  72:11
**9's**
  67:15
**9:02**
  4:3

**A**

**ability**
  36:10
**able**
  24:1 30:3
  33:21 36:25
**absolutely**
  37:9 51:6
  57:2 58:15
  78:19 80:19

**accept**
  45:25
**access**
  13:1,15
  15:11 27:12
  69:6
**account**
  13:16 15:11
  17:24 18:1,2
  72:21 77:8
**accountable**
  59:10
**accounts**
  50:8
**accumulation**
  83:21
**accurate**
  6:17,25 7:22
  13:3 18:13
  22:5 23:10
  26:19,23
  34:15 44:4
  53:17 54:12
  58:2 66:2
  68:24 69:2
  70:5 78:14
**accurately**
  7:18 72:8
  73:19 76:4
**acknowledge**
  70:9
**acknowledging**
  69:18
**acquaintance**
  24:6
**acquire**
  24:3,5
**acquired**
  26:10 47:11
  83:21
**action**
  19:19 22:9
  69:19 72:24
**actions**
  8:10 60:15
  61:16 74:19
  78:1,2,9

  81:12
**active**
  6:10,15,16,
  19
**actual**
  20:9 53:6
  80:11
**add**
  72:2 76:15,
  18
**added**
  57:2
**address**
  30:18
**admissions**
  51:24
**affiliated**
  29:18
**affirmed**
  4:7
**afterwards**
  79:12
**age**
  49:22
**ago**
  5:3 6:22
  45:16 65:24
  66:6,8,9
  77:13 78:2,
  10 83:24
**agree**
  9:20 10:1,12
  42:21 44:2
  54:10 76:8
**agreed**
  25:11 65:1
**agreement**
  8:6,23
**agreements**
  76:8
**ahead**
  5:21 14:16,
  24 20:6
  21:15 26:14
  28:14 39:7
  49:11 62:11,
  13 70:17

**alive**
  84:2
**allegation**
  41:9
**allege**
  39:19
**alleged**
  16:18 19:14
  38:21
**amazingly**
  33:24
**amount**
  63:9
**Anderson**
  67:4,14
**Andrew**
  13:11
**annoying**
  9:19
**answer**
  7:17 10:10
  14:25 15:16
  22:4 23:3
  24:23 58:14
  70:17 72:8
**answered**
  24:24 58:6
  62:23
**answers**
  44:22
**Anthony**
  13:10
**Antwane**
  5:24 6:7
  51:17,18
**anybody**
  37:10 48:18
  51:4 52:6,9,
  10 59:24
  60:6 62:18
**anymore**
  49:6 68:15
**anyone**
  12:3 22:12
  29:6 36:4
  49:5

apart
  38:7
apartment
  30:20
applied
  21:11
apply
  20:14,16
approximately
  6:18,23 7:8
  20:21 26:10,
  20
area
  7:10
around
  6:11,22 7:3
  25:13 29:15
  60:17
asked
  34:11 37:13
  41:11 58:6
  62:23 64:6
  72:4 75:15
  81:18
asking
  11:19 21:3
  63:8 64:8,24
assertion
  39:22
assets
  31:23 32:3,
  6,16,24
  83:16,23
assume
  18:5 31:16
  41:16 56:16
  60:1,2 81:22
assumed
  43:24
assuming
  14:13 44:21
  65:4
assumption
  41:17
attached
  43:24 44:21
  48:5,7,11,

12,15 71:22
attempt
  40:17
attempted
  53:5
attention
  70:2
attorney
  8:17 12:3
  60:7 65:4
attorney's
  39:24 64:7,
  8,9,13
attorney-
client
  15:22
attorneys
  13:4,7,9
  16:1 59:24
  60:11 64:5
  68:13 75:13,
  23 76:16,23
attracted
  24:1
auction
  30:13
auto
  38:22,23
auto-loan
  39:19
automatic
  42:18,19
autos
  39:2
avoiding
  62:25
awake
  71:13
award
  63:8
aware
  41:19

_____

        B
_____

B-R-O-W-N-L-
E-E
  24:17
back
  9:6 13:1
  24:18 25:25
  27:18 30:11
  33:3 52:7
  54:15 63:2
  68:18 69:13,
  25 70:3 79:9
  84:7
background
  33:3 35:18
bait
  20:8 38:14
  79:4
barter
  29:17,18
  30:12 32:11
  34:1 50:4
  83:1,13
bartered
  33:22
bartering
  82:24
based
  16:14 17:22
  20:23 21:4
  34:22 39:19
  48:18 83:24
basic
  33:3 76:19
basically
  11:15 83:16
basis
  8:17 26:12
  34:21 39:22
  41:2,8 60:2
  81:4
Bates
  42:9 43:11,
  14 55:1

bathroom
  13:24
bearing
  48:1
believe
  4:22 5:6,9
  6:17 7:8,25
  8:9 10:22
  12:7,10,13
  16:4,6,16
  19:1 21:5
  22:5 24:16
  25:13 26:3
  27:24 28:20
  34:21 37:23
  39:23 40:7
  44:20 45:11
  48:5,10,15
  51:13 53:20
  58:2 60:4,21
  61:4,5 63:23
  64:4,10
  68:14 69:8
  70:6 75:1,17
  79:3 80:12,
  17 82:3,5,9
believed
  38:14 47:4
below
  53:21
benefit
  9:10 27:10
  63:11
benefits
  18:4
Berrong
  13:12
besides
  32:3 50:21
  51:5 52:10
  59:24 60:6
best
  9:13,20 10:7
  55:24 64:12
better
  16:20 33:23
  42:11 72:14

Chet Michael Wilson
December 12, 2025

big
19:4 57:5
bigger
19:6 30:14
biggest
62:17 68:19
Biles
4:11 7:16,23
9:1,4,5
14:15,18
15:5,15,24
17:4,7,17
18:14,20
19:2,8 21:3,
6,20 22:3
23:15 28:1,
13 32:2
39:7,12
42:8,17,20
43:2,9 44:1,
23 45:19
46:4,6,11,15
48:2 49:10
52:16,20,23
53:3,16,18
54:19,21,23
56:4,8,18,24
57:11,22
58:3,8,13
62:12 63:2,4
64:1,21
65:8,12
66:12,14,17,
22 67:25
68:4 70:12,
17,20 71:15
72:9,12,14,
19 73:17
74:15 75:24
76:17,24
77:5 82:11,
15 84:11,14,
15
bill
25:4 71:21
bills
23:22

birth
24:13
bit
67:3
blocking
22:20 26:5
blown
77:13,17
body
34:9,20
bothered
42:7
bothering
62:3
bottom
55:14,17
66:9
bought
23:12 30:11
80:6
break
10:4,10,12
52:17 82:12
Brian
37:6,7,8,10,
11,14,23
38:4,9 41:19
45:7,8
brief
11:14 45:16
briefly
10:24 11:1,
11
bring
69:14 74:19
bringing
50:21 78:17
broad
41:5
brought
22:8 61:16
78:13
Brownlee
24:7,8,17
25:16,17
Brownley's
24:13

bunch
30:11 40:10
43:11
Bunker
50:17
burden
58:22,25
59:3 61:22
76:15,18
78:17
burdened
61:25
burdensome
75:19
buses
82:21
business
36:9 40:1,6,
18 41:11
buy
23:16,17
59:4 80:7,9
buying
36:16

---

**C**

calculated
21:8
call
14:10 18:8
22:24 25:23
36:6 40:22
48:18 49:5
called
4:6 13:25
16:14 22:20,
23 24:21
29:17
calling
25:1 30:15
calls
14:23 16:12
21:1,14 22:7
23:3 56:21
63:21 64:16
65:21,22

66:1 70:19
75:20 77:13,
18
camera
80:18
campaign
40:19 41:5
cancer
28:23
car
25:8,9,12
46:21 47:2
care
27:11 36:10
62:21
carrier
17:18,19,21
19:13
cars
82:22
case
5:2,4,8,10
6:21 8:7,8
12:9,18
14:10 16:5
21:8 37:25
38:2 43:16
44:17 45:10,
12 50:24
51:21 52:1,
2,4,10 60:4
61:5 65:2
66:3 73:6,9
82:4
cases
5:18,22 6:2,
6,9,14,24
7:20 12:11
13:4 21:4
32:18,20,24
59:21 61:6
69:1 74:24
75:1
cash
50:3
casts
40:16

