Timothy J. Fransen, OSB No. 073938
tfransen@cosgravelaw.com
**COSGRAVE VERGEER KESTER LLP**
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: (503) 323-9000
Facsimile: (503) 323-9019

Ryan D. Watstein (*Pro Hac Vice*)
ryan@wtlaw.com
James M. Ruley (*Pro Hac Vice*)
jruley@wtlaw.com
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

*Attorneys for Defendant*
*Freeway Insurance Services of America, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| CHET MICHAEL WILSON, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> FREEWAY INSURANCE SERVICES OF AMERICA, LLC, <br><br> Defendant. | Case No. 6:25-cv-1869-MC <br><br> **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO VOLUNTARILY DISMISS, FOR EXTENSION OF TIME, AND TO STAY DISCOVERY** |

**DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................. 1

II.    ARGUMENT .................................................................................................... 3

       A.    Plaintiff's Own Argument and Evidence Establish
             That the Blanket Power of Attorney is Improper ..................................... 3

       B.    The Record Suggests Wilson Never Executed the "Operative"
             Agreement—a Question Only Discovery Can Answer ............................ 5

       C.    Regardless of Who Signed What, the Agreements Work in
             Tandem to Give Counsel Complete Control—and Pay Them
             Most to Settle Individually ..................................................................... 6

       D.    Plaintiff's Characterization of His Settlement Mill as "Ordinary
             Rule 23 Economics" Itself Warrants Follow-Up Discovery .................. 9

       E.    Plaintiff Mischaracterizes Freeway's Argument and the Ancillary
             Subpoena Proceedings .......................................................................... 11

       F.    Plaintiff's New Rule 41(a)(2) Authorities Do Not Bar the
             Terms Freeway Seeks ............................................................................ 13

III.   CONCLUSION ............................................................................................... 14

## I.    INTRODUCTION

Freeway's opposition to Plaintiff's motion to dismiss established that the Court should not dismiss this case before ruling on Freeway's motion to deny class certification and allowing Freeway to complete the discovery it has already served. That discovery targets who originates, controls, and monetizes Plaintiff's claims—and whether some are manufactured. It bears on the proper terms of dismissal under Rule 41(a)(2) and on sanctions, which survive dismissal. The new evidence and arguments in Plaintiff's reply only confirm why the Court shouldn't let Plaintiff walk without discovery and a ruling on Freeway's motion.

Plaintiff doesn't dispute that the initial agreement between Wilson and the Heidarpour Law Firm (ECF No. 33, Ex. 3 (the "2024 Agreement")) grants HLF power of attorney over "any and all" of his TCPA claims, or that it requires him to reimburse HLF for expenses incurred on any outstanding claim if he terminates HLF. Instead, he claims that's acceptable. Though his lead authority doesn't even address the ethics of such a provision, a court in this District just did. That court held that a far less problematic agreement giving advance settlement authority "violates the Oregon Rules of Professional Conduct," and supports sanctions under the Court's inherent power, even after dismissal. *Slevin v. AB Hollywood, LLC*, --- F. Supp. 3d ----, 2026 WL 892186, at *12, *19 (D. Or. Mar. 31, 2026). And the 2024 Agreement is far worse: it expressly permits HLF to accept any settlement it deems "practical and reasonable," execute settlements and other agreements as though Wilson had done so himself, and continue resolving pending claims for 30 days after termination.

So Plaintiff claims a different agreement is "operative": one of the 100 or so secondary agreements Wilson allegedly signed after HLF farmed his claims to litigation counsel. ECF No. 26-1 (the "2025 Agreement"). But that claim only makes things worse. First, it appears to be false,

Page 1 -    **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

as all signs point toward HLF having executed the 2025 Agreement on Plaintiff's behalf. But even if Wilson signed, the 2024 Agreement governed this matter for the year before it was filed and continues to govern Wilson's hundreds of other matters. And it continues to operate in tandem with the 2025 Agreement: the 2025 Agreement caps Wilson's recovery and says his lawyers "own" every surplus dollar, and the 2024 Agreement continues to prevent termination and exert portfolio-wide economic pressure regardless of whether its fee terms apply to this case. So whichever agreement "governs" this case, the lawyers control this litigation.