Chet Michael Wilson
December 12, 2025

Celeste
 68:8
cell
 13:1,18,23
 14:3,9 17:19
 27:3 45:13
 47:25
cellular
 40:21
certain
 5:20 6:1,20
 7:22 8:5,10
 13:5,17
 16:9,23
 20:20 24:9
 25:25 39:1,3
 40:11 41:21
 59:22 64:20
 65:6,23
 68:23 76:10
 77:22 83:10
certificates
 34:3
certification
 61:5
certified
 59:16,19
 61:3,9,10,
 13,15,17,19
 62:22
cetera
 35:23
chance
 11:4 35:17,
 18 79:20
change
 26:24 27:3
 42:5 64:20
charged
 17:25
charging
 34:23
charity
 33:17
chat
 43:6

cheaper
 18:4
Chet
 4:5,16 46:7
 50:12 65:15
 68:6 72:20
 77:9
child
 31:16
children
 27:8 31:4,20
 49:13
choice
 34:19
choose
 27:2
choppy
 53:13
circumvent
 29:3
claim
 8:9 56:19
 61:24 69:18
 77:12
claiming
 16:21 58:20
 71:3
claims
 73:21
clarification
 83:14
clarify
 19:19
class
 59:14,16,19
 60:13,15,19,
 24 61:3,4,8,
 10,12,14,16,
 17,19 62:22
 63:12 64:23
 72:24 74:19
 78:9
clear
 11:2 17:19
 21:24 78:21
 80:1

click
 20:8 38:14
 79:3
clicked
 82:9
client
 65:1
close
 8:4
Cloud
 13:15
co-plaintiff
 5:16,18 6:2
 60:4,7
co-plaintiffs
 60:8
cocaine
 27:22
collect
 82:19
collected
 31:25
collectibles
 36:16
collection
 27:5,11
 32:13
college
 33:11
come
 12:15,17
 22:15 32:19,
 23 71:4,5
 79:25 83:23
comes
 70:21
comfortable
 76:5
comment
 67:21
comments
 79:3
commercial
 29:3
common
 63:11

communicate
 50:20
communicated
 37:8,17
 51:14,17
 52:9
communicating
 67:3
communication
 51:8
communication
s
 11:18 45:7
companies
 20:8 21:17
company
 5:5,6 29:14,
 16 32:7,8,15
 41:6 83:8
compensated
 62:16,18
 74:7
compensation
 23:20 34:24
 60:21 62:20
 69:16 70:11
 78:17
complain
 25:20
complaining
 22:18
complaint
 39:5,9 42:25
 63:3
complaints
 10:21 19:13
completely
 21:18
computer
 59:5 76:5
 80:6,7,9,16,
 21
concerned
 26:7
concluded
 7:1,5 8:8
 84:24

Chet Michael Wilson
December 12, 2025

conclusion
  14:24 21:2,
  15 56:22
  63:22,24
  64:17 75:21
concrete
  33:12,13
condo
  30:20
conduct
  40:19
conducted
  40:18
confidential
  7:15
conglomeratio
n
  61:22
connected
  40:9 47:16,
  19 71:20
connection
  80:17
connections
  50:1
connects
  40:10
consented
  41:19,21
consider
  14:21 16:1
  26:21
considered
  28:15 32:22
constantly
  55:19
construction
  33:13 35:3
  36:11
consumer
  19:12
consumers
  40:16 59:14
consumers'
  40:20
contact
  12:15,17,21

15:19,25
22:13 27:13
41:11
contacted
  41:10 78:3,4
contacts
  24:22 49:2
contend
  56:25
content
  62:14
contingency
  8:19
continues
  40:18
contract
  18:3
controlled
  53:25
convenience
  43:7
conversation
  11:14 12:5
convicted
  27:21 28:4,
  6,8,17 54:8,
  11
conviction
  52:23
convictions
  53:6
coolest
  46:19
COONS
  14:17 18:19
  43:1,5
  52:21,24
  54:18,20
  65:11 66:13,
  16 72:10,13,
  16 77:2
copy
  42:11
correct
  5:16 6:3,24
  7:7 8:19 9:8
  14:19 16:5,

12,18 18:12
19:17,20,23
20:3 21:25
22:11 23:18
24:16 26:22,
25 27:1,19,
22 31:16
32:16,24,25
38:11,13,22
40:2 41:17,
18,20 45:14,
22 46:1,9,
10,16,22,23,
24 47:3,8,9
51:1 53:22
54:8,9 58:21
60:20 63:12,
20 64:9,13
66:1,25 67:5
68:9 72:11,
22,25 73:23
74:2 78:13
79:1
correctly
  37:16 40:25
  68:20 77:19
correspond
  17:16
correspondenc
e
  45:17
counsel
  8:7 11:5,6
  65:6
counselor
  11:3
counter
  42:19
COUNTY
  4:1
couple
  33:15 35:2
  48:10,14
course
  10:3
court
  9:11,16,19
  42:13 43:4,

5,17
covered
  35:22 46:24
  65:14
COVID
  29:22
CPA
  84:6
cranes
  82:21
create
  59:13
Creek
  30:19
crime
  28:15
crimes
  28:8
criminal
  53:5,14
cultureforgoo
d.com.
  30:2
current
  29:8,9

D

D11
  52:20
daily
  26:11
damages
  21:8 63:9
Dank
  50:13,15
database
  41:23
databases
  40:9
date
  24:13 25:24
  56:16 77:22
dates
  45:21

Chet Michael Wilson
December 12, 2025

day
14:20 15:2
23:3 26:15,
17,21 47:24
57:3,4 64:12
66:1 67:11
72:24 78:10,
22 79:11

days
15:2 48:19

deal
5:20,22
12:20 13:4
28:23 41:12
49:16 50:7
57:3,5 70:6
71:9

dealing
13:12 22:14
23:1 74:8

dealt
13:6 55:25
59:8

debt
47:2

decade
35:16

December
4:2 67:7
72:22

decipher
70:7 78:3

decision
64:25

decommissione
d
30:13 82:20

defendant
10:18 38:8
40:16,18
41:4 42:6
80:13

Defendant's
17:1 18:16,
22

deficiencies
34:21

deficiency
34:22

definitely
57:3,9 67:15
69:16

degrees
34:3

depend
27:12 35:15

dependent
35:25 36:3

depending
21:23 29:6
51:23 81:5

deposition
4:17 5:1
10:16 11:10,
13 12:4,9
17:5 18:17
39:10 44:18
46:13 48:4
53:1 66:18,
20 68:2
72:17 77:3
84:24

depositions
9:7 81:14

detail
14:14

details
50:23 52:4
66:7 69:2,11

determine
75:6,10

detrimental
80:4

diagnosed
37:3

dial
48:24

difference
60:19,24

different
28:24 29:4
36:1 40:11
71:22 72:6
82:21 84:8

direct
51:8 52:14

directly
55:11 61:18

disbursed
60:10

discovery
48:13 82:3

discussed
11:21

disease
34:22

dismissal
10:21

dismissed
7:6

dissolve
29:21

dissolved
31:18

dissolving
29:15

distributed
60:23

distribution
27:21

doc
16:24 75:16

document
14:8,12,16
17:9,10
18:21,25
19:3 39:14
43:10,25
44:14 46:5
69:20 75:14,
15

documents
10:17,20,22
14:10,11
19:10,11,17,
18 27:24
28:3 44:16,
24,25 45:4
48:6,8 59:6
69:23 73:19
75:4,5,9

76:19 79:14
81:11,14
84:8

doing
14:19 32:1
35:10 36:20
40:1,6 71:21
76:5 80:5
81:9 82:17
83:17,22

dollars
30:6 47:1

dot
30:2

double
40:4

driven
27:4

duly
4:7

---

**E**

e.g
19:12

E11
52:22

earlier
44:15 54:13
56:17 58:16
79:2 80:5

earliest
43:7

earn
30:3 31:19
35:23

easier
48:21

easiest
82:7

easily
24:1

education
29:10 34:18

eight
31:8

| | | | |
|---|---|---|---|
| **either**<br>16:12 | **events**<br>33:17,21<br>35:5,13<br>36:13 | 42:13 44:18<br>46:12,13<br>52:22 53:1<br>54:16,18,20, | **fake**<br>24:23 25:1,3<br>41:23 |
| **elderly**<br>83:14 | | | **familiar**<br>5:25 17:11 |
| **email**<br>43:6 | **everybody**<br>19:4 27:6,8<br>29:6 30:14<br>59:14 60:22 | 25 66:15,18,<br>20,23 68:1,2<br>72:11,15,17<br>76:25 77:3 | 19:1 38:1,5 |
| **emails**<br>45:7 81:16 | | | **family**<br>23:25 27:6,8<br>36:4 37:20 |
| **emotional**<br>37:3 | **evidence**<br>19:10,11<br>54:4 | **existence**<br>34:9 | 49:13 |
| **employed**<br>29:13 | **ex**<br>31:17 | **expecting**<br>22:13 | **far**<br>8:10 41:13,<br>15 60:25 |
| **employment**<br>32:9 | **exact**<br>5:5 7:4 | **experience**<br>20:11 | 62:16 72:25<br>75:2 78:13<br>80:8 |
| **encountered**<br>49:15 | 10:23 14:14,<br>25 20:20 | **express**<br>40:23 | **farms**<br>29:2 |
| **end**<br>25:11 42:5<br>43:11 74:6<br>79:7 | 26:4 45:21<br>54:3,6 55:21<br>57:16 69:2 | **extensively**<br>58:6 | **faster**<br>48:21 |
| | **exactly**<br>5:23 6:5 | **extent**<br>14:23 15:21 | **fault**<br>70:10 |
| **ended**<br>29:14 | 15:18 24:19<br>59:23 61:7<br>74:19 83:10 | 63:21 | **fee**<br>8:19 |
| **ending**<br>55:1 | | _____ | **feel**<br>76:5 |
| **ends**<br>18:3 82:17 | **exaggerating**<br>78:15 | **F** | **feels**<br>23:2 |
| **enjoy**<br>62:5 74:10,<br>13 | **EXAMINATION**<br>4:10 | _____ | **fees**<br>64:7,8,9,13<br>65:4 |
| | **examined**<br>4:8 | **Facebook**<br>45:9,22,23<br>48:3,9,10,15 | |
| **entered**<br>41:25 | **exceptions**<br>10:8 | 50:11 65:9,<br>15 72:21<br>77:8 | **felony**<br>28:4,6 |
| **entices**<br>79:6 | **exchange**<br>24:19 47:2 | **Facebooks**<br>50:9 | **festivals**<br>33:18 |
| **entirety**<br>8:11 | **exchanging**<br>50:3 | **facets**<br>84:9 | **figure**<br>83:2 |
| **equipment**<br>29:24 30:12<br>82:19,20<br>84:3 | **excited**<br>74:6,7 78:16 | **facilities**<br>83:15 | **figures**<br>74:25 |
| | **exclamation**<br>73:22 | **fact**<br>23:7 49:23<br>68:11 | **file**<br>6:21 81:19,<br>22 |
| **escalate**<br>34:9 | **Excuse**<br>12:16 59:18 | **factual**<br>41:8 | **filed**<br>6:14,23 |
| **estates**<br>84:2 | **exhibit**<br>14:16 17:4,5<br>18:15,17<br>39:8,10 | **fair**<br>52:15 60:6<br>65:7 | 20:19 39:5,<br>16 60:15<br>78:6 |
| **et**<br>35:23 | | | |
| **Eugene**<br>30:17 | | **fairly**<br>6:17,25 | |