It's no wonder his lawyers have filed nearly 100 class actions and threatened hundreds more in his name but never sought a contested certification. If Wilson's lawyers generate a $100,000 individual settlement over one text, Wilson gets $500 and counsel gets $99,500. That's a 99.5% contingency. It's hard to see how Plaintiff can call that "ordinary Rule 23 economics" with a straight face. The evidence Freeway has been able to gather even without discovery, some of which is described below, shows it's anything but.

That's why Plaintiff's counsel asked to dismiss the case, imposed a unilateral stay in the meantime, and told the D.C. District Court that the forthcoming dismissal would render Freeway's subpoena "automatically void." His counsel also dismissed almost all the other cases they have against defendants represented by the undersigned, including several with prejudice, forever extinguishing their clients' supposedly legitimate claims. The court in *Fox v. Ritz-Carlton Hotel Co.* treated far less as evidence of strategic abandonment fatal to adequacy. 345 F.R.D. 358, 366–67 (S.D. Fla. 2024). There, counsel voluntarily dismissed without prejudice three "copy-cat" class actions one business day after moving for certification in the case at bar. The court rejected counsel's vague assurance that undisclosed reasons explained the dismissals and concluded that

Page 2 -   **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

WATSTEIN TEREPKA LLP
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

the timing showed counsel was protecting its own interests rather than those of the abandoned classes and, therefore, was inadequate to serve as class counsel. *Id.*

If dismissal without prejudice in just a few cases rendered counsel in *Fox* inadequate, the conduct here—attempting to dismiss the very case generating scrutiny to obfuscate the revelation of counsel's misconduct while simultaneously abandoning every other case paired up with the same defense counsel—is leagues worse. Counsel have shown that they will do anything to bury the evidence of a scheme that has made them millions in better-than-the-statute individual settlements. This Court shouldn't let that happen. It should condition dismissal on completion of Freeway's discovery and resolution of its motion to deny certification.

## II. ARGUMENT

### A. Plaintiff's Own Argument and Evidence Establish That the Blanket Power of Attorney is Improper

Freeway's certification motion established that HLF and a handful of referral counsel abuse the class-action model to extract *in terrorem* individual settlements. ECF No. 19 at 20–24. Even the minimal discovery Freeway obtained showed the tool: a fee agreement conferring blanket power of attorney to "execute all claims, contracts, settlements, checks, drafts, compromises, covenants, releases, verifications, dismissals and deposits, in every respect, as though Client were personally doing so." *See* 2024 Agreement ¶ 7.

Plaintiff's central answer? That a settlement negotiated and executed under a power-of-attorney clause "is not improper." ECF No. 26 at 3 (citing *First Fed. Sav. & Loan Ass'n of Walla Walla v. C.P.R. Constr., Inc.*, 689 P.2d 981, 984–85 (Or. Ct. App. 1984)). But *C.P.R. Construction* concerned only whether such a clause gave attorneys actual authority to bind a client to a settlement. *Id.* at 984. No class representative was involved, and no one challenged the clause's ethics. *C.P.R. Construction* is thus irrelevant.

Page 3 -    **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

There's a reason that's all Plaintiff has: the decision to settle belongs to the client, not the attorney. *Johnson v. Tesky*, 643 P.2d 1344, 1347 (Or. Ct. App. 1982); *McNabb v. GlaxoSmithKline*, 2006 WL 8459346, at *3 (D. Or. June 20, 2006). An advance transfer of that decision turns litigation into something pursued by the attorneys, for the attorneys.

*Slevin* held exactly that: an agreement giving counsel "advanced blanket authority to litigate and, most importantly, settle claims without consulting [the] plaintiff . . . violates the Oregon Rules of Professional Conduct," including Rules 1.2(a) and 1.4. 2026 WL 892186, at *12. And counsel's failure to communicate or investigate led the court to conclude she brought "a contrived lawsuit that was designed . . . to extract an attorney fee settlement from defendant, all to [her] benefit." *Id.* at *15.