Chet Michael Wilson
December 12, 2025

files
  76:3
fill
  84:5
finally
  22:15 74:7
  78:16
financially
  35:8,12
find
  20:9 26:17
  29:25 44:25
  45:2 64:5
  69:14 70:3
  71:20 82:7
fine
  15:6 47:23
fingertips
  32:14
finish
  9:12 10:11
  15:8
firm
  12:20,22,25
  23:7 45:5
  78:3 81:22,
  23,25 82:1,7
firms
  69:5
first
  4:7 6:21
  12:13 17:1
  18:16,23
  21:11 22:19
  26:6 37:23
  38:4 40:16
  44:5 55:5,24
  57:12,13
  58:18 59:1,8
  68:5 72:25
  73:8 82:9
fit
  83:16
five
  13:1 22:14
  29:20 31:8
  36:1 66:6,8,

9 68:18 69:9
  72:16 81:5
  83:5
five-minute
  82:12
fix
  23:8
Florence
  24:12 33:5
folks
  34:18
followed
  36:1 68:14
follows
  4:8
food
  10:6 29:2,3,
  10
forced
  41:12 71:12
forever
  83:4
forget
  5:5 12:22
  42:13
form
  15:13 17:14
  23:14 45:15
  47:21 49:8
  56:2,7,15
  57:6,25
  58:11 62:9
  70:4,15
  71:10 73:14
  74:12 76:14,
  21 79:5
forms
  33:13
forth
  11:4
forwarding
  81:12
found
  20:7 21:10
  63:17 64:19
  79:3,11
  81:25

foundation
  15:14
foundations
  33:13
four
  16:5,6,8
  42:9 44:2
  54:14,25
  56:19 57:1
  61:24 76:24
fourth
  44:12 55:17
frank
  64:6
FRIDAY
  4:2
friend
  24:6
friend's
  25:15
friends
  23:25 30:7
fruition
  79:25
frustrated
  78:18
frustration
  57:16 65:20
fuel
  34:20
full
  4:14 31:6,
  10,13,15
  37:24 38:1,
  2,3,5
fund
  63:11
funds
  60:9
furniture
  83:20

---

G

Gable
  68:8

gathered
  69:10
Gathering
  81:11
gatherings
  33:18
gave
  23:22 28:3
  46:21 68:17
  69:5 84:3
general
  51:2
generate
  32:16,20
generated
  25:4,5
generating
  34:13 36:10
get all
  69:11
get-go
  78:16
getting
  8:4 31:18
  61:17 65:20
  66:1 71:23
  77:12,17
give
  14:16 25:8,
  9,14 35:17,
  18,19 40:11
  64:4 69:3
  79:20 83:15
given
  12:25 14:2,5
giving
  34:18
glasses
  72:21
gnat
  62:3
goal
  59:12
goes
  61:1 69:22
going
  6:8,9 7:13,

15 8:9 9:10
10:9 11:15,
20 23:4
24:25 35:17
53:11,12
59:9 67:22
68:18 69:21,
25 71:24,25
74:7,20
81:13 84:13

**good**
4:12,13 35:9
76:5 82:25
83:7,11,12

**Googling**
82:2

**government**
36:3

**graduate**
33:6,8

**graduated**
33:10 35:2,
19

**grand**
6:14

**grant**
10:7

**great**
49:16

**greater**
63:10

**group**
13:7,13

**guarantee**
59:11

**guess**
32:22 65:3

**guy**
13:12 30:14
68:17

**guys**
69:5

---

**H**

**handle**
84:22

**handled**
84:6

**hands**
76:22

**hang**
15:5,6

**happen**
21:19 24:20

**happened**
41:14

**happy**
9:2 17:8
47:24

**harass**
59:14 76:1

**harassed**
47:24 50:23
57:14 58:20
59:10 69:15
70:11

**harassing**
22:12 23:2
71:2 76:21

**harassment**
57:2,8,25
58:12 62:10
70:6 74:5
81:6

**hard**
5:22 29:23,
24 49:4
55:20 66:6
70:7 75:19
76:2,7

**harmed**
62:1

**hassle**
42:4

**healed**
34:24

**healer**
28:22

**healers**
28:25 34:7

**health**
29:10,25
30:4

**hear**
15:23 37:16
43:18,20

**heard**
24:9 37:23
38:4 51:12
82:10

**Heidarpour**
12:20,21
13:11

**help**
28:23 50:5
64:22 69:12,
25 74:18
78:3

**helped**
28:25 49:16
50:4

**helpful**
49:14

**helping**
23:8 57:10

**Hey**
24:24 25:7
38:18

**high**
33:4,25
35:16

**hindered**
56:20

**history**
35:2 53:5,14
82:6

**hit**
35:14 36:13

**hold**
59:9

**holistic**
28:22 33:18
34:2,4,12,
13,16

**honestly**
11:17 57:7
59:8

**hourly**
8:17

**hours**
81:5,8,9

**house**
30:20

**huge**
57:7,9
58:22,25
61:22

**hundred**
7:24 30:5

**hurry**
47:7

---

**I**

**icloud**
68:17 69:6

**idea**
48:7

**identificatio
n**
17:6 18:18
39:11 44:19
46:14 53:2
66:19,21
68:3 72:18
77:4

**image**
55:25 56:14

**important**
27:6 29:5
43:2 67:20
71:24

**impossible**
9:19 69:10

**inaccurate**
13:5 66:4

**inappropriate**
26:22

**incidence**
60:3

**incident**
8:15

**included**
18:9

**includes**
41:5

**including**
  6:15 40:21
  73:25
**inclusive**
  18:10
**income**
  32:3,5,20,22
  34:11 73:22
  74:1 75:6,10
  83:4
**incorrect**
  28:2
**independent**
  36:7,8
**indirectly**
  37:17
**industry**
  35:15
**information**
  26:1 64:19
  81:11
**infringement**
  8:14
**initially**
  12:22
**initiate**
  15:25
**injured**
  58:20
**injuries**
  29:23
**injury**
  56:25
**insane**
  78:19
**Instagram**
  50:9,16
**instantly**
  26:9
**intended**
  38:11
**intentional**
  8:14 21:9,10
  63:17,18
  64:23
**interaction**
  41:7

**interactions**
  45:4
**interested**
  45:17 52:5
**internet**
  82:8
**interrupt**
  9:14
**introductory**
  69:4
**inundated**
  20:10
**inundation**
  55:20
**invest**
  79:24 80:5,
  23 81:4,10
**invested**
  80:7
**investigation**
  39:24
**invitation**
  40:23
**involved**
  35:23 41:6
  69:22
**ipad**
  80:12
**irritates**
  62:2
**irritating**
  62:3
**issue**
  17:12 54:25
  57:10 82:16
**issues**
  37:4 39:8
**it'**
  74:4
**items**
  54:7 84:1

---

**J**

**January**
  13:19

**job**
  9:19 29:8,9
  33:11 81:18
**jobs**
  35:22
**Johnson**
  5:24 51:17
**join**
  33:11
**Judge**
  52:15
**Julia**
  14:15 15:5
  16:24 17:8
  18:14 19:2
  39:7 42:8
  43:2 46:4
  52:20 54:14
  63:2 64:7
  65:8,10
  66:12 67:25
  72:9 76:24
**jumping**
  53:12

---

**K**

**keep**
  43:3 48:17
  53:12 69:21
  73:18
**keeping**
  48:1 68:19
**kids**
  31:3,5 52:2
**kind**
  13:7,13 15:1
  17:18 31:25
  32:10,12
  33:18,22
  34:19 35:11
  41:7 64:5
  69:3,12,18
  70:11 74:10
  83:19,24
  84:10