The endgame confirmed it: with a plaintiff-requested property inspection days away, counsel abruptly settled for $1,000 in fees—a fraction of her prior demand—without even consulting her client. *Id.* at *16. This happened right after the defendant served discovery calling the suit's basis into question. *Id.* The court found her bad faith "permeated the entire case from the beginning," sanctioned her under its inherent authority, and awarded the defendant its fees. *Id.* at *18–19.

The parallels are striking, but the 2024 Agreement and other facts here are far worse, and this is a class action, where the client is required to exercise judgment as a check on class counsel. *Slevin* condemned counsel's use of a blanket agreement to control and settle a contrived lawsuit for counsel's own benefit. This case is the *Slevin* scheme, but industrialized: nearly 100 class actions and hundreds of pre-suit class demand letters threatening more class actions—under a power of attorney broad enough to let HLF settle, release, and dismiss "as though Client were

Page 4 -    **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

WATSTEIN TEREPKA LLP
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

personally doing so." 2024 Agreement ¶ 7. And that's just Wilson's claims, with a litany of other serial litigants being used by the same lawyers the same way.

But the 2024 Agreement goes further still, with one-sided terms absent from *Slevin*. HLF holds sole discretion whether to pursue any claim at all, plus unilateral authority to accept "any settlement it deems practical and reasonable" without consulting him. 2024 Agreement ¶¶ 2, 8. And Wilson can't walk away either: if he terminates, Wilson must reimburse HLF for its expenses on all outstanding claims. *Id.* ¶ 9. Even if Wilson could afford that, HLF would have 30 days after termination to resolve any claim in negotiation on its own terms. *Id.* It's hard to imagine a more improper engagement agreement, and that would be true even if it didn't apply to class actions, as this one does.

### B.    The Record Suggests Wilson Never Executed the "Operative" Agreement—a Question Only Discovery Can Answer

Nor does the 2025 Agreement rescue the propriety of the engagement. He says it does because the 2025 Agreement is the "operative" one and contains no power of attorney. ECF No. 26 at 4. But the 2024 Agreement provides that a co-counsel agreement "shall superseed [*sic*] this agreement for the specific claim" for which it was drafted if "executed by Client." 2024 Agreement ¶ 3 (emphasis added). The record suggests that never happened.

Wilson lives in Oregon, and HLF is in D.C. So if Wilson signed the 2025 Agreement and the nearly 100 other co-counsel agreements for his other filed cases, he must have done so electronically. That's what he did for the 2024 Agreement, which has a SignNow audit trail. *Id.* The 2025 Agreement, on the other hand, has none. It was DocuSigned, but only by litigation counsel (Perrong and Paronich). Wilson's "CMW" mark and HLF's signature are unverified handwritten-style images, with no code, timestamp, or indication of who placed them there. Even litigation counsel's DocuSign audit trail is omitted. *See generally* 2025 Agreement.

Page 5 -    **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

The natural explanation? HLF signed for Wilson under the power of attorney it insists doesn't apply here, and then sent it to Perrong and Paronich by DocuSign. That would also explain why, after supposedly executing dozens of these agreements—all about class certification—he still didn't know what class certification is. Wilson Dep. (ECF No. 19-1, Ex. B) at 61:8–15.

Freeway asked HLF whether this is what happened, offering to pause its subpoena for an answer to that one question. Third Watstein Decl. (ECF No. 33), Ex. 4. Rather than answer one yes-or-no question, HLF hired a former U.S. Solicitor General and a team of white-collar defense lawyers to file an emergency motion to quash. *Id*. Wilson's declarations are also artfully worded to avoid answering who signed the 2025 Agreement. Wilson Decl. (ECF No. 29) ¶ 31.

The stakes of the answer to that question are not academic. The 2025 Agreement recites that its fee "is negotiable between us and you" and that Wilson signed it as his "free act and deed." 2025 Agreement ¶ 8, at 3. The Agreement also purports to ground the class-representative duties that Wilson swears he knows and accepts because he "agreed to" them "in writing." Wilson Decl. ¶¶ 31–32. If HLF signed, these recitals are fiction, and a fee agreement was filed with this Court to give a contrary impression.