**kinds**
  28:23
**Kings**
  34:1
**knew**
  37:14 38:10
  70:11
**know**
  5:23,25 7:14
  9:23 10:5,7
  11:4,18,23
  13:11 14:25
  15:3,10,17
  16:22 17:15
  19:5 20:11
  21:17 23:2,
  25 24:13
  26:4,15,16
  27:7,10,11
  28:15,25
  31:23 32:11,
  16 33:23,24,
  25 34:7,21
  35:16 36:2
  37:6,7,10,
  11,20 38:6,
  25 39:2
  40:8,12
  41:9,13
  42:4,5 43:7,
  24 44:22
  45:8 47:10
  48:9,13,16
  49:9,12,15,
  22,25 50:1,
  2,3 51:3
  52:14 54:5,6
  56:13 57:8
  59:4,22
  60:3,10
  61:2,10,11,
  14,16 62:15,
  24 64:2,4
  66:8 67:13
  68:22 69:15,
  19 70:8,25
  72:7 73:10
  74:9,20,21,

Chet Michael  Wilson
December 12, 2025

24 75:13,14,
18 76:1,22
77:23,25
78:16 79:10,
18 80:25
81:1,5,7,13,
16,17 82:21,
22 83:19,20,
22,25 84:4,
9,10
**knowing**
22:8 69:22
**knowledge**
20:23 21:4
29:1 34:19
37:12 39:25
40:1,6 41:2,
13,15 52:12
78:2

**L**

**label**
43:11,14
55:1
**labor**
29:24
**lacks**
15:14
**large**
70:13
**larger**
75:1
**latest**
56:16
**law**
12:20,22,25
16:2 23:7
45:5 69:5
78:3 81:22,
23,25 82:1
**lawsuit**
16:18 17:22
20:1 21:13,
25 38:21
51:5 69:14
73:25 75:15

**lawsuits**
20:18 36:19
72:25 73:25
74:10 75:10
78:6 80:6,
10,16,24
81:19 83:3
**lawyer**
8:21 9:15
45:1
**lawyers**
12:8 15:10,
19,23 50:21,
25 51:5
52:7,10
56:1,5,14
59:2 64:25
74:24 76:3
**leading**
15:14 22:2
70:15
**learn**
34:25
**learned**
81:1
**learning**
68:25 69:4
**leave**
17:15
**led**
23:7 59:4
**left**
53:10
**legal**
14:24 17:15
21:1,14
48:13 56:21
63:22,23
64:16 75:20,
21
**lend**
38:25 39:2,4
**lender**
38:22,23
39:19
**lenders**
22:11 61:21

**lending**
40:7,8,10
**level**
34:9
**life**
23:25 27:4,
15,19 28:21
32:12 50:2,3
51:12,15
56:6 72:3
74:8
**lifetime**
46:18 67:16
**light**
74:6
**limit**
53:5
**line**
10:11 57:23
73:22 74:1
75:6,10
**link**
44:21
**links**
72:6
**LINN**
4:1
**liquidate**
31:24
**listed**
34:12 54:7
**listen**
23:4
**literally**
9:17 10:8
52:10 67:15
**litigation**
12:19 16:23
38:6,7
43:17,24
48:11,12,16
81:10
**little**
60:25 62:3
67:3 84:8
**live**
24:8,11

30:16,17
31:5
**lived**
24:12 32:11
50:2
**living**
35:24
**Liz**
67:4,14
**loan**
40:11
**loans**
40:12
**locate**
44:16
**lodge**
53:11
**long**
11:20,25
17:23 23:3
26:4 29:18
33:14 34:6
47:11 62:14
63:16 68:23
72:1,5
**longer**
6:16
**look**
15:19 19:9
25:25 27:9
40:15 42:16
79:9
**looking**
52:13 73:19
75:4 81:16
82:6
**looks**
17:11 19:1
44:4 53:17
54:12 73:21
78:14
**lot**
6:8 7:14
20:8 21:17
29:1,4,22
32:11 33:12
34:6,8 49:3,

Chet Michael Wilson
December 12, 2025

12 50:3,7
71:22 73:15
80:25 81:1,
17 82:24
83:13,14,23
**Lots**
78:11
**love**
57:20,24
**loves**
67:16

---

**M**

---

**Madam**
43:5
**made**
19:14 22:23
23:21 30:5
35:9 64:25
72:20 83:7
**main**
27:10 59:12
**majority**
50:10 70:18
71:13 79:4
**make**
9:18 16:4
19:4,6 34:19
36:20 41:8
47:20 51:23
58:4,19
65:17 68:11
71:24 77:21
79:23 82:12,
17 83:9
**makes**
79:7
**making**
11:15 35:15
62:17 81:19,
21
**man**
24:24
**manual**
29:24

**Manufactured/
delivery**
53:24
**marijuana**
28:18 53:22
**mark**
17:4 18:15
39:7 46:11
66:14 72:14
76:25
**marked**
17:6 18:18
39:11 44:19
46:14 53:2
66:19,21
68:3 72:18
77:4
**marketing**
40:17
**Marketplace**
45:22,23
**marking**
66:13 72:10
**married**
31:1
**materials**
84:3
**matter**
23:1 52:1
54:17 57:15
72:2
**matters**
4:21,23
**max**
33:15
**mean**
4:24 8:12
10:25 17:25
18:2 21:16
26:3 30:9
35:14 36:7
52:3 53:17
57:15 62:15
67:12 69:25
72:2 73:11
75:13 79:23
80:8 83:12

84:6
**meaning**
43:14
**means**
10:1 48:7
59:20 61:11
62:24
**meant**
62:5
**media**
50:8,10,18
**medications**
36:23
**medicine**
33:19 34:2,
4,5,12,14,17
**meet**
11:8 80:20
82:17
**members**
37:20 49:14
63:12
**memorize**
49:6
**memorized**
49:17,23
**memorizing**
48:18 49:16
**memory**
16:11 79:19
**mental**
37:3
**mentioned**
27:18 34:2
78:12
**message**
18:11 44:8,
10 68:16
70:25
**messages**
13:2 16:3,18
19:12,14,20
20:4,16,24
22:11,17
26:7,11,21
38:8,10
40:20,23

41:20,21
42:9 44:3,6
54:14,25
55:20 58:9,
10 59:4,7
69:7 70:1,13
71:4 78:22
79:12,14
80:2
**messaging**
18:6
**messed**
29:22
**met**
11:3,19,20
**Michael**
4:5,16
**military**
30:11,12,13
33:11 82:20,
22
**mind**
43:6
**mine**
19:6 24:6
48:23
**minute**
9:7 37:13
**minutes**
12:2
**mischaracteri
zes**
22:1 64:16
**missed**
34:5
**missing**
53:20 76:4
**Mm-hmm**
35:21 36:15
49:4 65:16
**moment**
14:17 18:19
52:21 57:17
**monetary**
29:12
**money**
21:22,25

30:3 31:19
32:12,16,23
33:20 34:11,
13 35:9,15
36:20 47:20,
23 49:25
52:13 58:4
59:9 60:8,
19,20 62:7,
14 63:14
69:22 83:2,
3,7,11,12

**month**
78:10

**monthly**
30:24

**morning**
4:12,13
11:11,13
12:6 14:1
78:9

**mortgage**
5:6

**mothers**
31:12,13

**move**
67:24 83:17

**moved**
61:4

**movers**
29:17,19
83:13

**moving**
29:14,16
32:7,8,15
83:7,8,15,22

**multiple**
29:23 31:23
71:1 79:2,
12,14 82:19

**music**
23:4

**mute**
42:17

---

**N**

---

**name**
4:14 5:5 6:4
24:15,17
25:15 29:16
37:24 38:1,
2,3,5,6

**name's**
5:25

**named**
24:6 60:7

**names**
5:23

**narrative**
35:19

**National**
40:22

**natural**
34:10

**nature**
50:24

**neat**
23:24 84:10

**necessarily**
60:22 69:8

**need**
9:16 10:5,9
11:18 19:5
29:6 32:14
43:21 59:9
72:21 75:5,9

**needed**
80:11,21

**needing**
32:12

**needs**
31:20

**negative**
67:22

**negatives**
40:4

**net**
40:17

**network**
36:5 84:10

**networking**
27:4,18
28:21 29:5
32:11

**never**
41:10,11
46:3 47:4
51:12,14,25
52:2,6,9
59:8,16,19
61:18 64:23
79:25 81:18
82:10

**nice**
50:6

**nine**
36:1 49:19

**Nobody's**
81:21

**nonintentiona
l**
64:19

**nonresponsive**
67:24

**nonsense**
77:14,18

**noticed**
55:6

**notification**
71:11

**number**
6:14 7:4,22
13:16,18,20
14:25 20:20
22:20,24
23:11,16,17,
23,24 24:3,
19,21 25:1,
8,18,22
26:10,24
27:3,7,9
40:14 41:23,
25 42:9
43:24 44:6
45:14 46:9,
19,21 47:3,
12,13,17
48:1,19,22,