### C. Regardless of Who Signed What, the Agreements Work in Tandem to Give Counsel Complete Control—and Pay Them Most to Settle Individually

Even if Wilson signed the 2025 Agreement, that changes nothing. The 2024 Agreement admittedly governed this claim for the better part of a year, and it continues to govern potentially hundreds of other claims and thus to strongly influence this case. That's because the 2024 Agreement imposes a penalty for termination that Wilson likely could not afford and permits HLF to resolve any pending matters on its way out the door on any terms it sees fit. *See supra* Section II.A. A client who could suffer devastating portfolio-wide financial consequences for firing (or even upsetting) class counsel cannot legitimately police them in any matter.

Page 6 -   **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

The 2025 Agreement supplies the corresponding financial incentive. HLF and its referral counsel file every claim, no matter how individualized and incapable of class resolution, as a class action. They then cap the client's recovery at his "statutory damages," use the *in terrorem* leverage of Rule 23 to obtain payment of many multiples of that despite no statutory mechanism, and then take all that for themselves. The 2025 Agreement's cap is what makes this possible. 2025 Agreement ¶¶ 7–8. Because every settlement dollar above it belongs to counsel by contract, once an offer covers a client's fixed number, the client is indifferent. Every decision thereafter—like every decision under the 2024 Agreement's power of attorney—is the lawyers setting their own compensation.

That has already played out in this case: Before discovery opened, Freeway offered to resolve this case for "5 times Mr. Wilson's recovery on his best day in court." ECF No. 26 at 8 n.2. Presumably unsatisfied with the number, which was below their typical demands, counsel never responded. But months later, the same counsel moved to dismiss Wilson's case with prejudice, leaving him nothing. No client chooses nothing over five times his maximum recovery. This proves the obvious: Wilson didn't make that choice. His counsel did. They rejected Freeway's offer because it wasn't enough fees, and when Freeway threatened counsel's enterprise, counsel jettisoned Wilson's claim to protect its own economic interests. Wilson couldn't protect even his own claim from his lawyers, much less the interests of absent class members.

That arrangement defeats the TCPA's design. The statute has no fee-shifting provision because it was built for consumers, not lawyers: Congress set damages at $500 to $1,500 per violation—a lot of money for a single telephone call. It did that so an ordinary person could vindicate the claim himself in small claims court and keep all the money, or hire a lawyer who would keep part of it. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 384–85 (2012). This

Page 7 -   **DEFENDANT'S SURREPLY IN**
           **FURTHER OPPOSITION TO**
           **PLAINTIFF'S MOTION TO DISMISS**

WATSTEIN TEREPKA LLP
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

creates the right incentives: lawyers who want to earn outsized recoveries must bring genuine, well-researched class claims, press them through certification, and earn a court-awarded common-fund fee with a multiplier on their lodestar that offsets cases that fail.

Under statutes where Congress shifted fees (e.g., the FDCPA and FCRA), the parties can negotiate fees based on time incurred, or a prevailing plaintiff can ask the court to determine a reasonable fee. The HLF model does neither. There is no fee petition, no lodestar, no court ruling on reasonableness—only a number counsel names above Wilson's cap, backed by the threat of continued class litigation, reviewable by no one. Plaintiff's counsel has thus engineered a way to collect more in attorney's fees under a statute where Congress chose not to award them than under statutes that do shift fees, using the contingent fee agreements as the tool.

And look where that unreviewable fee goes. Plaintiff assures the Court that the 2025 Agreement "allocates any fee among the appearing firms in the ordinary way." ECF No. 26 at 4. That is not true. It routes 60% of any fee to Paronich Law—which has never appeared in this case—and 30% to HLF, which Plaintiff insists has no role here. 2025 Agreement ¶ 5. Ninety percent of every fee dollar flows to lawyers not even appearing before this Court. There is nothing "ordinary" about any of this.

*Hill v. Kaiser Foundation Health Plan* supports Freeway, not Plaintiff. ECF No. 26 at 8. That was a non-class case where the court scrutinized an arm's-length settlement of fees under the fee-shifting statute governing the claims. 2015 WL 5138561, at *11 (N.D. Cal. Sept. 1, 2015), *aff'd sub nom. Berne v. Kaiser Found. Health Plan, Inc.*, 719 F. App'x 651 (9th Cir. 2018). *Hill* thus reflects the legitimate model: fees grounded in the statute, negotiated alongside the merits, and reviewed by a court. The HLF model involves none of that—no fee-shifting entitlement, an allocation between client and counsel fixed by contract before any negotiation began, and no court

Page 8 -   **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

that will ever pass on it. And that imbalance is not unique to this case. HLF holds the same unilateral settlement authority over every other claim Wilson has pending with the firm, all under an agreement he can't afford to terminate.