23,24 49:16,
23 69:21
71:23 73:21
76:25

**number's**
27:14

**numbering**
55:13

**numbers**
13:21 26:5
40:21 49:6,
17,18

**numerous**
5:22

---

**O**

---

**oath**
9:7 58:17

**object**
7:13 9:15
26:12 53:14
57:6 58:11
70:4,15
73:14

**objected**
28:4

**objection**
7:13,21 8:22
14:23 15:13,
21 17:14
21:1,14 22:1
23:14 27:23
28:11 31:22
45:15 47:21
49:8 51:19
53:12,13
56:2,7,15,21
57:21,25
58:5,11
62:9,10,23
63:21 64:15
71:10 74:12
75:20 76:14,
21

**objections**
18:16,22

58:5 75:21
**obviously**
  7:15 69:3
**occasion**
  20:12 79:18
**offer**
  45:13 72:25
  73:2,9
**offered**
  46:3
**okay**
  4:20 5:4,11
  7:1 8:3,6
  9:4 10:3
  11:2,21,22,
  24,25 12:3
  13:18 14:15
  15:9 16:10,
  25 17:12,18
  18:2 19:11
  20:23 21:7
  24:21 27:2
  32:8,23
  33:14 35:11
  36:23 41:17
  42:8,20
  43:23 44:5
  45:6,13
  46:18 49:19
  52:6,24 53:7
  54:7,13
  58:25 60:6
  61:2,20 63:2
  64:6 65:7,
  11,19 66:11,
  16 67:14,19
  69:13 71:1
  72:10,13,16
  78:6,25
  79:16 82:13
  83:6 84:1,11
**once**
  20:20 46:18
  67:15
**one**
  5:9 7:2
  12:5,12
  14:17 15:9

18:19 19:21
21:5 23:19
27:4 28:22
29:22 31:11
40:9 41:12,
22 42:1,12,
24 44:5,12
48:5 50:12
51:6,20,25
52:21 53:8
54:5 55:5,6
57:5,7 60:3
62:4 65:9,15
66:13 67:2
68:13,23
69:5 70:14
71:5 72:10,
14 73:12
75:8 78:25
79:18 81:19
82:9,16
83:11
**ones**
  6:7,13,15
  65:9 70:3
**ongoing**
  59:3
**online**
  29:9,25 30:4
  83:18
**operates**
  42:6
**opportunity**
  46:19
**opposite**
  21:18
**opt**
  19:20
**opt-out**
  19:12
**optimist**
  67:21
**options**
  82:9
**order**
  30:6 75:5,9,
  25 82:17

83:1 84:4,
13,16
**Oregon**
  4:1 24:12
  30:17 33:5
**organize**
  70:9
**originally**
  67:7
**outcomes**
  19:15
**outlines**
  78:15
**overlook**
  71:25
**overly**
  75:18
**overturned**
  10:22
**overwhelmed**
  22:21
**owe**
  25:7,9,12
**owed**
  47:1
**owned**
  29:14 83:8

———————————

**P**

———————————

**page**
  19:2,3 39:18
  50:16 63:3
**pages**
  50:11 65:15
**paid**
  7:12 63:11
**panned**
  46:3
**paperwork**
  10:21 81:15
**paragraph**
  39:18 40:13,
  15 41:3 63:5
**parasites**
  23:2

**Paronich**
  13:10
**part**
  12:9 27:14,
  15,19 28:21
  39:24 47:7
  48:13 74:13
**particular**
  48:16 82:5
**pass**
  84:11
**passed**
  47:6
**passing**
  27:13
**past**
  20:7,11
**path**
  29:1
**Patrick**
  42:21
**paused**
  37:13
**pay**
  25:4 31:16,
  19 70:1
**paying**
  8:16 18:8,11
  23:22
**payment**
  47:4
**payments**
  23:21
**PC**
  80:12
**Peluso**
  7:13,21 8:22
  9:2 11:1,8,
  12,25 12:11,
  14,15,17
  14:1,23
  15:7,13,21
  17:14 21:1,
  14 22:1
  23:14 27:23
  28:11 31:22
  42:15,22

Chet Michael  Wilson
December 12, 2025

45:15 47:21 49:8 51:19,22 52:18 53:11 56:2,7,15,21 57:6,21,25 58:5,11 62:9,23 63:21 64:15 70:4,15 71:10 73:14 74:12 75:20 76:14,21 82:1,2,13 84:12,17,18,21,23

**pending**
6:10 10:9

**penny**
80:14

**people**
23:4,25 27:5,11 28:22 29:2,12 32:13 34:24 40:11 41:6 42:6 47:17,19 48:24 49:12,22,23 50:4,20,22,23 51:20,25 59:10,13 67:3 74:9,16,18 76:18 83:7,14

**percentage**
8:21

**period**
35:11 36:11 45:16,24 70:10

**permission**
40:23

**person**
20:9 23:21 38:19 41:14 59:11 71:1

80:20

**personal**
39:25 40:5 41:2,13,15 47:17 62:20 69:17

**personally**
30:7 63:14 64:12

**pertain**
81:12

**pertains**
63:1

**pharmaceuticals**
28:23

**phone**
13:1,16,18,20,21,23 14:3,4,9 16:12 17:13,19 18:8 22:7,12,19,20,24 23:3,4,9,11,16,17 24:19,22,24,25 25:5,18 26:10,24 27:3,7,8 36:6 41:23 44:20 45:3,14 46:9 47:16,23,25 48:1,19,21,23,25 49:6,17 71:23 73:21

**phones**
49:5,13

**pictures**
48:14

**pieces**
82:19

**place**
59:8 83:16

**plaintiff**
5:9 6:24

17:2 19:14,16 51:20 63:12

**Plaintiff's**
18:15,22

**plaintiffs**
5:7

**planted**
54:4

**pleaded**
63:18 64:2,22

**please**
4:14 7:17 14:16 24:15 40:14 46:5 84:18

**Plot**
50:17

**point**
9:15 10:4 20:18 22:23 27:14 47:16,18 65:23 73:22 78:12,20

**pops**
70:23 71:11

**port**
25:8

**portion**
77:19

**position**
76:20

**positive**
67:23

**possesses**
19:17

**possession**
28:17 53:22

**possible**
22:10

**possibly**
20:25 64:20

**post**
48:3 65:17 66:4 67:7

68:11,15 72:20 77:9,21

**posted**
46:16 66:24 67:2,7 68:22 77:10

**posting**
74:16

**posts**
45:9 48:9,10

**potential**
60:15

**potentially**
15:3 81:8

37:6,7,8,10,11,14,18,23 38:4 41:19,24 45:7,8

**practicing**
34:16

**prayer**
63:3

**prepaid**
18:1,2

**preparation**
12:4

**prepare**
10:15

**preparing**
81:14

**prerecorded**
77:13,18

**present**
17:13

**pretty**
32:1 35:9 82:11

**previous**
79:3 82:3

**previously**
10:18

**prior**
22:8 38:2 40:22 69:18,21 82:10

Chet Michael Wilson
December 12, 2025

| | | | |
|---|---|---|---|
| **privacy**<br>  42:1<br>**private**<br>  71:23<br>**privilege**<br>  15:22<br>**probably**<br>  15:2 23:19<br>  30:6 47:12<br>  65:3 68:24<br>**problem**<br>  23:22 40:4<br>  57:9<br>**process**<br>  15:17 16:23<br>  41:4 50:22<br>  51:2 69:4<br>**produce**<br>  18:16,23<br>  42:24 44:16<br>  45:4 75:23<br>  76:3,7,11,19<br>**produced**<br>  43:15 44:24<br>  45:1 82:4<br>**producing**<br>  17:12<br>**Production**<br>  14:11 17:2<br>**professional**<br>  73:11<br>**professions**<br>  35:23<br>**promise**<br>  11:17<br>**promote**<br>  40:18<br>**pronounce**<br>  12:22<br>**proof**<br>  79:17<br>**provide**<br>  36:4 40:22<br>**provided**<br>  27:25<br>**provides**<br>  36:5 | **pull**<br>  14:15 42:9<br>  46:4<br>**pulled**<br>  12:24<br>**pulling**<br>  65:8<br>**pumping**<br>  33:12<br>**purchasing**<br>  45:17<br>**pushed**<br>  79:11<br>**put**<br>  15:8 16:24<br>  18:14 34:20<br>  41:22 45:23<br>  52:20 54:15<br>  83:14,18,24<br>**putting**<br>  43:6<br><br>---<br><br>**Q**<br><br>---<br><br>**question**<br>  7:17 9:12,22<br>  10:1,9 15:8<br>  17:9 56:23<br>  60:14 61:23<br>  72:4 76:10,<br>  11<br>**questions**<br>  9:12 10:11<br>  53:14<br>**quiet**<br>  43:22<br>**quite**<br>  65:23<br><br>---<br><br>**R**<br><br>---<br><br>**ranches**<br>  29:3<br>**random**<br>  15:1 67:13<br>**rare**<br>  20:12 | **read**<br>  19:4 40:16,<br>  25 55:4,5,7,<br>  8,10,13,14,<br>  17 56:11,13,<br>  16 57:17<br>  59:1 67:20<br>  68:19 70:14,<br>  22,25 71:4,<br>  12,14 77:15,<br>  16,18 84:19,<br>  21<br>**reading**<br>  18:24 56:10,<br>  12 59:2<br>**real**<br>  79:6<br>**realize**<br>  79:6<br>**reason**<br>  9:16 14:2,5<br>  24:2 36:25<br>  43:22 52:3<br>**reasons**<br>  27:1,2,16<br>  29:4 42:3<br>**recall**<br>  55:5,11,16,<br>  19 56:3 59:1<br>  61:7,8 66:2<br>  73:5,7<br>**receipt**<br>  56:19<br>**receive**<br>  15:9 16:1<br>  26:8,11<br>  40:23 41:20<br>  57:5 59:25<br>  60:8<br>**received**<br>  7:19 14:20<br>  15:20 16:22<br>  17:22 18:12<br>  21:12 22:19<br>  23:9,11<br>  38:10 57:1<br>  58:25 74:21<br>  75:12 | **receiving**<br>  25:20 26:7,<br>  21 57:4<br>  58:18 60:19,<br>  20 61:21,24<br>  67:10 69:7<br>  78:22<br>**recess**<br>  52:19 82:14<br>**recognize**<br>  6:4,6 24:1<br>  39:13 77:6<br>**recognized**<br>  22:21<br>**recollection**<br>  52:1 54:17<br>  55:24<br>**record**<br>  4:15 24:15<br>  58:16<br>**records**<br>  14:3 17:13<br>  25:25<br>**refer**<br>  19:11 68:13<br>  75:23<br>**referred**<br>  12:19 50:22,<br>  25 82:1<br>**regard**<br>  34:4 38:5<br>  41:3 80:16<br>**regarding**<br>  19:14<br>**register**<br>  25:22<br>**registry**<br>  22:24 25:23<br>  40:22<br>**regular**<br>  47:25<br>**regulatory**<br>  19:13<br>**relate**<br>  19:12<br>**related**<br>  53:14 |