In sum: regardless of who signed what and when, the 2024 and 2025 Agreements act in tandem to strip Plaintiff of his independent judgment and any reason to exercise it. They are improper and unethical. What remains unclear is whether Wilson signed the 2025 Agreement, whether it took effect, how many claims are subject to the 2024 Agreement, and so on. Those are exactly what the discovery Plaintiff is trying so hard to avoid would answer.

### D. Plaintiff's Characterization of His Settlement Mill as "Ordinary Rule 23 Economics" Itself Warrants Follow-Up Discovery

Plaintiff also recasts Freeway's showing as an attack on Rule 23 itself: individual settlement is routine, he says, and Freeway's theory would "indict every putative class action ever filed." ECF No. 26 at 2. He offers a laundry list of reasons a case might settle individually— "offshore calling records, litigation risk, and the availability of remedial relief." *Id.* at 2, 5.

Of course, well-vetted class actions sometimes settle individually. But that ignores what Freeway actually objects to: a documented pattern with hundreds of data points where an undisclosed firm recruits serial litigants with one-off fact patterns not amenable to class treatment by definition, contracts for a share of every recovery in perpetuity, monetizes claims individually by slapping a "class" label on them for maximum individual settlement leverage, and abandons them once *in terrorem* pressure extracts a premium individual settlement for the lawyers.

Plaintiff doesn't contend these abstract "explanations" apply to any of his own cases. And certainly none of the listed reasons explains abandoning this case. He moved to dismiss to avoid scrutiny after Freeway documented the scheme. Numerous other facts eviscerate the legitimacy of these "explanations" too:

Page 9 -    **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

- **The explanations presuppose information counsel often never had.** "Offshore calling records" and the like are things discovery reveals—yet numerous Wilson cases settled almost immediately after filing, before discovery could reveal anything. Third Watstein Decl. ¶¶ 5–6 & Ex. 1. HLF's newest practice skips litigation and discovery entirely: since Freeway filed its motion to deny certification in this case, HLF and its co-counsel have sent targets draft class complaints demanding six-figure settlements—with no discovery, no investigation, and on claims with clear opt-in consent records. *Id.* ¶ 11. This underhanded, extortionate practice alone shows counsel's explanations for why their cases settle individually are a farce.

- **Counsel's behavior varies with who is watching.** Since Freeway filed its motion, HLF has abandoned every demand letter aimed at other clients of Freeway's counsel. Third Watstein Decl. ¶ 9. HLF and its co-counsel here have also dismissed out of nowhere numerous cases against defendants represented by Freeway's counsel, some with prejudice, forever extinguishing their clients' claims. *Id.* ¶¶ 9–10. Yet they continue to prosecute materially identical claims against defendants represented by other firms. *Id.* ¶ 11. Offshore records don't vary by defense counsel, of course. But fear of scrutiny does.

- **Counsel papers their exits like lawyers who know what they are doing is wrong.** Based on information Freeway has been able to obtain without discovery, every time Wilson settles, he must release his own lawyers from all claims relating to the case. Third Watstein Decl. ¶ 13. Attorneys practicing "ordinary Rule 23 economics" don't require a release from their own client at every settlement. One outstanding question is whether Wilson signs those releases, or whether HLF does under its power of attorney. The discovery Freeway has served but Plaintiff and HLF have refused to respond to should answer that.

- **Even the one purported exception proves the point.** In *Wilson v. PacifiCorp*, No. 6:24-cv-01956 (D. Or.), the parties seek this Court's approval of an $850,000 claims-made settlement of a prerecorded-voice "reassigned number" class that could not be certified if contested—brought by a plaintiff who is apparently not even a reassigned-number call recipient. Third Watstein Decl., Ex. 10. Half the fund is consumed by fees, administrative costs, and Wilson's "incentive award," which is dozens of times higher than the projected class members' recoveries. Why would a defendant pay for that? Because, in return, PacifiCorp obtains a release reaching back five years of all TCPA and related state law claims for all calls and text messages, not just pre-recorded reassigned-number TCPA claims asserted in the case. The settlement also uses a notice program built to keep claims low and directs any uncashed remainder to a charity that pays consumers' past-due power bills. The residual value, in other words, goes back to PacifiCorp.