Chet Michael Wilson
December 12, 2025

relevance
  7:14 27:23
  28:12 31:22
  51:19 53:13,
  15 58:1
relevancy
  8:22
relevant
  45:10,11
  54:5
reliant
  29:5
relief
  60:13
remember
  10:23 14:14
  17:23 27:8
  45:21 48:14
  55:20 56:10,
  11,12 57:16
  61:12 66:6
  73:3,8,12,15
remind
  21:7
REMOTELY
  4:1
rent
  30:23,24
  31:20
repeat
  7:18 75:8
  77:15
repeatedly
  40:19
replying
  20:12
REPORTED
  4:1
reporter
  9:11,16
  42:13,16,18
  43:4,6,18,21
  84:13,16,19,
  22
reporter's
  9:19

represent
  12:11
representatio
n
  17:16 82:6
Reprise
  16:14 19:25
  20:14,24
  21:12 22:11
  38:21,23
  39:19 40:1,6
  41:24 51:5
  52:11,13
  65:22 74:1
  79:20 80:2
Reprise's
  20:16
request
  14:8,11
  16:24 17:1
  19:9,22
  42:23 80:13
requested
  14:6 19:21
  63:20
requesting
  41:7
requests
  18:16,23
  44:15 75:16
requires
  83:2
research
  34:7
resell
  30:7
residual
  83:24
resolve
  69:17
resource
  34:18
resources
  27:5 31:24
respect
  59:13

respond
  9:13 20:3,7,
  9 21:24
  38:13,15,17,
  18 55:22
  78:25 79:4
responded
  79:8
responding
  67:4 68:8
response
  19:16 38:20
  80:2
responses
  18:15,22
  19:15 42:24
  44:15
responsive
  19:17,18
rest
  49:4 67:20
  71:4
restroom
  10:5 52:17
result
  60:18
retainer
  8:23
retirement
  83:15
return
  83:18
returns
  84:5
review
  10:20 14:11
  39:5 48:3
  53:8 75:9
reviewed
  10:17 39:16
rid
  22:6 34:21
ride
  29:24
right
  5:19 6:7
  10:8 13:23

  14:6 15:12
  16:10 17:1
  18:8,21 19:9
  21:22 23:12
  26:18 31:17
  32:21 35:1,6
  39:13 41:14
  42:12 43:10,
  17 46:7,19
  47:20 48:22
  49:5 53:4
  54:17,24
  55:22 56:1,
  9,14 57:5,23
  58:4 60:16
  62:7,22
  63:5,14,18
  65:13,15,22,
  25 66:23
  67:8,17
  68:5,25
  69:7,14
  70:3,14
  71:12 73:18,
  20 74:10,17
  75:16,19
  76:9,12
  77:10,14
  78:23 79:21
  80:2,6
  81:20,23
  83:4 84:2
Road
  30:19
robot
  77:13,18
Roughly
  5:3 30:25
  78:7
route
  36:1

_____

S

_____

Sara
  5:11,13,15
  51:7,8,12,14

Chet Michael Wilson
December 12, 2025

**savvy**
  75:23 80:19
**saying**
  38:18 58:19
  65:25 69:23
**says**
  15:23 17:1
  19:10,16
  44:5 66:9
  68:6,23
  77:17 78:8
**scene**
  33:19
**Schedule**
  53:25
**school**
  31:14 33:4,
  25 35:16
**screen**
  19:6 61:25
  70:23
**screenshot**
  44:20 66:10
**screenshots**
  16:3
**scroll**
  17:8 64:7
**search**
  12:23 23:6
  45:3,6,9
  82:4,5
**searched**
  13:1
**second**
  44:8 55:7
  65:10 71:8
  72:1
**see**
  14:7 16:25
  18:21 39:18
  43:12 44:5,7
  45:3 52:7
  53:25 55:1
  63:5 66:11
  68:5,6 71:8,
  17 75:5 78:8

**seeing**
  48:14
**select**
  48:22
**sell**
  45:13 47:13,
  14,18 49:24
  83:19
**selling**
  32:3,6,16,24
  36:16 82:18
**sells**
  47:7
**semi-trucks**
  82:20
**send**
  16:3 21:12,
  21 43:4,7
  71:2 80:1
**sending**
  56:5 81:11
**sends**
  40:20
**sense**
  30:10
**sentence**
  77:19
**separate**
  38:6
**September**
  17:13
**serious**
  15:2
**served**
  42:24
**set**
  18:16,23
  36:2
**settle**
  65:5 73:4
**settled**
  7:9 36:19
  59:21 60:4
  74:25
**settlement**
  7:5,19 73:9
  74:22 76:8

**settlements**
  7:15 59:25
**settling**
  32:18,20,24
**several**
  5:18 13:3
  55:6 73:20
**sharing**
  29:11
**show**
  69:23
**showed**
  24:21 44:14
  54:13 69:20
**showing**
  54:24
**Shows**
  65:20
**shut**
  32:15
**sic**
  17:16
**sign**
  73:20 75:13
  84:20
**signed**
  78:9
**signing**
  78:10
**similar**
  42:7 55:20
**simplicity**
  34:8
**single**
  9:17 62:4
  70:21 71:5
**sir**
  4:19 5:12
  7:17 8:18
  9:6,9,21,24
  10:2,14
  13:3,22
  14:17,19
  15:16 16:6
  18:7,19,21
  19:9 20:17
  22:4 23:16

  24:3,14
  25:21 27:17
  28:7,14,19
  30:23 31:2
  32:4 33:2,7
  35:7 36:24
  37:2,5,19,21
  38:12 39:17,
  21 40:3,5,
  15,24 41:1
  43:5 45:11
  46:17,20
  50:8 52:25
  53:23 55:2,
  23 57:19,23
  58:4,9 59:17
  60:2,15
  61:12 62:8
  63:13 66:16
  67:6,9 68:7,
  10,21 70:17
  72:20,23
  73:1,18,23
  74:2 75:7
  76:3,19 77:6
  78:11,24
  81:24
**sit**
  59:5
**site**
  30:1
**situation**
  10:10 22:15
  23:8 36:2
  37:24 59:13
  62:18 69:17
  79:24
**situations**
  42:7 49:15
**Siuslaw**
  33:5
**skip**
  57:13
**small**
  19:7
**social**
  50:8,10,18

Chet Michael Wilson
December 12, 2025

society
50:7
solicitations
25:20 26:18,
22 67:11
something's
22:15
sort
42:23
sourced
29:2
sources
29:3 34:11
speak
9:18,20
11:12,25
12:3,8 23:8
43:19,21
special
27:7
specific
23:21 25:24
50:24
specifically
13:5 18:9
19:22,24
specify
6:4
speculate
16:13 21:18
60:9
spell
24:15
spend
80:14
spent
69:16
spoke
11:9,11 14:1
68:15
spoken
51:4,25
52:2,6
squirreled
31:25
stages
69:4

stance
78:15
standards
8:10 60:21
64:5
standing
53:11
start
65:8
started
22:19 30:14
33:17 68:25
77:12 78:1,
10
state
4:14
stated
38:9 58:16
statute
21:8 64:11
statutes
52:14
statutory
63:8
stay
68:18 69:6,8
steady
73:22 74:1
75:6,10
80:18
step
22:6,10
steps
22:17
stop
20:13,14,16
21:11,24
22:10,17
38:13,16,17
44:6 59:12
79:1,5,8,11,
13,17 80:1
STOP'
19:12
stops
62:15

store
29:10,25
30:4
straight
33:25
strike
37:22 67:24
structured
50:7
stuff
11:15 17:15
20:10 28:16
29:11 30:7,
11,13 33:13,
23 34:1,8,10
35:18 48:14,
15 60:11
62:15 69:9,
11 71:19
76:6 83:2,19
84:3,6
submissions
19:13
substance
53:25
sudden
43:19
sue
15:20 20:25
70:3 76:18
sued
16:5
suffered
56:25
sufficient
9:4 31:19
suing
16:14,17
41:24 44:3
suits
50:21 78:13
summer
31:15
support
31:16 35:8,
12

supports
69:23
sure
6:10 11:15
16:4 22:23
26:4 36:21
46:2 52:18
54:3 56:13
58:19 59:20
62:17 67:12
71:24 78:14
81:25 82:10,
12
surrounds
50:3
swapped
47:2