Wilson's own declaration confirms the problem. He swears the cap is a feature: "[b]ecause my retainer agreement caps my own recovery at my statutory damages, I have no financial or any other interest in any outcome that would favor me at the expense of the class." Wilson Decl. ¶ 33.

That has *Roper* backwards. *Roper* allowed named plaintiffs to challenge the denial of certification

Page 10 - **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

after they rejected the defendant's attempt to buy off their individual claims, warning that allowing named plaintiffs to be "picked off" would frustrate Rule 23 and waste resources through successive suits. *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 329–30, 332–33, 339–40 (1980). It also recognized the potential for abuse where class members receive "nominal and symbolic" benefits while others become the "chief beneficiaries." *Id.* at 339. Wilson's model presents both concerns: counsel uses class allegations to obtain premium individual settlements, abandons the class before certification, and takes every dollar above Wilson's capped recovery. Across nearly 100 "class actions," he has never once litigated a contested certification motion. The cap therefore doesn't demonstrate that Wilson or his attorneys care about the class; it guarantees repeated individual settlements—the wasteful outcome *Roper* warned against—while making counsel the chief beneficiary.

At bottom, neither this case nor the typical HLF-originated TCPA class action involves "ordinary class-action economics." The concern—in *Slevin* and here—is not that attorneys earn contingent fees. It's that counsel combines control with a fee structure that rewards holding out until counsel's number is met. 2026 WL 892186, at *12, *15, *18; *see also Wuest v. My Pillow, Inc.*, 2019 WL 3577176, at *3–4 (N.D. Cal. Aug. 6, 2019) ("Plaintiff has abused the class action device whereby the defendants might well be willing to pay the named plaintiffs a premium for the elimination of the class") (citation omitted). And HLF went even further: it baked the class-action leverage into the fee contract itself, guaranteeing that *every dollar above Wilson's statutory cap belongs to counsel*.

### E.    Plaintiff Mischaracterizes Freeway's Argument and the Ancillary Subpoena Proceedings

The rest of the reply rests on new exhibits offered as though they resolve the matter. None does. Each is untested, and each deepens the questions Freeway's discovery would answer.

Page 11 -  **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

Plaintiff first points to a chronology: the lead form was created June 4, 2024, months before he contacted HLF on October 3, 2024—so, he says, the claim can't be "manufactured." But Freeway has never contended every claim begins as a fabrication. It has said the opposite from the start: HLF advertises for clients with legitimate claims and manufactures others to further monetize clients it holds perpetual rights over. ECF No. 23 at 19–20. The concern is what HLF's network does with a claim once it has one: how a matter that starts legitimately gets worked, inflated, and cashed out for the lawyers. *See Slevin*, 2026 WL 892186, at *11–15.

Plaintiff's counsel here also served as counsel in the numerous cases Freeway cited as evidence of fraud and manufactured claims. Despite that, they don't even try to rebut that those cases exemplified the exact litigation fraud pattern Freeway described as originating from the HLF model.

Plaintiff's reply also misstates the record. It says Freeway "admits" the lead is "fabricated" and asks why Freeway hasn't sued the vendor. ECF No. 26 at 13. Freeway admitted no such thing. It said the form was submitted under the name of a woman a former FBI agent couldn't locate, and the unanswered question is *who* submitted it—Wilson? Someone else with a financial interest? Dorianne Plageman? ECF No. 23 at 20; ECF No. 19 at 17–18. The "sue the vendor" rhetoric works only if the vendor fabricated the lead, and nothing supports that. That's why Plaintiff moved to dismiss with prejudice after Freeway outed the pattern. First Watstein Decl. (ECF No. 19-1) ¶¶ 46–51; *see also* Second Watstein Decl. (ECF No. 23-1) ¶¶ 10–11. Plaintiff's "shifting theories" narrative thus rests on positions Freeway never took. And Plaintiff's own actions belie it.