_____

T

T-A-N-K
30:2 50:14
T-H-A
50:13,15
T-H-E
50:14
T-I-N-K
50:14
tab
65:13 66:12
67:25 72:9,
16 76:24
77:2
table
52:23
take
10:10,12
20:24 22:17
25:14 36:10
52:16 56:6
72:1,5 79:15
82:12
taken
4:18 5:2
19:20 22:6
82:14

Chet Michael  Wilson
December 12, 2025

takes
  80:25
talk
  9:6 52:3
  65:6
talking
  19:22,24,25
tank
  30:2,9,10,15
  50:12,13,15
  65:15 68:6
  72:20 77:9
target
  34:6
taught
  34:8
tax
  84:5
Taylor
  5:11,13,15
  51:7,8,12,14
TCPA
  4:25 5:2
  6:9,15,21,23
  7:20 8:10
  12:23 14:21
  20:18 21:8
  22:8 32:18,
  20,24 50:21
  69:14,19
  74:1,22
  75:10 78:1,
  2,23 81:12
tech
  68:17 69:5
  75:23
technical
  69:12 80:19
telemarketer
  22:7 66:1
telemarketing
  40:19,20
  41:5
telephones
  40:21
tell
  13:18 25:17,

19 44:15
47:22 53:8
54:2 57:12
62:21 65:9
67:14 71:7,8
73:9 74:13
77:6
telling
  74:16
ten
  20:10 26:13,
  15,17,21
  28:5,9,19
  49:18 57:4
  81:5
ten-minute
  52:16
Tenth
  72:1
term
  30:9 61:18
terms
  8:6,24 21:23
testified
  4:8
testify
  37:1
testimony
  22:2 64:16
Texas
  39:20
text
  13:2 15:20
  16:1,17
  18:6,11
  20:16,23
  21:11,13,21
  22:10,17
  23:4 26:7,
  11,21 38:8,
  10 40:20
  41:20,21
  42:9 44:3,8,
  10 45:2
  54:14,25
  55:3,7,9,13,
  14,17 57:13

58:9,10,18
59:1,3 62:2
69:6 70:1,
13,21,24
71:4 72:5,6
78:22 80:2
texts
  10:17 14:20
  15:9 16:5
  17:22 55:8,
  25 56:20
  57:1,18
  61:21,24
  62:4 70:18
  79:9
tha
  50:13,15
Thank
  43:8 52:24
  66:11
thing
  29:22 32:10
  54:3 62:17
  68:19
things
  10:19,24
  19:21 28:24
  34:3 36:17
  54:10 71:22
  75:22 82:18,
  22 83:13,21
  84:9
think
  6:13,22,25
  7:3,6 8:4,23
  9:1 13:11
  18:4 21:21
  23:6 25:25
  26:11 27:13
  34:5 36:21,
  22 37:15
  40:9 42:14,
  20,22 47:25
  48:15,24
  51:16 60:1
  61:12,13
  62:16,17
  65:14 66:15

67:20 68:1
70:5 78:15
81:12
thinking
  25:5 41:23
thinks
  52:15
third
  4:21 44:10
  55:13,14
Thirteen
  31:8
thought
  23:24 24:23
  54:21 74:23
  78:22 80:3
thousand
  7:24 25:13
  47:1
three
  31:6,7,9
throw
  33:21
throwing
  33:17 35:5,
  12
time
  4:21 5:1
  11:13 12:13
  13:25 16:23
  17:21 20:18
  24:11 26:4
  29:13 30:6
  31:6,10,13,
  15,24 32:5
  34:6 35:12
  36:11 37:23
  38:4 45:16,
  24 49:3,21
  50:7 53:12
  55:7,11,21,
  24 56:11
  57:15 62:2,4
  65:24 67:10
  69:17 73:8
  74:8 75:8
  78:25 79:4,
  8,15,24

Chet Michael Wilson
December 12, 2025

| | | | |
|---|---|---|---|
| 80:8,25 81:3,16 84:4 | transaction 24:20 | | upwards 6:11 20:22 59:22 81:8 |

**times**
4:20 16:22
20:10 34:2
49:12

**title**
23:18,22
24:19 25:9
46:21 47:2

**titled**
18:22

**titles**
10:23

**today**
9:8 10:4,16
11:3 18:25
28:21 35:20
36:23 37:1
47:13

**told**
11:5 15:22
21:7 25:7
51:24 61:18
67:17 79:2
80:20

**top**
17:1 55:3,14
67:2 68:18
69:6,9

**total**
6:14

**townhouse**
30:21,22

**track**
43:3 73:18
79:15

**trade**
30:12 33:23
50:4 83:1,17

**traded**
23:18 33:22

**trading**
32:11 33:25
82:24

**traffic**
28:10,16

**transaction**
24:20

**transcripts**
81:13

**transport**
82:20

**Tree**
40:10

**trickling**
84:9

**trucks**
82:22

**true**
20:5 27:20
57:19 74:4,5

**truth**
47:22 74:14

**truthfully**
37:1

**try**
22:6 29:3
44:25 76:15

**trying**
9:17 35:1
37:15 69:17
70:24 74:19
77:15 83:2

**tunnel**
74:6

**turn**
9:2 67:22

**turned**
8:23

**two**
31:11 42:23
50:9,11 53:9
78:9

**TXT**
44:6

**type**
17:24 40:8

**typed**
79:17

---

**U**

---

**Uh**
51:16 64:14

**Um-hmm**
74:20

**umbrella**
13:8,9

**unauthorized**
26:18

**unbelievably**
71:3

**underneath**
13:13

**understand**
9:7,23,25
10:1 11:6
15:10 36:7
41:22 43:14
55:9 56:23
57:16 58:19
60:14,18,22,
24,25 61:20
62:25 64:18
82:16

**understanding**
8:13 16:19,
20 21:9
80:11,18

**Understood**
53:16

**Unimogs**
82:21

**universe**
67:16

**unlike**
71:3

**unlimited**
18:5

**unsolicited**
40:20

**upsets**
62:5

**upward**
15:3

**upwards**
6:11 20:22
59:22 81:8

---

**V**

---

**valuable**
80:8

**value**
47:18 49:25

**variance**
67:12

**varies**
15:1 26:16

**various**
27:1,2

**vehicle**
23:18,20

**vehicles**
33:23 34:1

**verbiage**
60:25

**verify**
14:3

**Verizon**
17:20,23,24

**versa**
50:5

**version**
63:20

**versions**
42:23

**vice**
50:5

**vicinity**
67:13

**violate**
16:2

**violated**
42:1

**violation**
63:9 64:3

**violations**
14:21 78:23

**voicemails**
16:10 68:19

Chet Michael Wilson
December 12, 2025

81:12,13
**volume**
 70:6,13

_____

**W**
_____

**W-A-R-R-E-N**
 24:16
**wait**
 20:9 50:14
**waiting**
 63:23
**walk**
 17:8
**want**
 10:11 11:4,
 23 13:5
 15:23 26:8
 58:9,16 62:7
 64:9 65:1
 70:3 71:8
 82:16 84:16,
 19
**wanted**
 21:25 69:13,
 16
**Warren**
 24:7,24
**waste**
 72:3
**wasted**
 74:8
**watching**
 34:24
**way**
 7:2 10:3
 23:19 27:7
 34:16 35:8
 41:4 42:5
 44:14 47:5
 52:7 62:1
**ways**
 36:8
**web**
 12:23 23:6
 30:1

**weed**
 71:19
**week**
 5:3 73:21
 81:6,8
**weekly**
 81:4
**went**
 10:18,24
 11:1 23:7
 43:22 64:7
 74:23 80:21
 81:23
**western**
 34:5
**whatsoever**
 41:6 51:9
 52:1 57:10
 60:13 70:5
**whichever**
 63:9,10
**whoa**
 19:10
**wide**
 40:17
**wide-scale**
 40:19
**Willow**
 30:19
**Wilson**
 4:5,12,16,17
 16:25 39:13
 42:9 43:10,
 11,19 44:2
 46:7 50:12
 51:24 53:4
 54:13,24
 55:1 63:5
 65:14,15
 66:24 68:5,6
 72:21 77:10
 82:16
**witness**
 4:6 43:20,23
 51:23 84:11
**word**
 9:17