Plaintiff also leans on two D.C. filings. Neither helps him. The first—HLF's motion to quash, with its supporting declarations, offered to show HLF doesn't settle without authorization— is HLF's untested say-so, made in a proceeding designed to shield it from cross-examination. And

HLF's untested testimony is contradicted by the documentary record that HLF seeks to shield from further discovery. The second, a stay order cast as vindication, is nothing of the kind: HLF sprang an "emergency" motion on the eve of Freeway's lead counsel's trial, and the court entered a temporary stay before any response was filed so the motion could be briefed. A stay preserving the status quo decides nothing.

The D.C. filings expose the consequences of Plaintiff's requested timing. HLF tells that court that the hoped-for dismissal will render the subpoena "automatically void." *In re Heidarpour*, ECF No. 26-2 at 23 (citing *In re Apollo Grp., Inc.*, 329 F. App'x 283, 284 (D.C. Cir. 2009)). His certification opposition tells this Court the same: dismissal "would moot certification and all discovery bearing on it." ECF No. 28 at 32. The prejudice to Freeway is not delay. It is total loss of the discovery.

*Slevin* is again instructive: the court there refused counsel's self-serving account at face value, finding that counsel's post-hoc explanations "ring hollow." 2026 WL 892186, at *17. HLF's say-so and a placeholder stay don't close the record. They confirm it must be developed.

**F.      Plaintiff's New Rule 41(a)(2) Authorities Do Not Bar the Terms Freeway Seeks**

Plaintiff closes with two new points: that *Heckethorn v. Sunan Corp.* forbids fee awards under Rule 41, and that Freeway can't call the adequacy record "more-than sufficiently developed" while seeking more discovery. ECF No. 26 at 12, 15 & n.3. Both fail. *Heckethorn* holds only that Rule 41(a)(2) is not an *independent basis* for sanctions. 992 F.2d 240, 242 (9th Cir. 1993). Freeway seeks no fees under Rule 41. It asks the Court to condition dismissal on completing served discovery—a term courts often impose where a plaintiff dismisses to avoid revelatory discovery. Fed. R. Civ. P. 41(a)(2); *see also In re Wellbutrin XL*, 268 F.R.D. 539, 544 (E.D. Pa. 2010); *Eaddy v. Little*, 234 F. Supp. 377, 380 (E.D.S.C. 1964). And sanctions remain independently available

Page 13 -  **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

under the Court's inherent authority, 28 U.S.C. § 1927, Rule 11, and so on, regardless of dismissal. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395–98 (1990); *Slevin*, 2026 WL 892186, at \*19.

Nor is there tension between Freeway's certification motion and its discovery. The existing record suffices to deny certification, and it has only gotten stronger since Freeway filed: the class-litigation-as-extortion history, the violent threats followed by dishonesty in trying to deny them, and the agreements creating a conflict with the class establish inadequacy without more. The served discovery asks how far the misconduct extends, just how much the Court's processes have been abused, and what dismissal terms are "proper" under Rule 41(a)(2). All the while, Plaintiff *opposes* a finding of inadequacy. He cannot oppose that finding while refusing the very discovery that would further establish it.

III.    CONCLUSION

Plaintiff's reply confirms serious misconduct. Freeway cannot yet measure how far it extends—and dismissal would not end the Court's authority over abuse of its process anyway. The Court should deny the stay, grant Freeway's motion to extend discovery, resolve the certification motion, and condition any dismissal on completion of the served discovery, so sanctions can be considered on a full record.

Dated: July 20, 2026

/s/ Ryan D. Watstein
Ryan D. Watstein (*Pro Hac Vice*)
ryan@wtlaw.com
James M. Ruley (*Pro Hac Vice*)
jruley@wtlaw.com
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

Timothy J. Fransen, OSB No. 073938
tfransen@cosgravelaw.com
**COSGRAVE VERGEER KESTER LLP**
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: (503) 323-9000
Facsimile: (503) 323-9019

*Attorneys for Defendant Freeway Insurance Services of America, LLC*

Page 15 -  **DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS**

**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695