**wording**
 5:17 46:2
**work**
 10:13 13:14
 26:5 29:23
 35:1 76:5
 78:11 83:24
**worked**
 12:13 33:12
**working**
 5:7 31:17
 42:19 79:18,
 22
**works**
 10:3 13:17
 15:17 20:13
 21:17 34:9
 36:14 82:25
**world**
 28:25 34:7
**worries**
 62:19
**worry**
 50:2
**worse**
 79:7,24
**worth**
 84:4
**Wow**
 71:1
**written**
 64:10
**wrong**
 38:18 40:14
 53:9 54:22
**wrote**
 73:24 74:3

_____

**Y**
_____

**yeah**
 6:8 7:7,19
 13:13 14:6
 18:25 23:12
 27:14 29:1,4
 31:18,23
 32:1 35:9

36:18 37:24
38:24 39:21
42:2,11,15,
22 43:21,23
47:5,12,15,
25 49:1
54:5,21 57:3
60:1,10
63:23 64:5,
18 66:14
68:24 69:1,
15,24 74:7
76:18 78:19
79:2,14,22
80:7,20 81:1
84:8,21
**year**
 6:22,23 26:2
 31:14 47:10,
 12 68:23
 77:24,25
 78:2,5,6
 81:2
**years**
 13:1 22:14
 23:1 24:10
 26:20 28:5,
 9,19 29:20
 31:25 33:15,
 25 35:3
 45:16 66:6,
 8,9 68:18
 69:9,15
 70:10 77:13,
 17 78:18,21
 83:5,24
**yesterday**
 11:14 12:1,5
**younger**
 33:24

_____

**Z**
_____

**zeroes**
 43:12
**Zoom**
 80:17

# EXHIBIT C

APP. 112



EXHIBIT
**9**
12/12/25 Wilson v. Skopos

All comments ▾

**Rhett Wells**
Right on pard

1y   Like   Reply   👍

**Celeste Gable**
How do I report all these robo callers? I'm on the DNCR but I still get them!! And I don't want to have to answer each call and document every LITTLE detail just to make it a report 😭😭‼️

1y   Like   Reply                                                🥵

**Chet Tank Wilson**
**Celeste Gable** I can help you and maybe my atty would be into talking more cases then what I did is I just gave her tech guy my iCloud and they stay on top of it. They are going back 5yrs. The biggest thing is keeping all the voicemails.

1y   Like   Reply   Edited                                        👍

**Brian Walker**
**Chet Tank Wilson** can you send me that info as well man

1y   Like   Reply                      👍

**Chet Tank Wilson**
**Brian Walker** will do I'll ask my atty about it

1y   Like   Reply

**Brian Walker**
**Chet Tank Wilson** ty bro

1y   Like   Reply   👍

**Lutefisk Kov** ✓
**Chet Tank Wilson** Me to

51w   Like   Reply   👍

Write a comment...

# EXHIBIT D

APP. 112



# EXHIBIT E

# Chet Tank Wilson's Post





**Chet Tank Wilson**
May 6 at 11:06 AM · 🌐

Got some holes need filled boys & I need to know who's with me on this one! 🇺🇸👊😎



Play

 1:12 / 1:53

 101

37 comments    2 shares    3.2K views

  Write a comment...

# EXHIBIT F

## Why this happened

The post may contain something that could encourage violence and lead to risk of physical harm, or a direct threat to public safety.

 **Chet Tank Wilson**
Feb 15, 2026

Get em ALL!

You shared this on your profile

This goes against our Community Standards on violence and incitement.

 See rule  >

## What you need to know

 (!) How to prevent further restrictions  >

(Q) How we made this decision  >

---

 **bunkerplot** • Follow                    •••

 bunkerplot Kicked off of Faggbook again! That was a good run though!

12w

♡ ○ ◁                                    ▢

Be the first to like this

February 17

  Add a comment...                    Post

Case 6:25-cv-01869-MC    Document 19-1    Filed 05/16/26    Page 134 of 149

**bunkerplot** • Follow



**bunkerplot** Kicked off of Faggbook again! That was a good run though! 😋

12w

## Why do you want another review?

You misunderstood this post

## What should we know about your post?

It's about an important issue

## What we'll do

 We'll update you within a few days.

Your case will be looked at again by our technology or a reviewer. We'll use the additional info you gave us to improve our systems.

We aim to respect your free expression while keeping the community safe.

            

Be the first to like this

February 17

 Add a comment...                    Post

**Feb 16, 2026**

# You'll hear back from us soon

Thanks for requesting a review. We'll let you know when it's complete. If we find we made a mistake, we will change the original decision.

Most people hear back in less than 4 days, but it can take longer.

## What you need to know

 **About this review**  >

**How reviews work**  >

 bunkerplot · Follow

bunkerplot Kicked off of Faggbook again! That was a good run though! 🥴

12w

Be the first to like this

February 17

Add a comment...    Post

# Updates on this decision



### You'll hear back from us soon
In review · Feb 16, 2026

⟩

# Why this happened

The post may contain something that could encourage violence and lead to risk of physical harm, or a direct threat to public safety.



 **Chet Tank Wilson**
Feb 15, 2026

**Get em ALL!**

You shared this on your profile

This goes against our Community Standards on violence and incitement.

📄 **See rule**    ⟩

# What you need to know....

 **bunkerplot** · Follow    •••

 **bunkerplot** Kicked off of Faggbook again! That was a good run though! 😖
12w

♡ ○ ⟨

Be the first to like this
February 17

☺ Add a comment...    Post

## What this means



Everything you manage, including all of your profiles, Pages and groups, is restricted.

**You can't post or comment**
Ends on Mar 18, 2026

**You can't start or join calls**
Ends on Mar 18, 2026

**You can't use groups**
Ends on Mar 18, 2026

## Why this happened

We restricted your account as a safety measure because your activity may not follow our rules.

**Violence and incitement**
Post removed
Feb 16, 2026 · In review

**Violence and incitement**
Post removed
Nov 12, 2025



---

**bunkerplot** · Follow



**bunkerplot** Kicked off of Faggbook again! That was a good run though! 😝
12w

Be the first to like this
February 17

Add a comment...                    Post



**Violence and incitement**

Post removed

Sep 29, 2025

>

**Hateful conduct**

Post removed

Sep 29, 2025

>

**Hateful conduct**

Comment removed

Jul 28, 2025 · Review complete

>

**Hateful conduct**

Post removed

May 17, 2025

>

**Bullying and harassment**

Post removed

Apr 7, 2025

>

**Bullying and harassment**

Post removed

Apr 3, 2025

>

**Bullying and harassment**

Post removed

Apr 2, 2025

>

**Hateful conduct**

Comment removed

>

---

bunkerplot · Follow

···

bunkerplot Kicked off of Faggbook again! That was a good run though! 🥲

12w

♡ ♡ ⊽                                                          ⊡

Be the first to like this

February 17

☺ Add a comment...                                          Post

# EXHIBIT G

## England

| | | |
|---|---|---|
| 🟩 Southeastern England & Northwestern Europe | 39% | › |
| 🟪 East Midlands | 9% | › |
| 🟩 Devon & Somerset | 4% | › |

## Celtic & Gaelic

| | | |
|---|---|---|
| 🟦 Central Scotland & Northern Ireland | 18% | › |
| 🟥 North East Scotland | 3% | › |
| 🟩 Connacht, Ireland | 2% | › |
| 🟦 Donegal, Ireland | 1% | › |

## Western Europe

| | | |
|---|---|---|
| 🟧 Southern Germanic Europe | 9% | › |
| 🟨 Northwestern Germany | 2% | › |

## Nordic

| | | |
|---|---|---|
| 🟧 Denmark | 8% | › |

## Central & Eastern Europe

| | | |
|---|---|---|
| 🟦 North Central Europe | 3% | › |

## Italy

| | | |
|---|---|---|
| 🟪 Central Italy | 2% | › |

bunkerplot · Follow

bunkerplot Not a fkn trace of knuckle dagger in my bloodline and proud! 😎

10w

Be the first to like this

February 27

Add a comment…                    Post

# EXHIBIT H



bunkerplot · Follow

Original audio

 **bunkerplot** This is surely gonna stir the pot, but I'm done accepting this reverse discrimination B.S. Pay your own way or get the fuck out of this country! Ain't nobody else's obligation to feed your lazy fkn ass!

28w

This reel has 20 comments from Facebook.

              

**54 likes**

October 30, 2025

  Add a comment...                                    Post

# EXHIBIT I



# EXHIBIT J



bunkerplot · Follow

bunkerplot Hit me up for details...
21w






4 likes

December 19, 2025

Add a comment...                                                    Post

# EXHIBIT K

 **Chet Tank Wilson**
July 10, 2014 · 🌐                                                                            • • •

Hey guys... scope this group I just made and add your friends... this is one of the most important things we could do to keep the gov't out of our pockets and out of our business...

 **Chet Tank Wilson ▸ NW HOUR SHARE**
July 10, 2014 · 🌐

This is a page that we can share our skills and trade work for others returned work instead of dealing with monetary exchange. This nearly doubles the value of each of our work. It circumvents taxation, and builds a strong community independent of our government which has come to the point of enslaving it's own people and stealing their money every chance they can get running each if us through the gauntlet of their corrupt bureaucracy... this page will take a minute to grow into a fully operational group so make sure to add anyone that is on the same page with us that would be willing to be proactive with this idea... **See less**

 Like                     Comment                     Share